# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION – TOLEDO

| | | |
|---|---|---|
| **OTTAWA TRIBE OF OKLAHOMA** | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | **CASE NO. 3 05cv7272** |
| | : | |
| **SAMUEL SPECK, DIRECTOR** | : | **JUDGE DAVID A. KATZ** |
| OHIO DEPARTMENT OF | : | |
| NATURAL RESOURCES | : | |
| | : | |
| Defendant | : | |

## PLAINTIFF OTTAWA TRIBE OF OKLAHOMA'S RESPONSE IN OPPOSITION TO DEFENDANT SAMUEL SPECK'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Richard D. Rogovin (0022002)
William M. Harter (0072874)
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, OH 43215
(614) 559-7234 (Phone)
(614) 464-1737 (Fax)
email:  rrogovin@fbtlaw.com
email:  wharter@fbtlaw.com
*Attorneys for Plaintiff*

William C. Caughey (0005567)
900 South Boundary
Perry Town Square
Suite 8A
Perrysburg, OH 43551
(419) 872-1688 (Phone)
(419) 872-1795 (Fax)
email:  wcaughey@email.toast.net
*Attorney for Plaintiff*

Daniel T. Spitler (0023291)
131 E. Court Street
Bowling Green, OH 43402
(419) 352-2535 (Phone)
(419) 353-8728 (Fax)
email:  dspitler@shynlaw.com
*Attorney for Plaintiff*

# TABLE OF CONTENTS

ISSUES TO BE DECIDED.................................................................................1

SUMMARY OF THE ARGUMENT..................................................................1

BACKGROUND ............................................................................................2

    I.  The Parties...........................................................................................2

    II. Applicable Treaties .............................................................................3

           A.  Treaty of Greeneville...........................................................3

           B.  Treaty of Fort Industry.........................................................4

           C.  Treaty of 1807 ....................................................................5

           D.  Treaty of 1808 ....................................................................6

    III.  The Controversy ...............................................................................7

ARGUMENT ..................................................................................................7

    I.  The Amended Complaint Squarely Presents a Justiciable Case or
        Controversy about the Existence of Treaty Rights. ....................................7

           A.  This Dispute is Concrete, not Hypothetical or Conjectural. ...................8

           B.  This Dispute is Ripe for Adjudication. ...................................9

    II.  The Eleventh Amendment is No Bar to the Tribe's Action against
        Mr. Speck. ........................................................................................10

    III.  Neither the United States nor the State of Michigan is an Indispensable
        Party................................................................................................14

           A.  The United States is Not a Necessary Party.......................................15

           B.  The State of Michigan is Not a Necessary Party.................................18

           C.  Even if the United States or Michigan Were a Necessary Party
                Neither is Indispensable. ...................................................18

    IV.  The Indian Claims Commission Act and Proceedings Under It Do Not
        Bar the Tribe's Claims. ......................................................................19

A.  Brief Overview of the ICCA. ................................................................ 20

B.  The ICCA's Five-Year Statute of Limitations Applies Only to Claims Against the United States. .................................................. 21

C.  The Present Claims are Not Barred By *Res Judicata* (Claim Preclusion). ......................................................................... 22

D.  The Present Action is not Barred by Collateral Estoppel (Issue Preclusion).......................................................................... 24

E.  An Award by the Commission for Inadequate Compensation of Ceded Lands Does Not Preclude a Subsequent Action in Federal Court to Protect Hunting and Fishing Rights. ................... 27

F.  The Prior Commission Award Does Not Act As A Release................ 29

V.  The Statute of Limitations in 28 U.S.C. § 2415 Is, On Its Face, Inapplicable to This Action. ....................................................... 29

VI. The Tribe Has Hunting and Fishing Rights in the Lands Ceded in Applicable Treaties................................................................... 30

VIII. Laches and Abandonment are Affirmative Defenses That Require Factual Discovery and Cannot Be Decided on a Motion to Dismiss......... 36

A.  Laches ............................................................................... 37

B.  Abandonment .................................................................... 38

CONCLUSION.......................................................................................... 39

CERTIFICATE OF SERVICE ...................................................................... 40

# TABLE OF AUTHORITIES

Cases Cited:

*Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041 (9th Cir. 2000) ......... 12

*Arnett v. Myers*, 281 F.3d 552 (6th Cir. 2002) ....................................................... 112-14

*Barton v. Summers*, 293 F.3d 944 (6th Cir. 2002) ......................................... 12

*Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877 (6th Cir. 1997) .................................... 23

*Blatchford v. Native Village of Noatak & Circle Village*, 501 U.S. 775 (1991) ............... 13

*Brewster v. Barnhart*, 2005 U.S. App. LEXIS 17556 (6th Cir. Aug. 16, 2005) ................ 25

*Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236 (S.D.N.Y. 2000) ................................. 37

*Cayuga Indian Nation of New York v. Cuomo*, 667 F. Supp. 938
   (N.D.N.Y. 1987) .................................................................................... 23-24, 26

*Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2[d] Cir. 2005) ............. 23, 24

*Cheyenne-Arapaho Tribes of Oklahoma v. State of Oklahoma*, 681 F.2d 705
   (10th Cir. 1982) ............................................................................................ 9, 10

*Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir. 1951) ..................... 16

*City of Hamilton v. Harville*, 63 Ohio App. 3d 27 (Ohio Ct. App. 1989) ......................... 39

*Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435
   (6th Cir. 2004) ................................................................................................. 37

*Evans-Marshall v. Board of Education*, 428 F.3d 223 (6th Cir. 2005) .............................. 7

*Ex Parte Young*, 209 U.S. 123 (1908) ................................................................... 10-14

*Flight Sys., Inc. v. Electronic Data Sys.*, 112 F.3d 124 (3[d] Cir. 1997) ........................... 37

*Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan
   Dept' of Natural Resources*, 141 F.3d 635 (6th Cir. 1998) ...................................... 30

*Hamilton v. Myers*, 281 F.3d 520 (6th Cir. 2002) ..................................................... 12-14

*Hans v. Louisiana*, 134 U.S. 1 (1890) ..................................................................... 10

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997) .................................... 11-14

*Karlen v. New York Univ.*, 464 F. Supp. 704 (S.D.N.Y. 1979) .........................................37

*Keweenaw Bay Indian Comm. v. State of Michigan*, 11 F.3d 1341 (6th Cir. 1993) ........15

*Knox Cty. Educ. Ass'n. v. Knox Cty. Bd. Of Educ.*, 158 F.3d 361 (6th Cir. 1998)...........24

*Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809 (8th Cir. 1983) ......................28

*MacDonald v. Village of Northport*, 164 F.3d 964 (6th Cir. 1999) ..................................12

*Mille Lacs Band of Chippewa Indians v. Minnesota*, 853
      F. Supp. 1118 (D. Minn. 1994)..........................................................................23, 25

*Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904 (8th Cir. 1997).........28

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
      526 U.S. 172 (1999) ............................................................2, 30, 32, 34, 35

*Montana v. United States*, 440 U.S. 147 (1979) ............................................................24

*Narragansett Tribe of Indians v. Southern Rhode Island Land Dev. Corp.*,
      418 F. Supp. 798 (D.R.I. 1976) ...............................................................................16

*Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987)...... 17, 20, 21, 22

*Nichols v. Rysavy*, 809 F.2d 1317 (8th Cir. 1987) ..........................................................17

*Northern Insurance Co. of New York v. Olmstead*, 238 F. Supp. 2d 923
      (N.D. Ohio 2003).........................................................................................................8

*Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States*, 722 F.2d
      1407 (8th Cir. 1983)..............................................................................................21, 22

*Osage Nation of Indians v. United States*, 1 Ind. Cl. Comm'n 54 (1948), *rev'd on
      other grounds*, 199 Ct. Cl. 592, 97 F. Supp. 381 ....................................................20

*Paramount Pictures Corp. v. Carol Pub. Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998),
      *aff'd*, 1999 U.S. App. LEXIS 21519 (2[d] Cir. 1999)....................................................39

*Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983).......................16

*Red Lake Band of Chippewas v. City of Baudette*, 730 F. Supp. 972
      (D. Minn. 1990) ..........................................................................................................17

*Seminole Nation v. United States*, 316 U.S. 286 (1942).................................................16

*Sherman v. Standard Rate Data Serv., Inc.*, 709 F. Supp. 1433 (N.D. Ill. 1989) ...........37

*Sherrill v. Oneida Indian Nation of New York*, 125 S. Ct. 1478 (2005) ..........................37

*Sokaogon Chippewa Community v. Wisconsin*, 879 F.2d 300 (7th Cir. 1989)...............22

*State of Minnesota v. Hoeven*, 331 F. Supp. 2d 1074 (D.N.D. 2004) ......................11, 13

*The Oneida Indian Nation of New York v. New York*, 194 F. Supp. 2d
    104 (N.D.N.Y. 2002) ..............................................................................9, 22, 23, 25

*Timpanogos Tribe v. Conway*, 286 F.3d 1195 (10th Cir. 2002) ......................................28

*United States v. Dion*, 476 U.S. 734 (1986)...................................................................28

*United States v. Michigan*, 653 F.2d 277 (6th Cir. 1981) ................................................28

*United States v. Mitchell*, 463 U.S. 206 (1983) ...............................................................16

*United States v. State of Michigan*, 471 F. Supp. 192
    (W.D. Mich. 1979)...............................................................................9, 30, 32, 35, 36

*Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635 (2002).11, 14

*Western Shoshone National Council v. Molini*, 951 F.2d 200 (9th Cir. 1991) ............27-28

Statutes and Rules:

25 U.S.C. § 2 .................................................................................................20-21

25 U.S.C. § 12 ...................................................................................................20

25 U.S.C. § 70 ...................................................................................................20

25 U.S.C. § 177 ..................................................................................................33

28 U.S.C. § 2201 .................................................................................................8

28 U.S.C. § 2415...................................................................................1, 2, 29, 30

Federal Rules of Civil Procedure 19 .................................................................14, 15, 18

## ISSUES TO BE DECIDED

- Must the suit be dismissed as non-justiciable despite the existence of a ripe and concrete dispute between the parties about treaty rights?

- Does the Eleventh Amendment bar this suit for prospective relief against a state officer?

- Are the United States and the State of Michigan indispensable parties when no action of either is challenged and no relief is sought against them?

- Do prior proceedings under the Indian Claims Commission Act bar this lawsuit when those proceedings involved different issues and different parties and could not have involved the defendant here?

- Does the statute of limitations in 28 U.S.C. § 2415, which expressly states that it does not apply to property rights claims, apply to this property rights claim?

- Should the court adopt as a matter of law the defendant's narrow, arguable interpretations of the Indians' treaty rights despite the well-settled rule that treaties must be liberally construed in favor of the Indians?

- Can affirmative defenses – such as laches and abandonment – that are not clearly established by the amended complaint be grounds for dismissal?

## SUMMARY OF ARGUMENT

Despite offering a plethora of arguments, defendant Samuel Speck has not offered a single basis on which the Ottawa Tribe of Oklahoma's claim should be dismissed in whole or in part. Several of Mr. Speck's arguments are inappropriate for consideration on a motion to dismiss, where the facts must be construed in the light most favorable to the Tribe and where dismissal is permitted only if the Tribe could

1

prove no sets of facts entitling it to relief.  Others of his arguments are simply wrong as a matter of law.  His motion to dismiss should be denied for these reasons, each of which is explained in more detail below:

- The Tribe's claim reflects an actual controversy about the existence and scope of its hunting and fishing rights in well-defined areas.  As the existence of those rights is disputed by the State of Ohio and Mr. Speck, the controversy is both concrete and ripe, and it is appropriate for declaratory relief.

- This suit does not implicate a "special sovereignty interest" and is not the functional equivalent of a quiet title action.  The Eleventh Amendment therefore does not bar the Tribe's claim.

- This action neither challenges any action of nor seeks any relief from the United States or the State of Michigan.  They are not, therefore, necessary parties, let alone indispensable ones.

- The Tribe's claim against Mr. Speck was not, and could not have been, brought under the Indian Claims Commission Act.  As a result, prior proceedings before the Indian Claims Commission do not bar any aspect of the Tribe's current claim.

- The statute of limitations in 28 U.S.C. § 2415 is inapplicable on its face to the kind of property rights claims brought here.

- The treaties at issue, liberally construed in favor of the Tribe, *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999), indicate that the Ottawas retain hunting and fishing rights in the lands ceded in those treaties.

- Mr. Speck's affirmative defenses – laches and abandonment – are not clearly established by the amended complaint, so they cannot be considered on a motion to dismiss.

## BACKGROUND

### I.    The Parties.

Plaintiff Ottawa Tribe of Oklahoma (referred to throughout this memorandum as the "Ottawas" or "Tribe") is a federally recognized Indian tribe.  Amended Complaint ¶ 1. The Tribe is the successor in interest to the Ottawas whose representatives signed the various treaties on which this lawsuit is based.  *Id.* at ¶ 28.  It includes descendants of

the Ottawas who were removed from Ohio to Kansas, and who thereafter migrated from Kansas to Oklahoma. *Id.* at ¶ 27. Defendant Samuel Speck is Director of the Ohio Department of Natural Resources, a department of the State of Ohio that claims authority under Ohio statutes to regulate all fishing and hunting within the state. *Id.* at ¶ 2.

## II. Applicable Treaties.

### A. Treaty of Greeneville

On August 3, 1795, the Ottawas and other tribes entered a treaty with the United States at Greeneville, Ohio. 7 Stat. 49. In this treaty, the Indians and the United States agreed upon a general boundary line between the Indians' lands and the United States' territories that ran generally southward from present day Cleveland to a point between Canton and New Philadelphia, and the generally westward across present-day Ohio. The Indian reserved the land to the north and west of this boundary. The lands and waters at issue in this case are all to the north and west of this boundary, and therefore were within the territory reserved to the Indians in the Treaty of Greeneville. *See infra* pages 4-6.

The Treaty of Greeneville explicitly reserved hunting and other usufructuary rights for the Indians in the lands retained by them:

> To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared that the meaning of that relinquishment is this: The Indian tribes will have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States . . . .

Treaty of Greeneville, Art. V.  The treaty also stated that "when [the Ottawas and other tribes], or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States . . . ."  *Id.*

### B.    Treaty of Fort Industry.

On July 4, 1805, two treaties were signed by the United States and several Indian tribes at Fort Industry near  present-day Toledo, Ohio.  These treaties, which became known, together as the "Treaty of Fort Industry", 76 Stat. 87, were ratified by the United States Senate.  Amended Complaint at ¶ 8.

Under one of these treaties, the Indian tribes ceded that part of Ohio subsequently known as "Royce Area 53" to the United States and certain Connecticut land companies.  The boundaries of the area ceded by this treaty were:

(a)    On the north, the border between the United States and Canada, established under the Treaty of Paris (1783);

(b)    On the east, the boundary established under the Treaty of Greeneville (1795) (7 Stat. 49);

(c)    On the south, the 41st degree of north latitude; and

(d)    on the west, a north-south line 120 miles due west of the Ohio-Pennsylvania state line.

*Id.* at ¶ 9.

Under the other treaty, the Indian tribes ceded that part of Ohio subsequently known as "Royce Area 54" to the United States.  The boundaries of the area ceded by this treaty  were:

(a)    On the north, the 41st degree of north latitude;

(b)    On the east, the boundary established under the Treaty of Greeneville;

(c)    On the south, the boundary established under the Treaty of Greeneville; and

(d)    on the west, a north-south line 120 miles due west of the Ohio-Pennsylvania state line.

*Id.* at ¶ 10.  The Second Treaty of Fort Industry, in Article 6 thereof, further provided that the "said Indian nations, parties to this treaty, shall be at liberty to fish and hunt within the territory and lands which they have now ceded to the United States, so long as they shall demean themselves peaceably." *Id.* at ¶ 12.

## C.    Treaty of 1807.

On November 17, 1807 another treaty was signed by the United States and several Indian tribes at Detroit, and later ratified by the United States Senate.  7 Stat. 105; Amended Complaint at ¶ 13.  Under this treaty, the Indian tribes ceded another part of Ohio and other territories, the boundaries of which were described as follows:

> Beginning at the mouth of the Miami river of the Lakes, and running thence up the middle thereof, to the mouth of the great Aug Glaize river, thence running due north until it intersects a parallel of latitude, to be drawn from the outlet of Lake Huron, which forms the river Sinclair; thence running north east the course, that may be found, will lead in a direct line to White Rock, in Lake Huron, thence due east, until it intersects the boundary line between the United States and Upper Canada, in said Lake, thence southwardly, following the said boundary line, down said lake through river Sinclair, Lake St. Clair, and the river Detroit, into Lake Erie, to a point due east of the aforesaid Miami river, thence west to the place of beginning.

The Treaty of 1807, in Article 5 thereof, further provided that "[i]t is further agreed and stipulated, that the said Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded as aforesaid, as long as they remain the property of the United States." *Id.* at ¶ 15.

### D.    Treaty of 1808.

Subsequently, at Brownstone, in the Territory of Michigan, on November 25, 1808, another treaty was signed by the United States and several Indian tribes.  This treaty was also duly ratified by the United States Senate.   7 Stat. 112; Amended Complaint at ¶ 16.   Under this treaty, the Indian tribes ceded another part of Ohio and other territories, the boundaries of which were described as follows:

> [A] tract of land for a road, of one hundred and twenty feet in width, from the foot of the rapids of the river Miami of Lake Erie, to the western line of the Connecticut reserve, and all the land within one  mile of the said road, *on each side thereof,* for the purpose of establishing settlements along the same; also a tract of land, for a *road only,* of one hundred and twenty feet in width, to run southwardly from what is called Lower Sandusky, to the boundary line established by the treaty of Greeneville, with the privilege of taking at all times, such timber and other materials from adjacent lands as may be necessary for making and keeping in repair the said road, with the bridges that may be required along the same.

*Id.* at ¶ 17.  The Treaty of 1808, in Article 4 thereof, further provided that "[i]t is agreed that the said Indian nations shall retain the privilege of hunting and fishing on the lands given and ceded as above, so long as the same shall remain the property of the United States."  *Id.* at ¶ 18.

The Treaty of 1808, in Article 1 thereof, specifically made reference to the Treaty of 1807, the Treaty of Greeneville, and the Treaty of Fort Industry.  Thereafter, in Article 5, the Treaty of 1808 further provided:

> The several nations of Indians aforesaid, do again acknowledge themselves to be under the protection of the United States, and of no other sovereign; and the United States on their part do renew their covenant, to extend protection to them according to the intent and meaning of stipulations in former treaties.

*Id.* at ¶ 19.

III.    **The Controversy**

In 2005, the Tribe informed the State of Ohio of the Ottawas' intention to exercise the hunting and fishing privileges conferred by these treaties.  *Id.* at ¶¶ 32-33, 35.  The State responded by issuing a press release to the effect that the Tribe's predecessors had relinquished their hunting and fishing privileges in Ohio.  *Id.* at ¶  34 and Exh. A.

**ARGUMENT**

Courts are reluctant to dismiss colorable claims without the benefit of discovery. *Evans-Marshall v. Board of Education*, 428 F.3d 223, 228 (6th Cir. 2005).  In reviewing a motion to dismiss for failure to state a claim on which relief can be granted, the Court should accept all of the amended complaint's factual allegations as true.  *Id.*  It should construe all such allegations in the light most favorable to the plaintiff and grant the plaintiff the benefit of every reasonable inference.  *Id.*  A motion to dismiss should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief.  *Id.*

I.      **The Amended Complaint Squarely Presents a Justiciable Case or Controversy about the Existence of Treaty Rights.**

The crux of the Tribe's amended complaint is that it retains certain hunting and fishing rights under various Nineteenth Century treaties, and it seeks a declaration to that effect.  The State of Ohio – as evidenced by Attorney General Jim Petro's press release (*see* Amended Complaint Exh. A) and Mr. Speck's motion to dismiss – denies that such rights still exist.  Despite this concrete dispute – with one party asserting its property rights under specific documents and the other party denying that those rights exist – Mr. Speck argues that no justiciable controversy exists.  He is incorrect.

7

The Declaratory Judgment Act requires only that there be an "actual controversy" between the parties: "[i]n a case of actual controversy within its jurisdiction...any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  Declaratory judgments are proper:

> (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

*Northern Insurance Co. of New York v. Olmstead*, 238 F. Supp. 2d 923, 926 (N.D. Ohio 2003).  Under these standards, this dispute is appropriate for declaratory relief.

### A.      This Dispute is Concrete, not Hypothetical or Conjectural.

Mr. Speck's argument that this case is not justiciable flows from two incorrect premises.  First, he argues that the amended complaint fails to present a concrete dispute, because how the Tribe would exercise its rights and whether and how the State of Ohio would interfere with those rights is "hypothetical or conjectural."  But that focus misses the point of the amended complaint.  The point is not to speculate about what might happen in the future.  The point is to determine whether rights granted the Tribe by treaties still exist today and, if so, the extent of those rights.  The Tribe claims that these rights still exist, while Mr. Speck argues they do not.   There is nothing hypothetical or conjectural about this dispute: the asserted rights are based on a discrete number of specific treaties, the lands and waters at issue are well-defined by those treaties, and the parties' respective positions about the existence of the rights are clear.  This is a concrete dispute.

Federal courts have routinely employed the declaratory judgment mechanism to adjudicate disputes about the existence or scope of property rights.  In a fishing rights case, the Western District of Michigan found that an actual controversy existed "as to the meaning of the treaties at issue herein and the existence of any tribal right to fish in the Michigan waters of the Great Lakes under those treaties."  *United States v. State of Michigan*, 471 F. Supp. 192, 217-218 (W.D. Mich. 1979), *remanded on other grounds*, 623 F.2d 448 (6th Cir. 1980), *modified in part on other grounds*, 653 F.2d 257 (6th Cir. 1981).  The court further held that "declaratory relief is properly sought . . . ."  *Id.* at 218. In *Oneida Indian Nation of New York v. State of New York*, 194 F. Supp 2d 104, 137 (N.D. N.Y. 2002), the court refused to dismiss a counterclaim seeking a declaratory judgment that land was unlawfully purchased from the Oneida Indians by the State of New York.  The court held there was an actual controversy over the status of the property and that, even though "substantial issues of fact and law remain[ed] to be determined," the counterclaim was ripe.  *Id.* at 138-139.

**B.     This Dispute is Ripe for Adjudication.**

Mr. Speck's second incorrect premise is that this dispute is not ripe.[1]  In making this argument, he relies on inapposite authorities discussing pre-enforcement challenges to statutes and regulations.  He contends that, because the Tribe has not been threatened with prosecution under conservation statutes or regulations, this dispute is not ripe.  But the thrust of this case is not about the threatened enforcement of such laws against the Tribe.  This issue in this case is whether the Tribe retains the

---

[1] There is no small irony in Mr. Speck's alternative arguments that the Tribe's claim is not yet ripe for adjudication but barred by laches because it was brought too late.

hunting and fishing rights conferred by various treaties and, if so, the limits on the modern-day exercise of those rights.

Mr. Speck's reliance on *Cheyenne-Arapaho Tribes of Oklahoma v. State of Oklahoma*, 681 F.2d 705 (10th Cir. 1982), is therefore misplaced.  There Indian tribes sought to enjoin the state from exercising jurisdiction over hunting and fishing on an Indian reservation.  The Tenth Circuit held that because the tribe challenged regulations the State had not yet enforced, there was no actual controversy.  *Id*. at ___.  Here the nature of the dispute is quite different.  The Ottawas are not seeking to enjoin an unenforced regulation pertaining to its hunting and fishing rights; instead, they are seeking a declaration as to the existence and extent of those rights.  The former may not be ripe until enforcement, but the latter is.

Mr. Speck also claims that "the mere existence of a statute or regulation does not necessarily raise a justiciable controversy."  That assertion is true but irrelevant.  The amended complaint does not seek a declaration of a statute's or regulation's invalidity, or an injunction against a statute's or regulation's enforcement.  Instead, it simply seeks a declaration of property rights.  The asserted rights are disputed, so the Tribe's claim is ripe.

## II.     The Eleventh Amendment is No Bar to the Tribe's Action against Mr. Speck.

The Eleventh Amendment to the Constitution has been interpreted to bar suits in federal court against states brought by their own citizens.  *Hans v. Louisiana*, 134 U.S. 1 (1890).  But for nearly one hundred years – since *Ex Parte Young*, 209 U.S. 123 (1908) – it has been settled that a suit against a state official in his official capacity

10

seeking prospective relief is not regarded as one against the state, and therefore is not barred by the Eleventh Amendment.

In *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), the Supreme Court carved out a narrow exception to the *Ex Parte Young* doctrine.  There an Indian tribe brought suit against Idaho state officials to reclaim submerged lands in Lake Coeur d'Alene.  The Court held that *Ex Parte Young* did not apply because the suit was "the *functional equivalent of a quiet title action* which implicates *special sovereignty interests*."  *Id.* at 281 (emphasis added).  The Court regarded the suit as attacking the core of the state's sovereignty because, if the tribe prevailed, "substantially all benefits of ownership and control would shift from the State to the Tribe."  *Id.*

The Supreme Court later confirmed that *Coeur d'Alene* represented a narrow exception to the *Ex Parte Young* doctrine, not a retreat from it.  In *Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635  (2002), the Court reaffirmed *Ex Parte Young*.  It held that, to determine if the suit against a state official avoids a Eleventh Amendment problem, a federal court "need only conduct a straightforward inquiry into whether the complaint alleges on ongoing violation of federal law and seeks relief properly characterized as prospective."  *Id.* at 645.

Thus, after *Coeur d'Alene* and *Verizon*, a suit against a state official is not barred by the Eleventh Amendment if it alleges an ongoing violation of federal law and seeks only prospective relief – unless the suit implicates a "special sovereignty interest."  "Since *Coeur d'Alene*, courts have narrowly defined the types of actions implicating the 'special sovereignty interests' of a state."  *State of Minnesota v. Hoeven*, 331 F. Supp. 2d 1074, 1086 (D.N.D. 2004).  As the Ninth Circuit put it, "[w]e do not read *Coeur*

*d'Alene* to bar all claims that affect state powers, or even important state sovereignty interests." *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1048 (9th Cir. 2000).

The Sixth Circuit has found only two state interests to be crucial enough to qualify as special sovereignty interests. In *MacDonald v. Village of Northport*, 164 F.3d 964 (6th Cir. 1999), the plaintiffs sought to extinguish a public access road to Lake Michigan. Because the plaintiffs sought a declaration that the public access road was the "lawful property of Plaintiffs," the court concluded that the case was the functional equivalent of a quiet title action. The case is therefore a straightforward application of *Coeur d'Alene*, which held that the *Ex Parte Young* doctrine could not be used to quiet title against a state. In *Barton v. Summers*, 293 F.3d 944 (6th Cir. 2002), the plaintiffs' suit sought to force a particular allocation of state revenues. The Sixth Circuit held that the Eleventh Amendment barred the suit, because the allocation of state funds was a special sovereignty interest.

In contrast, the Sixth Circuit has held that the very types of rights at issue here do *not* implicate special sovereignty interests – and that suits asserting these types of rights against state officers are not barred by the Eleventh Amendment. In two companion cases decided in 2002 – ignored by the State in its motion papers – the Sixth Circuit held that the Eleventh Amendment did not bar claims asserting fishing and riparian rights against state officials. *Arnett v. Myers*, 281 F.3d 552, 567 (6th Cir. 2002); *Hamilton v. Myers*, 281 F.3d 520 (6th Cir. 2002). The court held that these claims did "not rise to the level of a functional equivalent of a quiet title action implicating special sovereignty interests," and thus were not barred by *Coeur d'Alene*. *Id*. at 526. "At

12

most," the court found, "if the [plaintiffs] prevail, the State of Tennessee will be required to tailor its regulatory scheme to respect the [plaintiffs'] constitutionally protected riparian rights . . . ." *Id.* at 528; *Arnett*, 281 F.3d at 568 (same). "[T]his court," the Sixth Circuit held, "does not read the ruling of *Coeur d'Alene* to extend to every situation where a state property interest is implicated." *Id.*; *see also Hoeven*, 331 F. Supp. 2d at 1086 (finding that a challenge to state hunting restrictions did not implicate a special sovereignty interest of the state).

Under these precedents, this action is not barred by the Eleventh Amendment. A "straightforward inquiry" reveals that the amended complaint alleges an ongoing violation of federal law – the State of Ohio's refusal to recognize the Tribe's hunting and fishing rights. The amended complaint seeks only prospective relief – a declaration of those hunting and fishing rights. Furthermore, this is not a suit that implicates a "special sovereignty interest" within the meaning of *Coeur d'Alene*. As in *Arnett* and *Hamilton*, if the Tribe prevails, "[a]t most . . . the State . . . will be required to tailor its regulatory scheme to respect" the Tribe's rights. *Hamilton*, 281 F.3d at 528.

In an effort to avoid the binding precedents, the State misstates the law and mischaracterizes the nature of this suit. First, the State's motion papers are rife with inaccurate statements of Eleventh Amendment doctrine. For example, the State seems to suggest that the Supreme Court's decision in *Blatchford v. Native Village of Noatak & Circle Village*, 501 U.S. 775 (1991), held that the Eleventh Amendment bars all tribal claims against states in federal court. In reality, *Blatchford* held only that 28 U.S.C. § 1362, which confers federal question jurisdiction over certain suits by Indian tribes, did not abrogate the states' sovereign immunity. *Blatchford* did *not* purport to alter the *Ex*

*Parte Young* doctrine.   The State also contends that *Ex Parte Young* applies only to ongoing *constitutional* violations.   Not so – as the Supreme Court held in *Verizon Maryland*, all that is required is an allegedly "ongoing violation of federal law . . . ."  535 U.S. at 645.

Second, the State labors mightily to characterize this case as "the functional equivalent of a quiet title action" as in *Coeur d'Alene*, but that characterization simply does not fit.  The State argues that the Tribe seeks to divest the State of all regulatory control over the lands at issue.   That is a bald mischaracterization of the amended complaint, which plainly states that the Tribe's exercise of hunting and fishing rights would be subject to certain, limited types of conservation measures.   Amended Complaint ¶ 31.   The State also contends that, because this action implicates land controlled by the State, it is necessarily barred by *Coeur d'Alene*.   But the Sixth Circuit explicitly rejected that argument in *Arnett* and *Hamilton*: "[T]his court does not read the ruling of *Coeur d'Alene* to extend to every situation where a state property interest is implicated."   *Arnett*, 281 F.3d at 568.   Simply put, this action is not the functional equivalent of a quiet title action.   It is, instead, the type of action that, after *Coeur d'Alene*, courts have held does not implicate special sovereignty interests.   The Eleventh Amendment is no bar.

**III.    Neither the United States nor the State of Michigan is an Indispensable Party.**

The amended complaint does not seek relief against, and would not affect the rights of, either the United States or the State of Michigan.   Neither the United States nor Michigan is therefore a necessary party within the meaning of Fed. R. Civ. P. 19, let alone an indispensable one.

14

Rule 19 dictates that the Court first decide whether either of these parties is a necessary to this action, using these criteria:

> (1) in the person's absence complete relief cannot be accorded among those already parties; (2) the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in that person's absence may (i) as a practical matter impair or impede the parties' ability to protect that interest or (ii) leave the parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a); *Keweenaw Bay Indian Comm. v. State of Michigan*, 11 F.3d 1341, 1345 (6th Cir. 1993).  If a non-party satisfies one of these tests, it should be joined as a party if possible.  Fed. R. Civ. P. 19(a).  If it cannot be joined, then the Court should "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed . . . ."  Fed. R. Civ. P. 19(b).  In making this determination, the Court should consider these factors:

> First, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b); *see also Keweenaw Bay Indian Comm.*, 11 F.3d at 1346.

### A.	The United States is Not a Necessary Party.

The United States is not a necessary party to this action.  First, the Tribe can obtain the relief it seeks without the United States as a party.  *See* Fed. R. Civ. P. 19(a)(1).  The Tribe seeks a declaration of its hunting and fishing rights in areas within the State of Ohio.  Because the Tribe has sued only Mr. Speck, as an officer of the State of Ohio, the Tribe's requested relief is necessarily limited to those areas within the

State's jurisdiction – in other words, the Tribe does not seek relief with respect to any lands owned by the United States.  The participation of the United States is therefore unnecessary.

Second, this action will not impair or impede the ability of the United States to protect any of its interests and will not subject the United States to any inconsistent obligations.  Because no land owned by the United States in encompassed by the Tribe's request for relief, the United States' only "interest" in this lawsuit arises from its trust relationship with the Tribe.  *E.g., United States v. Mitchell*, 463 U.S. 206, 225 (1983); *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942).  This lawsuit does not jeopardize that interest, so the United States is not a necessary party.

In support of his argument that the United States is an indispensable party, Mr. Speck points out that the United States entered the treaties at issue and claims that the United States could "find itself subject to obligations with which it does not agree depending upon this Court's interpretation of its treaties."  Memorandum in Support of Motion to Dismiss at 26.  But Mr. Speck offers no concrete explanation of why this could possibly be true.  After all, no relief is sought against the United States or with respect to any property owned by the United States.

Mr. Speck's position has been rejected by many courts.  *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983) (holding that the United States was not an indispensable party in tribal litigation to establish title to land); *Choctaw and Chickasaw Nations v. Seitz*, 193 F.2d 456 (10th Cir. 1951) (same); *Narragansett Tribe of Indians v. Southern Rhode Island Land Dev. Corp.*, 418 F. Supp. 798 (D.R.I. 1976) (same).  "The courts have generally held that the United States is not an indispensable

16

party when an Indian tribe or individual sues a third party to establish title or recover possession of land." *Red Lake Band of Chippewas v. City of Baudette*, 730 F. Supp. 972, 978 (D. Minn. 1990).  As these cases illustrate, the mere fact that the United States executed a treaty that gives rise to a tribe's property rights claim does not make the United States a necessary or indispensable party.

In those cases where the United States has been found to be an indispensable party, it is because the dispute is ultimately about the legality of actions taken by the United States.  *Red Lake Band of Chippewas*, 730 F. Supp. At 978.  That distinction explains both of the cases Mr. Speck cites as support for his argument.  In *Nichols v. Rysavy*, 809 F.2d 1317 (8th Cir. 1987), the plaintiffs' claim depended on proving that land patents issued by the United States were invalid.  The "result of this suit . . .," the Eighth Circuit held, "would depend entirely on whether the United States acted legally or illegally in granting the fee patents . . . ."  *Id*. at 1333.  Because "the government's liability cannot be tried behind its back," *id*. (quotation and citation omitted), the United States was indispensable in that case.  Similarly, in *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1472 (10th Cir. 1987), the tribe's land claims were, in effect, challenges to a federal executive order reallocating land from the tribe to the United States.  Furthermore, the United States owned a significant portion of the land subject to the Tribe's arguments.  As a result, the court of appeals noted, the "Tribe and the United States are adversaries, each claiming sole title to the same land."  *Id*. at 1473.

In contrast to *Nichols* and *Navajo Tribe*, this case does not present a challenge to any act of the United States.  To the contrary, this action proceeds on the premise that the Tribe's treaties with the United States are valid.  In short, this case seeks no relief

17

against the United States and cannot impair any interest of the United States.   The United States is not a necessary party.

**B.     The State of Michigan is Not a Necessary Party.**

Mr. Speck contends that the State of Michigan is an indispensable party because "most of the land mass ceded in [the Treaty of 1807] is now in the State of Michigan, not Ohio."  Memorandum in Support of Motion to Dismiss at 29.  That may be true, but it does not make Michigan even a necessary party, as the amended complaint seeks no relief against that state.  The amended complaint seeks a declaration that the Tribe is "entitled to exercise its hunting and fishing privileges in all areas *of Ohio* encompassed by" the cited treaties.  Amended Complaint at 9 (emphasis added).   And Mr. Speck's perfunctory argument that the State of Michigan controls waters adjacent to those encompassed by the amended complaint hardly suffices to show that this action will impair that state's interests or subject it to inconsistent obligations.

**C.     Even if the United States or Michigan Were a Necessary Party, Neither is Indispensable.**

Even if Rule 19(a) indicated that the United States or the State of Michigan should be joined as parties defendant (and it does not), sovereign immunity would likely prevent that joinder.  Under Rule 19(b), the next question is whether in equity and good conscience this action should be dismissed.  The answer – even assuming the United States and Michigan should be joined – is that this action should continue without them.

As already explained, the amended complaint seeks no relief against either the United States or Michigan, seeks to impose no burdens on either of them, and would affect the rights and obligations of neither of them.  Relief, if proper, will be awarded only against the defendant, Mr. Speck.   Neither Mr. Speck nor the purportedly

18

necessary, absent parties will be prejudiced by the granting of relief against Mr. Speck. Moreover, relief against Mr. Speck will be adequate, as the Tribe presently is seeking a declaration as to its rights within the State of Ohio.  Finally, dismissal might leave the Tribe without an adequate remedy.  If the United States is an indispensable party, then the Tribe must sue the United States to obtain the relief it seeks.  But it is unlikely the Tribe could do so in either federal or state court because the United States enjoys sovereign immunity, waived only pursuant to certain statutes.  For all of these reasons, this action should not be dismissed even if the United States or Michigan is a necessary party.

**IV.     The Indian Claims Commission Act and Proceedings Under It Do Not Bar the Tribe's Claims.**

Mr. Speck next argues that all of the Tribe's claims are barred under the five year statute of limitations set forth in the since-repealed Indian Claims Commission Act ("ICCA"), and that the present claims are barred on grounds of *res judicata*, collateral estoppel, or release, due to the prior hearings before the now-defunct Indian Claims Commission.  As will be discussed further below, the ICCA, including its statute of limitation provision, applied only to claims against the United States.  It therefore has no applicability here.  With regard to the prior Commission hearings, the parties and the issues in the Commission hearings were different from the present case.  In fact, the Commission had no jurisdiction to hear claims against non-federal defendants.  And the United States own little of the lands and water at issue during the Commission's duration, so the United States would not even have been a proper defendant in a claim to enforce the Tribe's hunting and fishing rights.  Thus, Tribe did not and could not raise the present claims against the defendant in this case in the Commission hearings.  The

doctrines of *res judicata* and collateral estoppel, therefore, have no effect on the current claims.  Moreover, there was no release of claims in the Commission hearings.  Even if there was, such a release would apply only to the defendant in those hearings, the United States, and not the defendant in this case.

### A.    Brief Overview of the ICCA.

Congress passed the ICCA in 1946 to establish the Indian Claims Commission. The ICCA granted jurisdiction to the Commission to hear only claims "against the United States on behalf of any Indian Tribe…"  25 U.S.C. § 2 (repealed).  Jurisdiction of the Commission was further limited to those claims accruing before 1946 "in law or equity." 25 U.S.C. § 70(K) (repealed).[2]  In an early decision, the Commission narrowly construed its authority under the ICCA as limiting relief "to that which is compensable in money," and not equitable relief.  *See Osage Nation of Indians v. United States*, 1 Ind. Cl. Comm'n 54, 65 (1948), *rev'd on other grounds*, 199 Ct. Cl. 592, 97 F. Supp. 381.  The legislative history of the bills extending the life of the Commission confirmed that this early interpretation of the ICCA was correct.  *See Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1461 (10 Cir. 1987) (quoting congressional report that "tribes with valid claims would be paid in money.  No lands would be returned to a tribe.").  The ICCA also established a five year statute of limitations for filing claims against the United States that existed prior to the establishment of the Act.  25 U.S.C. § 12 (repealed).

---

[2] On September 30, 1978, the Indian Claims Commission was dissolved and its undecided cases were transferred to the Court of Claims.  Act of October 8, 1976, Pub. L. No. 94-465, 90 Stat. 1990, as amended by the Act of July 20, 1977, Pub. L. No. 95-69, 91 Stat. 273.

## B. The ICCA's Five-Year Statute of Limitations Applies Only to Claims Against the United States.

As set forth above, the Commission's jurisdiction was expressly limited on the face of the ICCA to claims against federal defendants. 25 U.S.C. § 2 (repealed). There is no provision in the ICCA even mentioning claims against other parties. The ICCA's statute of limitations provision, therefore, has no applicability to claims against non-federal defendants, such as the defendant in this case.

Mr. Speck argues, however, that the ICCA statute of limitations applies not only to the United States, but to non-federal defendants as well. In support, Mr. Speck cites to *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987) and *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States*, 722 F.2d 1407 (8th Cir. 1983). Mr. Speck's reliance on these cases is misplaced, as neither holds that the ICCA statute of limitation applies to claims against non-federal parties.

In *Navajo*, the Tribe sought a declaration that it had existing title to a tract of land. The court upheld the dismissal of the United States on ICCA statute of limitations grounds. The court then dismissed the case in its entirety, and thus the remaining third party defendants, on grounds that the United States was an indispensable party to the action – the non-federal defendants were not dismissed on grounds of statute of limitations. In finding that the United States was an indispensable party, the court relied heavily on the unique facts of that case, including the fact that the United States had title to a portion of the land to which the Tribe was claiming rights. Thus, the United States would have lost land if the Tribe prevailed against the third parties. That is not true here, as the United States is not an indispensable party. *See* Part III, *supra*.

21

*Navajo*, therefore, not only does not hold what Mr. Speck says it does, but its true holding also has no applicability to the present action.

Neither does the *Oglala* case support Mr. Speck's position.  There the court merely upheld the lower court's dismissal of all parties on grounds that the ICCA provided exclusive jurisdiction for the unconstitutional takings claims that were issue there.  *Oglala*, 722 F.2d at 1411.

Not only are the above cases distinguishable, but more recent cases, including those dealing with fishing and hunting rights, have squarely held that claims against non-federal defendants are not barred by the ICCA's statute of limitations provision. *See Sokaogon Chippewa Community v. Wisconsin*, 879 F.2d 300 (7th Cir. 1989) (United States is dismissed based on ICCA statute of limitations grounds; non-federal defendants are not); *see also Oneida Indian Nation of New York State v. The County of Oneida*, 194 F. Supp. 2d 104, 125 (N.D.N.Y. 2002) (citing *Oneida Indian Nation of New York State v. the County of Oneida*, 434 F. Supp. 527, 532 n.9 (N.D.N.Y. 1977) (finding that the establishment of the Commission evidences "no intent to supplant Indian claims against other parties, governmental or private.").  Mr. Speck therefore cannot take advantage of the ICCA's statute of limitations.

## C. The Present Claims are Not Barred By *Res Judicata* (Claim Preclusion).

Neither is the present action precluded under the doctrine of *res judicata*.  In the Sixth Circuit, a claim is barred by *res judicata* only if all of the following elements are present: 1) there is a final decision on the merits by a court of competent jurisdiction; 2) the subsequent action is between the same parties or their "privies"; 3) the issue sought to be barred in the subsequent action was litigated or should have been litigated in the

prior action; and 4) there is an identity of the causes of action.  *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997).

None of these elements is satisfied in the present case.  In particular, the Commission lacked jurisdiction to hear claims against non-federal defendants and to hear claims for injunctive relief.  Thus, here, the parties are not the same and there was no final decision on the merits by a court of competent jurisdiction with respect to these parties.

Indeed, in most cases involving Indian claims against non-federal defendants, although it is clear from the opinions that there was a previous Commission hearing against the United States, the defendants do not even raise the *res judicata* defense. Thus, in most cases, there is no discussion in the court's opinion of the issue.  *See, e.g.*, *The Oneida Indian Nation of New York v. New York*, 194 F. Supp. 2d 104, 123 (N.D.N.Y. 2002) (discussion on the effect of prior Commission hearings in he context of collateral estoppel, but not *res judicata*); *see also Mille Lacs Band of Chippewa Indians v. Minnesota*, 853 F. Supp. 1118, 1136 fn. 5 (D. Minn. 1994) (noting that "The State has abandoned its *res judicata* defense because the parties here are not identical to those in the Commission proceedings.")

In those few cases where the applicability of the *res judicata* doctrine is discussed, courts have summarily dismissed the defense.  For instance, in *Cayuga Indian Nation of New York v. Cuomo*, the court simply stated:

> Clearly, none of the defendants in this district court action, nor their privies, were defendants in the ICC action. Moreover, as the court has already concluded that the ICC was created to resolve claims against the United States, the plaintiffs could not have proceeded against non-federal defendants, at least not against those who did not derive title

> directly from the United States, in that forum.  Therefore, *res judicata* does not serve as a bar to this federal court action.

*Cayuga Indian Nation of New York v. Cuomo*, 667 F. Supp. 938, 947 (N.D.N.Y. 1987), *rev'd on other grounds*, *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2[d] Cir. 2005).

As in *Cayuga*, the defendant in the present action is different from that before the Commission.  And, the Tribe could not even have brought this action before the Commission for this relief and against this defendant.  *Res judicata*, therefore, does not bar this action.

### D. The Present Action is not Barred by Collateral Estoppel (Issue Preclusion).

Mr. Speck incorrectly contends that the Tribe's claim is barred by the doctrine of collateral estoppel.  Under this affirmative defense, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.  *Montana v. United States*, 440 U.S. 147, 153 (1979); *Knox Cty. Educ. Ass'n. v. Knox Cty. Bd. Of Educ.*, 158 F.3d 361, 376 (6th Cir. 1998).

Courts applying the doctrine have stated that to apply the principle to a factual issue, the party relying on the previous judgment must show that 1) the issue in the present action is identical to one in the prior action, 2) the issue was actually litigated and decided in the prior action, 3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior action, 4) the estopped party was a party or in privity with a party to the prior adjudication, and 5) the party sought to be estopped was given a full and fair opportunity to litigate the issue in the prior action.

*Brewster v. Barnhart*, 2005 U.S. App. LEXIS 17556 (6th Cir. Aug. 16, 2005).    Federal courts have applied these same elements when faced with arguments that prior Commission proceedings collaterally estopped Indians from relitigating treaty issues. *See, e.g., Mille Lacs Band of Chippewa Indians v. Minnesota*, 853 F. Supp. 1118, 1136 (D. Minn. 1994); *The Oneida Indian Nation of New York v. New York*, 194 F. Supp. 2d 104, 123 (N.D.N.Y. 2002).  To apply collateral estoppel, therefore, the Court would have to find that the issues being raised here are identical to issues actually litigated in the prior hearing before the Commission.   They are not.

The *Oneida* case is instructive.   There the state and other non-federal defendants argued that determinations made by the Commission and the Court of Claims, in prior actions brought before those courts, precluded the plaintiff Indians from re-litigating the same issues in the district court.   The plaintiffs moved to strike this defense.   The district court denied the motion on grounds that the motion was not yet ripe since there was not yet a full development of the factual and legal record.   The court further noted that if, as the case developed, issues were revealed to which the prior determinations of the Commission and the Court of Claims prove relevant, then collateral estoppel may be invoked, but it would "of course be limited to issues actually litigated and decided in those prior actions, and will apply only to those issues that were necessary to the outcome of those actions."   *The Oneida Indian Nation of New York*, 194 F. Supp. 2d at 123.

Similarly, in *Cayuga Indian Nation of New York v. Cuomo*, the defendants argued an issue of federal ratification of the treaties at issue in that case had already been

decided by the Commission, and therefore relitigation of that issue was precluded by collateral estoppel.  The Court examined the record below and held as follows:

> The issue of federal ratification was not before the Commission.  It was not raised; it was not litigated; and it was not essential to the ICC's decision.  Thus, collateral estoppel does not bar this court's determination of the issue of federal government ratification of the conveyances.

*Cayuga Indian Nation*, 667 F. Supp. at 947.

Mr. Speck does not point this Court to a single issue in the present action that should be barred because it was already litigated at the Commission.  Instead, Mr. Speck seems to argue simply that because there was a prior hearing before the Commission involving members of the Ottawa Tribe, and evidently regardless of what the prior hearings were about, this Court should automatically bar the present litigation in its entirety.

Mr. Speck discusses at length the Commission's findings of fact and final judgment, and even attaches these documents to its Motion.  Yet, Mr. Speck does not point to anywhere in these documents where there is any mention of hunting and fishing rights.  And Mr. Speck does not argue that the hunting and fishing rights were previously litigated before the Commission.  Instead, Mr. Speck's point seems to be merely that a hearing before the Commission occurred involving the Ottawas' and the United States and that a judgment was rendered.  This, of course, is not enough to support a collateral estoppel defense.

In point of fact, the Commission hearings were about claims for inadequate compensation for ceded lands.  The Commission findings of fact and award entry attached as exhibits to Mr. Speck's motion to dismiss make no mention of whether the

26

Tribe did or did not retain hunting and fishing privileges over the ceded territory for good reason – the issue simply was not before the Commission.   Accordingly, the issues raised in this case were not previously litigated and collateral estoppel does not apply.

### E.   An Award by the Commission for Inadequate Compensation of Ceded Lands Does Not Preclude a Subsequent Action in Federal Court to Protect Hunting and Fishing Rights.

Mr. Speck also asserts that simply because members of the Tribe received compensation as a result of the Commission hearings, all hunting and fishing rights were thereafter extinguished.   In support, he cites to *Western Shoshone National Council v. Molini*, 951 F.2d 200, 202 (9th Cir. 1991).   That case, however, did not deal with *treaty-reserved* rights, as does the case at bar.   Rather, that case dealt with aboriginal title issues and a treaty that contained no express reservation of hunting and fishing rights.   *Id.* at 203 (distinguishing a list of cases where rights to hunt and fish were expressly reserved in treaties and stating "these cases are inapplicable here, because there is not a treaty which grants the Shoshone hunting and fishing rights.")

To be sure, cases do hold that, under circumstances involving aboriginal title or a treaty that is silent as to hunting and fishing privileges, an award by the Commission may extinguish any *implied* rights to hunting and fishing.   But it well settled that this is not the case with regard to a treaty that expressly reserves usufructuary rights, including rights to hunt and fish on ceded lands.    The rights at issue here at not implied at all; they are explicit.

Where a treaty expressly reserves rights to hunt and fish, these rights are not extinguished unless the Commission award specifically and expressly acknowledges that the award includes an amount to compensate the Indians for relinquishment of its

27

hunting and fishing privileges.  In the absence of such express Commission language, the award under the Commission does not extinguish hunting and fishing rights, and does not bar a future claim to enforce those rights.  *Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 925 (8th Cir. 1997) (distinguishing *Western Shoshone* and holding the prior Commission proceedings did not estop plaintiffs from bringing its subsequent usufructuary claims against the State; "If the rights were reserved in a treaty, the ICC would have had to find that the rights had been extinguished; thus, silence implies no determination as to those rights."); *see also United States v. Michigan*, 653 F.2d 277, 279 (6th Cir. 1981) (treaty guaranteed fishing rights preserved to the Indians continue to the present day as federally created and federally protected rights); *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1202 (10th Cir. 2002) (*citing United States v. Dion*, 476 U.S. 734, 738 (1986) (as a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress); *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 821-26 (8th Cir. 1983) (right to hunt and fish expressly granted by treaty will not be abrogated absent express and unambiguous statement by Congress), *cert. denied*, 464 U.S. 1042 (1984).

The Ottawas were first granted title to the lands at issue in this case in the Treaty of Greeneville in 1795, 7 Stat. 49.  This grant included not only title to the lands granted, but also rights to hunt and fish.  Later, through the series of treaties set forth in the amended complaint, the Ottawas ceded some of these lands, but expressly reserved its rights to hunt and fish.  Thus, the hunting and fishing privileges that are the subject of the current action are treaty-reserved rights.  The Commission award is silent as to

these privileges.  These explicitly reserved rights therefore were not extinguished by the Commission's award.

**F.      The Prior Commission Award Does Not Act As A Release.**

Mr. Speck also argues that the prior judgment by the Commission acts as a release of all claims by the Tribe for all rights against all parties, including the present claims for hunting and fishing rights against the Mr. Speck.   In support, Mr. Speck quotes the language contained within the Commission judgment.

The relevant language of the judgment states merely that the award is "... a final award in full satisfaction of all claims *against the defendant in Docket 133B...*" Commission Judgment, Defendant's Motion to Dismiss, Exh. G (emphasis added). Under the plain reading of this award, the release, if any, applies only to the United States, *the defendant in Docket 133B*.  The award makes no mention of, and cannot be legally extended to, additional parties after the fact.   Simply put, the prior hearings before the Commission were about different issues between different parties, and have no legal bearing on the present action before this court.

**V.      The Statute of Limitations in 28 U.S.C. § 2415 Is, On Its Face, Inapplicable to This Action.**

Mr. Speck's argument that the statute of limitations in 28 U.S.C. § 2415 bars the Tribe's claim flies in the face of the statutory language.  On its face, that statute applies only to claims "founded upon any contract express or implied in law or fact" and those "founded upon a tort . . . ."  28 U.S.C. § 2415(a) and (b).  The Tribe's claim is neither. On the contrary, the Tribe's claim is one to determine the existence of a property right, and thus is not subject to the statute.  And if there were any doubt, subsection (c) of the statute removes it:  "Nothing herein shall be deemed to limit the time for bringing an

action to establish the title to, or right of possession of, real or personal property."  28 U.S.C. § 2415(c).  Simply put, § 2415 has no application to a claim to determine the existence of hunting and fishing rights.

## VI.    The Tribe Has Hunting and Fishing Rights in the Lands Ceded in Applicable Treaties.

The State attempts to divide and conquer the Tribe's claim by parsing each relevant treaty individually, offering a niggardly interpretation of each, and trying unilaterally to limit the scope of the Tribe's claim.  This effort fails for two reasons.  First, the Tribe's claim is broader than the State tries to portray it.  Even if some of the State's treaty interpretations were correct, the Tribe's claim would survive at least in part. Second, the State's treaty interpretations are far too narrow.  It is well settled that "Indian treaties are to be interpreted liberally in favor of the Indians . . . and [ ] ambiguities are to be resolved in their favor . . . ."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999) (citations omitted); *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dep't of Natural Resources*, 141 F.3d 635, 639 (6th Cir. 1998); *United States v. State of Michigan*, 471 F. Supp. 192, 216 (W.D. Mich. 1979), *remanded on other grounds*, 623 F.2d 448 (6th Cir. 1980), *modified in part on other grounds*, 653 F.2d 257 (6th Cir. 1981).  Moreover, treaty language is not to be given a technical meaning, but should instead be interpreted in the sense it would have been understood by the Indians.  *Id*. at 250.  At this stage of the litigation, in particular, the Court should therefore construe the treaties in the light most favorable to the Tribe – "courts are charged with the responsibility of interpreting [treaty] phrases most favorably to the Indians."  *Id*. at 251.

The State begins its attack on the Tribe's treaty rights by trying to narrow the claim to one for fishing rights in Lake Erie.  The State then interprets the Treaty of Fort Industry as not having preserved any fishing rights in Lake Erie.  Therefore, the argument goes, the Tribe's claim fails as a matter of law.

But the amended complaint is obviously broader than that.  It seeks a declaration that the Tribe has retained "hunting and fishing privileges in all areas of Ohio encompassed by the aforementioned Treaty of Fort Industry, the Treaty of 1807, and the Treaty of 1808."  Amended Complaint ¶ 38.  That includes portions of Lake Erie, but it also includes areas of northern Ohio.  So the State is simply incorrect when it argues that "the Tribe appears to be seeking only the right to commercially fish in Lake Erie . . . ."  Motion to Dismiss at 37.

The State also offers several parsimonious interpretations of the treaties, contrary to the Supreme Court's admonition to interpret treaties liberally in favor of Indian tribes.  Each of the applicable treaties is discussed below.

Treaty of Fort Industry.  On July 4, 1805, the Ottawas and other tribes entered two treaties at Fort Industry near present-day Toledo.  Amended Complaint ¶ 8.  In one of the treaties, the Ottawas ceded what is known as "Royce Area 53," which included portions of northern Ohio and Lake Erie.  Id. at ¶ 9.  In the other, the Ottawas ceded "Royce Area 54," which included portions of northern Ohio generally southward of Royce Area 53.  Id. at ¶ 10.  The second of these treaties included an explicit reservation of hunting and fishing rights: "The said Indian nations, parties to this treaty, shall be at liberty to fish and hunt within the territory and lands which they have now

ceded to the United States, so long as they shall demean themselves peaceably." *Id.* at ¶ 12.

These two treaties should be construed *in pari materia* and as a single agreement with the Ottawas.  They were signed at the same place on the same day and, presumably, negotiated together.  The treaty under which Royce Area 54 was ceded – and which reserved hunting and fishing rights – explicitly referenced the treaty under which Royce Area 53 was ceded.  They were presented together to the Senate by President Jefferson.  *See* Exhibit B to Corrected Motion to Dismiss (docket # 8).  And they were treated as a single treaty in the official government record of Indian land cessions.  *See Indian Land Cessions in the United States, 1784* – 1894, available at http://memory.loc.gov/ammem/amlaw/lwss-ilc.html  (excerpt  attached  as  Exhibit  A). Accordingly, they were understood by the signatories – including the Indians – as a single agreement.  And treaties are interpreted "to give effect to the terms as the Indians themselves would have understood them."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999); *United States v. State of Michigan*, 471 F. Supp. at 216.

Moreover, the reservation of hunting and fishing rights is reasonably understood to apply to both treaties.  For starters, it makes little sense for the Indians to have reserved hunting and particularly fishing rights in Royce Area 54, which was entirely inland, but not in Royce Area 53, which included Lake Erie.  In addition, the reservation of hunting and fishing rights in the one treaty applied to "the territory and lands which [the Indians] have now ceded to the United States . . . ."

In addition, under the Indian Nonintercourse Act, 25 U.S.C. § 177, land could not be ceded by Indians to private companies or individuals except by a duly ratified treaty with the United States.  Thus, because the United States was a party to both treaties, "the territory and lands which" the Indians on that day "ceded to the United States" is reasonably interpreted – and presumably was interpreted by the Ottawas – to include both Royce Areas 53 and 54.

Furthermore, a previous treaty informed the Ottawas that they could cede their lands *only* to the United States.  The Treaty of Greeneville, 7 Stat. 49 (1795), stated that "when [the Ottawas and other tribes], or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States . . . ."  Thus the Tribe would have reasonably understood that, by the Treaty of Fort Industry, it was ceding both Royce Areas 53 and 54 to the United States – and that it was preserving hunting and fishing rights in both of those areas "ceded to the United States."

Liberally construed in favor of the Indians, as it must be, the Treaty of Fort Industry therefore reserved to the Ottawas hunting and fishing rights in all of Royce Areas 53 and 54, including Lake Erie.

Treaty of 1807 and Treaty of 1808.  In the Treaty of 1807, the Ottawa Tribe and other Indian tribes ceded certain lands in northern Ohio, but retained hunting and fishing rights on those lands "as long as they remain the property of the United States." Amended Complaint ¶ 14.  In the Treaty of 1808, the Ottawas and other tribes ceded certain swaths of land in northern Ohio for the purpose of creating a road; they retained hunting and fish rights on those lands "so long as the same shall remain the property of the United States."  *Id*. ¶ 18.  The State argues for a literal interpretation of these

33

provisions.  Because most or all of the lands ceded by these treaties is no longer the property of the United States, the argument goes, the Ottawas no longer have hunting and fishing rights in those lands.

But treaty interpretation requires looking "beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196.  A "review of the history and the negotiations of the agreements is central to the interpretation of treaties." *Id.* at 202.  That the Ottawas lost their hunting and fishing rights under these treaties as soon as the United States sold these lands to private parties is not the only available interpretation, or even the most reasonable one.  Indeed, Mr. Speck's interpretation of this language would have permitted the United States unilaterally to terminate the Indians' hunting and fishing rights in these lands without notice and without consideration.  A more plausible interpretation is that this provision meant that the Tribe would enjoy these rights so longs as the lands in question remained within the territorial jurisdiction of the United States.  After all, the permanent status of the Northwest Territories was then in doubt due to conflicts between the United States and Great Britain, and it was not resolved until the conclusion of the War of 1812.  Construing this language most favorable to the Tribe, Mr. Speck is not entitled to dismissal of the Tribe's claim based on his parsimonious readings of the Treaties of 1807 and 1808.

Moreover, the Treaty of 1807 was not the only source of the Tribe's hunting and fishing rights based in the areas encompassed by that treaty.  The Treaty of Greeneville had already reserved these rights to the Ottawas in these same territories:

> To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared that the meaning of that relinquishment is this: The Indian tribes will have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States . . . .

Treaty of Greeneville, Art. V, 7 Stat. 49.  Thus, even if the qualifying language in the Treaties of 1807 and 1808 were interpreted literally, the Tribes still possessed unqualified hunting and fishing rights in these same lands based on the Treaty of Greeneville.  The later treaties cannot be read to abrogate or limit the rights granted by the Treaty of Greeneville.  Indians' treaty rights can be abrogated only with the clearest of language.  E.g., *Mille Lacs Band of Chippewa Indians*, 526 U.S. 172; *United States v. Michigan*, 471 F. Supp. at 252.

Finally, Mr. Speck argues that the hunting and fishing rights established by the Treaty of 1807 were extinguished by the Treaty of 1831.  The latter treaty includes a provision stating that "[o]n the ratification of this convention, the privileges of every description, granted to the Ottaway nation within the State of Ohio, by the treaties under which they hold the reservations of land herein ceded, shall forever cease and determine."  The Treaty of 1807 is one of "the treaties under which" the Ottawas held a reservation ceded in the Treaty of 1831.  So, Mr. Speck argues, the hunting and fishing rights in the Treaty of 1807 were extinguished.

The short and sufficient answer to this argument is that it is contrary to Supreme Court authority.  In *Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, the Supreme Court rejected an argument that the Indians had, by a subsequent treaty, relinquished their hunting and fishing rights.  The subsequent treaty states that "the said Indians do further fully and entirely relinquish and convey to the United States, any and all right,

35

title, and interest, or whatsoever nature the same may be, which they may now have, in, and to any other lands in the Territory of Minnesota or elsewhere." *Id.* at 184. The Court held that this language did not extinguish hunting and fishing rights because those rights were not explicitly mentioned in the subsequent treaty. *Id.* at 195. The omission, the Court held, was "telling because the United States treaty drafters had the sophistication and experience to use express language for the abrogation of treaty rights." *Id.* At a minimum, the Court held, the subsequent treaty was ambiguous, and therefore to be construed in favor of the Indians. *Id.* at 200; *see also United States v. Michigan*, 471 F. Supp. at 259 (finding ambiguous, and construing in favor of the Indians, a treaty phrase granting hunting rights only "until the land is required for settlement").

Here, too, the Treaty of 1831 contains no explicit mention of the Tribe's hunting and fishing rights. That treaty's drafters were sophisticated enough to have employed express language to abrogate those rights if they had so chosen. The omission must be construed in favor of the Ottawas. Moreover, as already explained, the Treaty of Greeneville had conferred hunting and fishing rights in these same lands, and the Treaty of 1831 did not purport to affect the rights granted by the Treaty of Greeneville.

## VII.  Laches and Abandonment are Affirmative Defenses That Require Factual Discovery and Cannot Be Decided on a Motion to Dismiss.

Finally, Mr. Speck is incorrect in asserting that two of his affirmative defenses – laches and abandonment – are appropriate subjects of a motion to dismiss. Because a motion to dismiss must accept all of the factual allegations of the complaint as true, an affirmative defense will rarely warrant dismissal. Only if the applicability of an affirmative defense is "clear on the face of the complaint" may a complaint be dismissed

on that basis.  *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 263 (S.D.N.Y. 2000); *see also Flight Sys., Inc. v. Electronic Data Sys.*, 112 F.3d 124, 127 (3$^d$ Cir. 1997) (to warrant dismissal, an affirmative defense must be apparent on the face of the complaint and present an "insuperable barrier to recovery").

The Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation of New York*, 125 S. Ct. 1478 (2005), is not to the contrary.  There the Court held that affirmative defenses such as laches, acquiescence, and impossibility were applicable to the Indian land claim at issue.  But the case was not decided on a motion to dismiss – and nothing in the Court's decision suggests a departure from the usual rule that affirmative defenses are not appropriate subjects of a motion to dismiss.  Mr. Speck may (or may not) be able to prove the defenses after discovery, but he cannot do based on the allegations of the amended complaint.

A.  **Laches**

As Mr. Speck concedes, laches requires proving that the plaintiff unreasonably delayed bringing the action and that the defendant has been prejudiced by the delay. *Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 466 (6th Cir. 2004).  The burden of proving both of these elements is on Mr. Speck.  He cannot do so on a motion to dismiss.  "[L]aches is a factual question which generally is not subject to resolution at the summary judgment stage let alone at the pleadings stage." *Sherman v. Standard Rate Data Serv., Inc.*, 709 F. Supp. 1433, 1441 (N.D. Ill. 1989); *see also Karlen v. New York Univ.*, 464 F. Supp. 704, 708 (S.D.N.Y. 1979) (laches" properly should be raised in the defendant's answer and not upon a motion to dismiss.").

First, the amended complaint does not establish that the Tribe's delay in bringing this action was *unreasonable*. To be sure, the treaties on which the Tribe's claim is based were signed in the Nineteenth Century. Amended Complaint ¶¶ 8-19. But that does not mean that the Tribe had to assert its claim shortly thereafter – particularly when, under later treaties, many Tribe members were removed to other states. *Id*. at ¶¶ 21. Discovery is therefore necessary to determine whether the Tribe's delay was unreasonable.

Second, the amended complaint does not establish any prejudice to Mr. Speck from the delay in bringing this action. The amended complaint does not allege that the passage of time has resulted in the loss of evidence that Mr. Speck might use to support his defense. Neither does it allege that Mr. Speck has relied to his detriment on the Tribe's not having brought this action earlier. Mr. Speck does argue that the delay will cause prejudice to third party land owners. But that prejudice is not apparent from the face of the amended complaint, as it must be to warrant consideration at this stage. Furthermore, prejudice to third parties who will not be bound by the results of this litigation is not the issue. Laches requires prejudice to the *defendant* – and neither the amended complaint nor Mr. Speck's motion (even if it could be considered) establishes any such prejudice.[3]

### B.    Abandonment

Mr. Speck's reliance on the affirmative defense of abandonment at the pleading stage suffers from the same problem – the applicability of the defense is not clear on the face of the amended complaint. Abandonment requires not just the non-use of a

property right; it also requires proof of an intent to abandon the property right.  *E.g.*, *Paramount Pictures Corp. v. Carol Pub. Group*, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998), *aff'd*, 1999 U.S. App. LEXIS 21519 (2$^d$ Cir. 1999); *City of Hamilton v. Harville*, 63 Ohio App. 3d 27, 30 (Ohio Ct. App. 1989).  The amended complaint demonstrates no such intent, so this defense cannot be decided on a motion to dismiss.

## CONCLUSION

The motion to dismiss the amended complaint should be denied.

Respectfully submitted,

/s/ Richard D. Rogovin
Richard D. Rogovin (0022002)
William M. Harter (0072874)
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, OH 43215
(614) 559-7234 (Phone)
(614) 464-1737 (Fax)
email:  rrogovin@fbtlaw.com
email:  wharter@fbtlaw.com
*Attorneys for Plaintiff*

/s/ William C. Caughey
William C. Caughey (0005567)
900 South Boundary
Perry Town Square
Suite 8A
Perrysburg, OH 43551
(419) 872-1688 (Phone)
(419) 872-1795 (Fax)
email:  wcaughey@email.toast.net
*Attorney for Plaintiff*

/s/ Daniel T. Spitler
Daniel T. Spitler (0023291)
131 E. Court Street
Bowling Green, OH 43402
(419) 352-2535 (Phone)
(419) 353-8728 (Fax)
email:  dspitler@shynlaw.com
*Attorney for Plaintiff*

---

[3] Mr. Speck's motion also makes passing references to acquiescence and impossibility as affirmative defenses, but offers no argument or explanation as to those purported defenses.  They, too, are inappropriate for consideration at the pleading stage.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was filed electronically this 15th day of February, 2006.  Notice of this filing will be sent to all parties by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.  Parties who do not receive this filing via the Court's electronic filing system will receive a copy by regular U.S. mail.

/s/ William M. Harter
William M. Harter
*Counsel for Plaintiff*

CINLibrary 1603579v.2