**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **OTTAWA TRIBE OF OKLAHOMA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No.  3:05 CV 7272** |
| | : | |
| **SEAN LOGAN, DIRECTOR,** | : | **JUDGE ZOUHARY** |
| **OHIO DEPARTMENT OF NATURAL** | : | |
| **RESOURCES,** | : | |
| | : | |
| **Defendant.** | : | |

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON LACHES AND ABANDONMENT**

---

Defendant, Director Sean Logan of the Ohio Department of Natural Resources (ODNR), hereby moves for summary judgment in his favor on all claims stated in the Amended Complaint.  Even if the Ottawa Tribe of Oklahoma (the "Tribe" or "Plaintiff") has a treaty-based right to hunt and fish, which Defendant does not concede, that right has lapsed due to the fact that the Tribe waited until 2005 to seek legal recognition of a right that it had not exercised since the 1830s.  In the intervening years, Ohio has transformed from a heavily wooded, virtually

unpopulated state to the 7th most populous state, filled with cities, towns, villages, industry, farmland, designated parklands, highways, and railroads.

At the same time, hunting and fishing have dramatically changed.  In the days of the Northwest Territory, both settlers and Native Americans freely roamed the land, hunting and fishing for subsistence.  And fur traders trapped and hunted virtually without regulation.  By way of comparison, hunting and fishing exist today in the State of Ohio **at all** only due to purposeful efforts to manage the populations of fish and game and the resources needed for their survival.

More specifically, during this same period, Lake Erie has transformed from a pristine, virtually uncharted body of water barely touched by the subsistence fishing of settlers and tribes to a major shipping route subject to commercial and sport fishing pressures from four States and Canada. And the fishery, constantly pressured by changing conditions in the lake, such as the development of the shoreline and the unintentional introduction of foreign invasive species, might not exist at all today, but for carefully designed and constantly evolving regulation to preserve the resource, regulation with which Plaintiff asserts that it would not have to comply.

The Tribe's delay in seeking to enforce its alleged rights, and the drastically altered condition of Ohio lands and waters, all support a determination that too much time has elapsed to permit the Tribe to reassert its alleged ancient rights.  Not only has Ohio dramatically changed during the intervening years, but the exercise of tribal rights, which are the right to hunt and fish free from all regulation except that strictly necessary to prevent extinction of the species, would be inconsistent with long-standing regulation and prejudicial to Ohio's citizens.  Any attempt by the Tribe to hunt and fish on private lands is to the obvious prejudice of all of those with justifiable expectations regarding their dominion over property that has been privately owned since the days of early statehood.  And any attempt by the Tribe to hunt and fish on public lands

and waters in any manner other than that already permitted by Ohio law operates to the prejudice

of other recreational users of the land, all current and future hunters and anglers in the state, the

current owners of commercial fishing licenses in Ohio, and indeed the citizens of Michigan, New

York, Pennsylvania, and Canada, all of whom also rely on Ohio's adherence to regulations

needed to maintain the Lake Erie fishery. For all of these reasons, the Tribe's claims, if in fact it

has claims, are barred by laches, acquiescence, and impossibility, as recognized by the United

States Supreme Court in *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005).  And

because the material facts needed to demonstrate the changes to Ohio necessary to prevail on this

defense are not disputed, this Court should enter summary judgment in favor of the Defendant,

the Director of the Ohio Department of Natural Resources.

<div style="margin-left: 40%;">

Respectfully submitted,

MARC DANN
Attorney General

/s/  Sharon A. Jennings
SHARON A. JENNINGS (0055501)
DAMIAN W. SIKORA (0075224)
PEGGY  W. CORN (0042197)
RICHARD N. COGLIANESE (0066830)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 17th Floor
Columbus, OH  43215-3428
(614) 466-2872
(614) 728-7592 (facsimile)
sjennings@ag.state.oh.us
dsikora@ag.state.oh.us
pcorn@ag.state.oh.us
rcoglianese@ag.state.oh.us
*Counsel for Sean Logan, Director,*
*Ohio Department of Natural Resources*

</div>

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

MEMORANDUM IN SUPPORT ................................................................................ 1

I.      INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF THE FACTS .................................................................... 1

       A.     The Ottawa's Claims............................................................................ 1

       B.     The Treaties........................................................................................... 1

             1.     The Treaties of Fort Industry ................................................ 2

             2.     The Treaty of 1807 ................................................................ 2

             3.     The Treaty of 1808 ................................................................ 3

       C.     All Bands of the Ottawa Tribe Ceded Their Remaining Lands in Ohio and Left Ohio. ................................................................... 4

       D.     Ohio Has Changed Significantly Since the Early 1800s........................ 4

             1.     Generations of development have transferred Ohio from an unsettled wilderness into a populous, highly developed state.................................. 5

                    a.     Ohio in the early 19th Century ........................................ 5

                    b.     Modern Ohio  .................................................................. 6

             2.     Lake Erie, its watershed, and fish populations have also been significantly altered by human activity in the years from 1830 to the present ...................................................................... 10

III.    STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ........................... 15

IV.    SUMMARY OF ARGUMENT ................................................................... 15

V.     LAW AND ARGUMENT ................................................................. 15

    A.    The Equitable Defenses Of Laches, Acquiescence, And Impossibility Apply To The Tribe's Attempt To Prohibit ODNR From Enforcing Hunting And Fishing Regulations Against It. ........................................................ 15

        1.    The equitable defenses of laches, acquiescence, and impossibility bar tribes from asserting disruptive equitable claims, regardless of the merits of those claims ................................................................. 16

        2.    The equitable defenses of laches, acquiescence, and impossibility, as recognized in *Sherrill*, apply to the Tribe's hunting and fishing claims .................................................................................... 18

    B.    The Equitable Defenses Of Laches, Acquiescence, And Impossibility Bar The Tribe's Claims ............................................................................. 20

        1.    The Tribe seeks far more than a determination that it be permitted to enjoy the same hunting and fishing privileges as all Ohioans .................... 22

        2.    The Tribe has not exercised or sought to exercise its alleged right to hunt and fish in over 170 years .................................................... 23

        3.    Allowing the Tribe to assert its long-dormant alleged rights would disrupt the settled expectations of all Ohioans and the State of Ohio's sovereign authority to regulate hunting and fishing, particularly on Lake Erie ............................................................................ 24

            a.    A treaty recognized right to hunt and fish deprives the State of a portion of its sovereign powers ................................. 25

            b.    A treaty recognized right to hunt and fish disrupts the settled expectations of Lake Erie sport anglers and commercial license holders ................................................ 27

            c.    A treaty recognized right to hunt and fish inland disrupts the settled expectations of private landowners and other recreational users of State natural areas ......................... 29

VI.     CONCLUSION ......................................................................... 30

CERTIFICATE OF SERVICE ................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)...................................................20

*Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769 (9th Cir. 1994).................................7, 26

*Apache Survival Coalition v. United States*, 21 F.3d 895 (9th Cir. 1994)....................................20

*Bigelow v. Mich. Department of Nat. Resources*, 970 F.2d 154 (6th Cir. 1992)..........................28

*Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005),
    *cert. denied*, 126 S.Ct. 2022 (2006) ...................................................................15, 21

*City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005)............................................ passim

*County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985) ...................................15, 16, 17

*Galliher v. Caldwell*, 145 U.S. 368 (1892) ....................................................................18

*Idaho v. Coeur d'Alene*, 521 U.S. 261 (1997)...............................................................26, 27

*Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387 (1892) .....................................................26

*Maine v. Norton*, 257 F.Supp.2d 357 (D. Me. 2003).........................................................26

*Sanders v. Louisville & N.R. Co.*, 144 F.2d 485 (6th Cir. 1944) ...................................................26

*Toledo Museum of Art v. Ullin*, 477 F.Supp.2d 802 (N.D. Ohio 2006).........................................19

*United States v. Winans*, 198 U.S. 371 (1905)...............................................................22

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*
    443 U.S. 658 (1979)........................................................................................22

*Western Mohegan Tribe and Nation v. Orange County*, 395 F.3d 18 (2d Cir. 2004) ..................27

## STATUTES

7 Stat. 359, Article 17 ..............................................................................................4

<u>MEMORANDUM IN SUPPORT</u>

**I.      INTRODUCTION**

This motion for summary judgment raises the issues of laches, acquiescence, and impossibility, which bar all of the Tribe's claims.  The purpose of this motion is not to contest whether the treaties in question in fact created hunting and fishing rights that survived the later treaties extinguishing all of the Tribe's rights in Ohio, although Defendant has previously asserted, and continues to assert, that the claims are subject to dismissal on these grounds. Instead ODNR now moves, with appropriate factual support, for summary judgment on the defense that the Tribe is barred from asserting these claims, which date back to 1805 through 1808, in 2005, pursuant to *Sherrill.*

**II.     STATEMENT OF THE FACTS**

    **A.      The Ottawa's Claims**.

The Tribe filed this Complaint on June 30, 2005. In its Complaint, as amended, the Tribe seeks a judgment declaring its right to exercise hunting and fishing privileges in all areas of Ohio encompassed by specifically identified treaties signed in 1805, 1807, and 1808.  Amended Complaint, ¶¶30, 31.  The Tribe asserts that it is entitled to hunt and fish without regulation or restriction by Defendant and "subject only to such restrictions as [the State] shall prove by clear and convincing evidence to be (a) necessary conservation measures, (b) the least restrictive alternatives available, and (c) non discriminatory." *Id.*, ¶31.

    **B.      The Treaties.**

The Tribe's claims are based on several different treaties, which are discussed in greater detail in Defendant's previously-filed motion to dismiss.  Because the purpose of this motion is

not to argue the merits of the treaty language, the following provides only that information necessary to frame the issues currently before the Court.

### 1.        The Treaties of Fort Industry.

The first treaty upon which the Tribe relies is the 1805 Treaty of Fort Industry, Am. Comp. ¶¶8-12, which is actually two treaties negotiated and signed concurrently at Fort Industry on July 4, 1805, regarding two separate parcels of land. The first Treaty ceded a parcel of land bordering Lake Erie, from Cleveland to Sandusky, to the Connecticut Land Company.  This area is identified as Royce Area 53.  *See* Affidavit of Bruce Motsch Ex. A ("Royce Map").[1]   As to this land, the Treaty states that the tribes release "all the interest, right, title, and claim of title" to all the lands of the Connecticut Land Company and that "therefrom, said nations, the sachems, chiefs, and warriors thereof, and the posterity of said nations, shall be <u>forever barred</u>."

The second Treaty ceded a parcel of land directly south of the Connecticut Land Company's tract, which is thus a number of miles from Lake Erie, to the United States.  This area is identified as Royce Area 54.  *See* Royce Map.  This Treaty, the Federal Treaty, provides that "said Indian nations, parties to this treaty shall be at liberty to fish and hunt within the territory and lands which they have now ceded to the United States, so long as they shall demean themselves peaceably," Am. Comp. ¶12.   Because the land in question does not border Lake Erie, this Treaty could not have been granting the Tribe any rights in Lake Erie, which is not part of the territory ceded by the Treaty.

### 2.        The Treaty of 1807.

---

[1] The Amended Complaint misstates the northern boundary of the Connecticut Land Treaty as "the border between the United States and Canada, established under the Treaty of Paris." Amended Complaint, ¶9(a).)  In fact, the treaty sets the northern boundary at "the northernmost part of the forty-second degree and two minutes north latitude."

The Tribe also claims hunting and fishing rights to a section of land in Ohio ceded in a treaty signed by the United States, bands of Ottawa, and several other tribes on November 17, 1807.  Am. Comp. ¶¶13-15.  The land ceded under this treaty is identified as Royce Area 66 on the Royce Map. The land ceded in this treaty consisted of a small portion of northwestern Ohio and a larger portion of lower Michigan.  The land in Michigan borders the western shore of Lake Erie.  The land in Ohio does not directly border Lake Erie because it borders other tracts at the mouth of the Maumee River that were specifically set aside as reservations.

Article 5 of the Treaty of 1807 provides that "the said Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded aforesaid, as long as they remain the property of the United States."  Am. Comp. ¶15.  Although the land ceded by the tribes in that treaty may well have remained unsold and in the public domain for some years after 1807, the land was long ago sold to private individuals or entities, or state or local governmental entities.

### 3.        The Treaty of 1808.

Finally, the Tribe claims hunting and fishing rights pursuant to a treaty signed on November 25, 1808.  Am. Comp. ¶¶16-22.  And like the Treaty of 1807, this treaty provides that "the said Indian nations shall retain the privilege of hunting and fishing on the lands given and ceded as above, so long as the same shall remain the property of the United States."  Am. Comp. ¶18. In this treaty, the tribes cede two strips of land for roads. One strip, 120 yards wide and including a mile on either side, went through Indian territory to connect Royce Area 53 (the land the tribes ceded in 1805) to Royce Area 66 (land the tribes ceded in 1807).  This strip of land is identified as Royce Area 70 on the Royce Map.   Today, this strip of land runs roughly the same course as State Route 20.  Motsch Aff. Ex. I.

3

The second strip of land ceded in this treaty was a stretch of land through Indian territory that was only 120 yards wide, which connected the above road (Royce Area 70) with United States territory below the Treaty of Greenville line.  This land can be seen on the Royce Map as starting near what is marked as Freemont, Ohio and running south through Upper Sandusky, Ohio and Marion, Ohio before ultimately touching the southern border of Royce Area 87. Today, this strip of land roughly parallels the Sandusky River, which has been designated a state scenic river, down to Upper Sandusky, where it then follows the approximate course of Route 23 to Waldo.  Motsch Aff. Ex. I.

However, like certain of the other treaties, no portion of the land ceded touches Lake Erie. And, like the Treaty of 1807, the privilege expressly applied only until the land was transferred to private landowners.

**C.**     **All Bands of the Ottawa Tribe Ceded Their Remaining Lands in Ohio and Left Ohio.**

After the 1808 Treaty, the various bands of Ottawa entered into several other treaties in which they ceded their remaining lands to the United States. The last of the Ohio land held by Ottawa bands was ceded in treaties signed on August 30, 1831 and February 18, 1833.  Pursuant to these treaties, "all of the various bands of Ottawa agreed to cede their remaining lands in Ohio to the United States and to be removed to reservations granted them in areas which later became part of the state of Kansas." Am. Comp. ¶21. The Treaty of 1831 provided that "[o]n the ratification of this convention, the privileges of every description, granted to the Ottoway nation within the State of Ohio, by the treaties under which they hold the reservations of land herein ceded [the Treaties of 1807 and 1817], shall forever cease and determine."  7 Stat. 359, Article 17.  The last group of Ottawa, with the exception of a handful of individuals who decided to remain behind, left Ohio in 1839, and the main tribal organization transferred to Kansas by 1839.

4

Reports of Plaintiff's Experts Helen Hornbeck Tanner, p. 11, and Patrick Tucker, p. 12, attached as Exs. A and B.

**D.      Ohio Has Changed Significantly Since The Early 1800s.**

No matter what facet of the State of Ohio one examines, the differences between the State in the days of early statehood and now are striking.

**1.      Generations of development have transferred Ohio from an unsettled wilderness into a populous, highly developed state.**

**a.  Ohio in the early 19th Century**

In the days of early statehood, Ohio was a relatively unpopulated, heavily-forested wilderness.  For example, the 1800 census recorded 1302 people in the Western Reserve. Report of Defendant's Expert Amos J. Loveday, ("Loveday"), p. 7, Affidavit and Report attached as Ex. C.  Human presence was the exception not the rule. *Id.*  Much of the area was in forest, mostly hard woods, and a considerable part, particularly of the western sections, was swamp lands. See Motsch Aff. Ex. C., Map of Original Vegetation of Ohio. For a more detailed view of the original land cover in Royce Areas 53, 54, and 66, see Motsch Aff. Exs. F, G, and H.  Except for marshes, peat bogs, and prairie grasslands, which covered between approximately 1% and 5% of these areas, the remainder was forested.  *Id.*  The area lacked roads, and the first wave of settlers often had to hack their way into the parcels they had purchased. Loveday, p. 11. Further, northern Ohio, while filled with rivers and streams, did not contain many of the lakes and reservoirs that exist today.  For example, in northwest Ohio almost all of Ohio's inland lakes are man-made.  Affidavit of Scott Hale ¶¶12-18.

The area was inhabited by many types of animals, including the wolf, bear and panther. Loveday, p. 8.  Wild turkey inhabited forests in all Ohio counties and provided an important food source for early settlers. Affidavit of David L. Risley Ex. B, p. 43.  Likewise, giant Canada geese

nested in post-glacial wetlands in the northern half of the state, while white-tailed deer were numerous. Risley Aff. ¶¶ 18, 24, Ex. B, pp. 25, 28.

Generally there were no restrictions on hunting, and the taking of predators or other animals deemed undesirable was encouraged through the payment of bounties for furs.  Bounty laws existed as early as 1804 and continued to be enacted until well into the 19th Century. Loveday, p. 9.  It was not until the 1830s that the General Assembly regulated the trapping of muskrat, and not until after 1857 that other laws regulated the hunting or taking of other animals. *Id*. at 16-17.

In the early 19th century, unimproved Ohio land was treated as open range, with hunting freely allowed in unimproved areas. *Id*. at 10. Landowners fenced out unwanted animal intruders from their farm fields, typically as they came under production (or were improved) and allowed animals, particularly hogs, to forage freely without much regard for property boundaries. *Id.*

During these early years, northern Ohio was isolated from the major markets of the day, which lay to the south and east. *Id*. at 13.  This began to change in 1825 with the opening of the Erie Canal connecting Lake Erie with New York City. The Ohio Erie Canal, terminating at Cleveland, was completed in 1833. The Miami Canal, terminating at Toledo, was completed in 1845.  During this same period, steamships were introduced to the Great Lakes.  *Id*. at 14. Railroads began to arrive in the late 1830s and provided a network for transporting commodities to and from the lake ports. By 1850 three major lines crossed north central Ohio from north to south. Two terminated at Sandusky, while the third ended at Cleveland.  By 1860, railroads connected Ohio to the Atlantic coast and to Chicago.  *Id.*

The resulting access to markets quickly stimulated agriculture in the region and set off a general growth in the economy.  *Id.*  As a result of this development, most of which occurred

after the transportation systems were in place, approximately 60% of land within the Western Reserve was improved farmland in 1850. *Id*. at 10.

### b.  Modern Ohio

Between the 1830s and today, Ohio has undergone striking changes. Population has exploded statewide to 11,353,140 as of April 1, 2000, of whom only .7% (76,075 persons) reports an American Indian or Alaskan Native heritage.[2] And the State has gone from lands owned by the United States and private land developers like those owning the Western Reserve, to lands that have been privately held, primarily from the early and middle of the 19th century. At present, 95% of Ohio land is privately owned, Risley Aff. ¶37, Ex. C, p. 13, and every type of development imaginable has occurred within the State. Finally, fish and game have gone from abundant to scarce (and sometimes rebounded), and have gone from an unregulated resource to one that exists at all only because it is carefully managed.

In accordance with its status as the 7th most populous state, much of the State is developed.  For example, Royce Area 53 has gone from almost 100% forest to 7.52% pasture, 41.86% cropland, 16.46% residential, and 4.13% commercial. Motsch Aff. Ex. F. Likewise, Royce Area 54 has been transformed from forest to 11.30% pasture, 52.79% crop land, 5.39% residential, and 1.02% commercial/industrial.  *Id*., Ex. G. Lastly, Royce Area 66 has been transformed from forest and swamp to 2.9% pasture, 75.73% crop land, 6.96% residential, and 1.73% commercial/industrial.  *Id*. Ex. H.  See also Exs. Q-LL, which show the current landcover in each treaty area by County. For further descriptions of development within each of these counties, see Affidavit of Steven R. Kelley Exs. D-W, the Ohio County Profiles of each county,

---

[2]These figures are from the 2000 census, last accessed May 31, 2007.  See  http://factfinder.census.gov/servlet/QTTable?_bm=y&-geo_id=04000US39&-qr_name=DEC_2000_SF1_U_DP1&-ds_name=DEC_2000_SF1_U.

which include total taxable value of real property, number of registered vehicles, miles of road, and type of land cover for each county within Royce Areas 53, 54, and 66.

At the same time, Ohio, which is 35th in geographic size, has the 10th largest highway network and the fourth largest interstate highway system in the country.  Ohio has more than 3000 miles of four-lane divided highways extending to every region of the State.  Affidavit of John R. Watkins, Ex. A, p. 210. Ohio is 5th in airports, with over 10 million people departing from Ohio's 8 busiest airports via scheduled air service.  *Id*. at 212.

Modern Ohio has more than 6,000 dams.  Risley Aff. Ex. C, p. 35.  The vast majority of fishable inland waters in Northeastern Ohio are manmade lakes and reservoirs originally created to provide drinkable water to local communities. Hale Aff. ¶15.  Statewide, of all lakes/reservoirs greater than 80 acres, approximately 99.3% of the surface area is man-made as opposed to natural. *Id*. at ¶13. The Division of Wildlife operates six fish hatcheries to stock these manmade lakes and reservoirs with fish for sport fishing and works with local officials to manage the fish populations for inland sport fishing within the State.  *Id*. at ¶¶19, 20. Without constant re-stocking, most of the species of fish introduced would eventually disappear. *Id*. at ¶37. There has been no commercial fishing in Ohio's rivers, inland lakes, reservoirs, streams or ponds for approximately 100 years.  *Id*. at  ¶¶38, 39.

Human pressures, including hunting and habitat loss, have affected Ohio's wildlife.  The larger predators (wolves, bears, panthers, and bobcats) largely disappeared from the State by the 1860s. Loveday, p. 16.  By 1838, the mountain lion had disappeared.  Risley Aff. ¶19, Ex. D.

Other species were extirpated, and exist in the State currently only due to successful re-introduction and protection.  For example, the wild turkey population was extirpated in Ohio by 1904, but has been successfully reintroduced. *Id* at ¶20, Ex. B, pp. 43-44.  Likewise, the giant

Canada goose was considered extinct before 1940, but later successfully reintroduced to Ohio from Minnesota. *Id*. at ¶24, Ex. B, p. 25. And white-tailed deer had been extirpated from the state by 1902, but have rebounded.  *Id*. at ¶35, Ex. D.

Another major change is in the regulation of hunting (and fishing, discussed below).  By the 1860s the General Assembly set hunting seasons, legislated controls on the types of weapons and devices hunters and fishermen could use, and enacted rules relating to trespass on private property.  The Commission on Fish and Game, one of the precursors to ODNR, was created in 1886. Risley Aff. Ex. J, p. 57.  Furthermore, hunting and fishing (except on Lake Erie) had become almost entirely a recreational activity by the end of the 19th Century.  Loveday, p. 25. In 1913, Ohio enacted the first licensing requirements for both sport hunting and fishing, as a means to control the number of fish and animals taken and to raise money for wildlife protection. Loveday, p. 17.

Modern hunting takes place on private land and on some public lands. With 95% of the State's land in private hands, Ohio ranks 47th of the 50 states in the amount of public land available for recreation per capita.  Risley Aff. ¶37, Ex. C, p. 13.  The current amount of public land available for wildlife recreation is not meeting public demand.  The sprawl of urban and suburban landscapes into the rural countryside has reduced traditional hunting, trapping, and watchable wildlife opportunities on private lands, further increasing pressure on the available public lands.  Risley Aff. ¶38, Ex. C, p. 9.  In light of the demand for access to wildlife by Ohio's large human population, ODNR's challenge is to balance the differing access needs of hunters and anglers, conservationists, and Ohioans who want to watch but not hunt wildlife (such as growing numbers of birdwatchers), and at the same time to maintain sustainable populations of wildlife species despite the limited habitat available to many of them.  See Risley Aff. ¶39,

Ex. C, especially pp. 7-14. In 2001, state residents and non-residents spent a total of $2.3 billion on wildlife recreation.  *Id.* at ¶48, Ex. F, p. 6.  This includes the $350 million that 500,000 deer hunters in Ohio contribute to Ohio's economy each year.  *Id.* at ¶49, Ex. C, p. 13.

ODNR's Division of Wildlife carefully determines hunting seasons and bag limits, if any, for wildlife in Ohio by collecting data on the ways and extent to which Ohioans have been accessing wildlife, as well as data on Ohio wildlife populations, i.e., whether they are increasing, declining, or stable, as well as the amount and condition of habitat available to them.  Risley Aff. ¶46.  The most complex task in monitoring and managing wildlife in Ohio is that the Division of Wildlife also must take into account migratory waterfowl, which is subject to the Migratory Bird Treaty between the United States and Canada, which applies to migratory wildlife populations of ducks and Canada geese.  See Risley Aff. ¶¶51-54, Ex. D; Ex. I.

> **2.  Lake Erie, its watershed, and fish populations have also been significantly altered by human activity in the years from 1830 to the present.**

Like the land, Lake Erie has been affected by Ohio's transformation from an unsettled wilderness to a populated and developed State.  The watershed has been developed, busy ports line the Lake and are served by important shipping lanes, and millions of Ohioans recreate on the Lake and its shores.  At the same time, fishing has gone from something people, including Native Americans, did to put dinner on the table, to two distinctly different endeavors – sportfishing and commercial fishing.

Commercial fishing did not exist on other than an extremely local basis during the early 19th century due to lack of refrigeration and the corresponding lack of a means to transport fish any distance.  An early industry did, however, apparently exist in 1831.  Loveday, pp. 12-13.  By

the 1840s accounts from towns around the lake leave little doubt that fishing had become a sizable business. *Id*. at 17.

The success of commercial fishing, like agriculture, rested to a considerable degree on transportation improvements (canals and later the railroads) that linked Ohio to Eastern markets. The market for Ohio fish was expanded even more with the advent of refrigeration systems in the 1870s. By 1870 Ohio fisheries were shipping about 20% of the nation's whitefish and an assortment of other species.  *Id.* at 18.

Overall, the years have seen a change in the species present in the Lake.  Numerous important fish species that were at one time prevalent in Lake Erie either no longer exist at all or have only relic populations.  These include lake herring, lake trout, lake sturgeon, sauger, and blue pike.  Affidavit of Roger L. Knight, ¶26.  The native strains of lake herring disappeared by 1940, lake trout by 1910, lake sturgeon by 1930, sauger by 1955, and blue pike by 1960.  *Id*. at ¶27. At the same time, there have been numerous exotic species that have been artificially introduced into Lake Erie.  They include zebra mussels, carp, gizzard shad, rainbow smelt, alewife, sea lamprey, white perch, and round goby. *Id*. at ¶29.  The fish community in Lake Erie today is vastly different than the fish community in 1800.  *Id*. at ¶5.

One of the primary reasons for this change in the fish community is because of the different landscape surrounding Lake Erie, especially in the major tributary watersheds that look and function entirely different than they did in pristine times.  Knight Aff. ¶6.  Before European settlement, barrier beaches and spits accommodated the development of extensive and contiguous coastal wetlands.  Watkins Aff. ¶25, Ex. A, p. 34.  These swamps, including the Great Black Swamp, which covered approximately 1500 square miles of the western Lake Erie Basin, have all been cleared and drained, eliminating most of the capacity to prevent pollutants

11

and sediments generated in the upland portions of the watershed from entering Lake Erie. *Id.* at ¶26, Ex. A, p. 34.  Of the 11,649 square miles in the watershed, over 78% has been altered from its original state.  The shorelines of river mouths and estuaries in Lake Erie are densely industrialized and highly urbanized, eliminating or degrading critical spawning and nursing habitat for a wide variety of fish.  Knight Aff. ¶¶ 9, 10, 56.  While much of this conversion may be necessary to support human populations, this loss poses severe challenges for sustaining a healthy ecosystem.  Affidavit of Ed Hammett, Ex. A, p. 31.

Another major influence shaping Ohio's Lake Erie coast over the past 200 years is the building of man-made coastal structures.  The Ohio shoreline of Lake Erie is 262 miles long and is one of the most developed and structurally protected in the Great Lakes. *Id.* at 33.  These structures, along with measures to control erosion and prevent the loss of property, have forever changed Ohio's north shore.  Watkins Aff. ¶13, Ex. A, p. 184.

In 1803 there were few coastal structures along the Ohio Lake Erie shore.  *Id.* at ¶15, Ex. A, p. 184.  In the 1870s, 68% of the mainland shore had beaches, a significant percentage of which were wide sand beaches used for travel along northern Ohio.  *Id.* at ¶16, Ex. A., p. 184.

Now Ohio has one of the most extensively developed shorelines in the Great Lakes. One corollary of lake shore development is the hardening of the shoreline.  A shoreline is hardened as natural sands are replaced by concrete, jetties, and other manmade structures.  A hardened shoreline leads to erosion and lack of filtering of run-off.  The Ohio Geological survey showed that the percent of hardened shorelines in Ohio doubled between 1970 and 2000. Hammett Aff. Ex. A, p. 33.  The percentage of hardened shorelines ranges from 60% in Ashtabula County to 98% in Lucas County.  *Id.*

Another change, necessary to support the development of first agriculture, and then industry in the State, is the development of ports and harbors. Throughout the 1800s, Ohio developed ports and harbors at most of its major Lake Erie tributaries, and coastal structures such as jetties and breakwaters were built at or near the mouths of Ohio's rivers. Jetties and breakwaters interfere with the movement of land along the shore, depriving downdrift areas of sand. Watkins Aff. ¶17, Ex. A, p. 184. There are no natural ports along Ohio's portion of Lake Erie capable of supporting commercial navigation. Each port has been created by the installation of structures such as breakwaters, wharfs and piers, and is maintained to navigable depths through routine dredging. Watkins Aff. ¶ 24.

The Lake and its shore have changed along with the rest of Ohio. So, too, have people's expectations regarding the management of the resources of the Lake, including the fish. Not since the 19th century has the Lake been able to support unregulated fishing pressure without the danger of depleting the resource. Ohio participates with Canada, Michigan, New York and Pennsylvania in setting limits to protect walleye and perch. Ohio in turn limits the number of perch available to each of its 18 holders of commercial fishing licenses, and forbids the commercial fishing of walleye in Ohio waters, thus reserving a portion of its perch catch and all of its walleye catch for sport anglers. R.C. 1533.341. See also, Christopher Bunt deposition transcript, p. 98. As part of its management strategy, Ohio ended gill net fishing in 1983 by buying the existing licenses. Loveday, p. 27.

Walleye and perch are regulated through the setting of total allowable catches ("TAC"). The TAC for walleye is set in the number of fish while the TAC for yellow perch is set in terms of pounds of fish. Knight Aff., ¶37. Although the populations of walleye and yellow perch have fluctuated in Lake Erie, the populations are less than they were in the mid-1980s and are trending

downward.  Knight Aff. ¶32.  For example, in 1998, the total TAC was 10.3 million walleye and 7.44 million pounds of yellow perch.[3]  These TACs are substantially higher than recent and future projected TACs.  Ohio's total walleye take in 2006 was 1.9 million fish.  Ohio's TAC for walleye in 2007 is 2.733 million.  If, however, projections regarding the walleye population hold true, Ohio's TAC for walleye in 2008 will be only 1.3 million.  Thus, Ohio's anglers may have to substantially limit their catch in order to keep Ohio within its TAC for 2008.  A similar problem occurred for yellow perch in 2007, which led to the issuance of an executive order by Governor Strickland reducing the bag limit for yellow perch from 40 to 30 fish.  This change will continue in the future. Knight Aff. ¶¶48, 50, 51.

Sport fishing is important, not only from the standpoint of managing the resource for recreation, as well as commercial ventures, but also because the sport has become an important part of the tourist industry.  By 1999, for example, 31,972 (70%) of the annual non-resident licenses issued in Ohio were sold in the lake counties.  An estimated 450,000 people fish in the Ohio waters of Lake Erie each year.  Risley Aff. Ex. C, p. 29. The Ohio Lake Erie Commission estimated in 1998 that sport fishing "generated $1 billion dollars in annual economic value." Loveday, p. 25.  Anglers boost local economies through the purchases of goods and services, special taxes, licenses, and other fees.  Anglers also support local jobs and wages, along with hotels and other lodging facilities, marinas, charter boat services, restaurants, grocery stores, gas stations, bait and tackle stores, and other local businesses.  Watkins Aff. Ex. A, p. 64.  There are nearly 1,000 licensed Ohio charter guides, and more than 300 marinas on Lake Erie's shoreline. Risley Aff. Ex. C, p. 29.

---

[3]   Ohio gets 51% of the walleye TAC and 43% of the yellow perch TAC.  Thus, Ohio had a TAC of 5.28 million walleye and 3.19 million pounds of yellow perch that year.

## III.     STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether laches, acquiescence, or impossibility bar the assertion of hunting and fishing rights based on treaties signed between 1805 and 1808 by a tribe that left the State by 1839 and made no attempt to assert these rights before 2005.

## IV.     SUMMARY OF ARGUMENT

The Ottawa assert treaty based rights to hunt and fish in Ohio, rights that were allegedly granted by treaties signed between 1805 and 1808.  The Ottawa were removed from Ohio in 1839 to reservations that were hundreds of miles from Ohio, and made no attempt to assert these alleged rights until 2005.  Accordingly, the Ottawa's claims for equitable relief are barred by the equitable defenses recognized in *Sherrill*.  The claims are barred because changes over the intervening years render inequitable the Tribe's extremely late attempt to turn the hands of time back to the early 19th Century.

## V.     LAW AND ARGUMENT

### A.     The Equitable Defenses Of Laches, Acquiescence, And Impossibility Apply To The Tribe's Attempt To Prohibit ODNR From Enforcing Hunting And Fishing Regulations Against It.

The Supreme Court's recent decision in *City of Sherrill v. Oneida Indian Nation,* 544 U.S. 197 (2005), has dramatically altered the legal landscape against which this Court must consider Plaintiff's claims.  In that case, the Court applied the equitable defenses of laches, acquiescence, and impossibility to preclude the prospective equitable relief sought by the Oneida, even though both the United States and the Court had previously recognized the legal merit of the Oneida's claim that the State of New York violated federal law by purchasing Oneida lands.  *See also Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005), *cert. denied,* 126 S.Ct. 2022 (2006) (applying the Court's ruling in *Sherrill* to a claim for money damages for similar claims).  Because the Ottawa, like the Oneida, seek to revive claims that have long lain dormant, and seek, through equitable relief, to enforce their sovereign rights

15

into the future, *Sherrill* applies here, and bars their claims.   If equity can bar tribal claims, even against a State that has been determined to have violated federal law, it surely bars them here, where the Tribe does not allege that the State of Ohio has violated any law and where the United States has not determined that there is a wrong requiring redress, as in *Sherrill*.

> **1.    The equitable defenses of laches, acquiescence, and impossibility bar tribes from asserting disruptive equitable claims, regardless of the merits of those claims.**

In *Sherrill*, the Supreme Court found that a federal common law defense of laches, acquiescence and impossibility can be applied to tribal land claims in appropriate circumstances. *Sherrill*, 544 U.S. at 221.  And, because that decision turned on the nature of the relief sought (equitable) and the fact that the relief sought would disrupt the sovereignty of the State, her counties, and subdivisions, the applicability of these defenses is not limited solely to land claims. Instead, the Court's reasoning in *Sherrill* applies to any attempt, like the one here, to seek equitable relief that disrupts settled expectations and the sovereignty of the State, where many decades have passed without assertion of tribal rights.

In *Sherrill*, the Oneida purchased properties in the city of Sherrill.  The parcels of land were once contained within the Oneida's reservation, created by treaty between New York and the Oneida in 1788, and were last possessed by the Oneida in 1805.  *Id.* at 202.  During previous litigation, the Oneida had successfully established that the tribe had a triable claim for damages against Oneida County for wrongful possession of lands (including the lands now at issue in *Sherrill*) that the State of New York purchased from the Oneida in 1795 in violation of federal law prohibiting sales of tribal lands without the acquiescence of the federal government (commonly referred to as the "Non-Intercourse Act").  *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985) ("*Oneida II*").   In *Oneida II*, the Court expressly stated no opinion

as to whether equitable considerations should limit the relief available to the Oneida because those issues were not addressed by the Court of Appeals or presented to the Court.  *Oneida II*, 470 U.S. at 253, n. 27.

In *Sherrill*, the Oneida sought "declaratory and injunctive relief recognizing its present and future sovereign immunity from local taxation on parcels of land the Tribe purchased in the open market, properties that had been subject to state and local taxation for generations." *Sherrill*, 544 U.S. at 214.  The Court, however, rejected the tribe's theory that its purchase of the land "unified" its fee title and aboriginal title, thus permitting it to exercise sovereign authority over the land.  The Court held that "'standards of federal Indian law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." *Id.*

The Court focused on two factors in deciding that equitable defenses could apply to the Oneida's claims:  (1) the nature of relief sought; and (2) the disruptive effects of the requested relief.  First, the Court repeatedly contrasted the relief sought in *Sherrill* with that sought in *Oneida II*.  As the Court noted, "[w]hen the Oneidas came before this Court 20 years ago in *Oneida II*, they sought money damages only.   The Court reserved for another day the question whether 'equitable considerations' should limit the relief available to the present-day Oneidas." *Sherrill*, 544 U.S. at 213 (citations omitted).  The Court then carefully distinguished between whether a party has a claim or a substantive right from the appropriateness of any given remedy. *Id.*  "It is well-established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief." *Id.* at 217.  Accordingly, the Court carefully distinguished *Oneida II*, in which New York sought to assert equitable defenses to a claim for money damages, from *Sherrill*, in which the Oneida sought equitable relief that would project "redress for the Tribe into the present and future." *Id.* at 202; see also

17

*id.* at 221 n.14.  In *Oneida II*, the Court found that the application of a nonstatutory time limitation in an action for damages would be "novel," while in *Sherrill* the Court easily concluded that equitable defenses applied to a complaint seeking an equitable remedy, as does the complaint here.

More importantly, the Court repeatedly mentioned the disruption that would be caused by granting the relief sought by the Oneida.  The Court discussed how changes in the value and character of land can affect the appropriateness of certain forms of relief, and noted that "'[L]aches is not  . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced – an inequity founded upon some change in the condition or relations of the property or the parties.'"  *Id.* at 217 (quoting *Galliher v. Caldwell*, 145 U.S. 368, 373 (1892)).  Thus, the Court concluded, the declaratory and injunctive relief sought by the Oneida "is unavailable because of the long lapse of time, during which New York's governance remained undisturbed, and the present-day and future disruption such relief would engender." *Id.* at 215 n.9.  In the end, the Court concluded "the distance from 1805 to the modern day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate."  *Id.* at 221.  Pursuant to *Sherrill*, then, equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied in cases seeking equitable relief based upon tribal claims.

> **2.  The equitable defenses of laches, acquiescence, and impossibility, as recognized in *Sherrill*, apply to the Tribe's hunting and fishing claims.**

The equitable defenses of laches, acquiescence, and impossibility apply to the Tribe's attempt to obtain prospective relief based upon its alleged treaty-recognized hunting and fishing

rights.  Equitable defenses do apply to actions brought under the Declaratory Judgment Act, when the character of relief sought is equitable, *i.e.,* prospective or injunctive, rather than legal, *i.e.,* retrospective or monetary, in nature.  Here, where the relief sought is to prevent ODNR from enforcing statutes and rules against the Tribe, that relief is equitable in nature, and subject to the equitable defenses recognized in *Sherrill*.

Declaratory judgment is not a type of claim, but instead is a procedural remedy that is neither distinctly legal nor equitable.  *Sanders v. Louisville & N.R. Co.*, 144 F.2d 485, 486 (6th Cir. 1944).  Or in the words of this Court, "[a]ctions for declaratory judgment are neither legal nor equitable claims, but are considered to be sui generis."  *Toledo Museum of Art v. Ullin*, 477 F.Supp.2d 802, 806 (N.D. Ohio 2006).  Thus, to determine whether an action for declaratory judgment is legal or equitable in nature, the Court must examine whether "the issues tendered by the pleadings" and/or the relief sought is legal or equitable.  *Sanders*, 144 F.2d at 486.  Indeed, in *Sherrill*, the Oneida sought both a declaratory judgment and an injunction, so the Supreme Court has already recognized the applicability of equitable defenses to actions for declaratory judgment based on treaty rights.

The Tribe states that "unless this Court declares the rights of the parties in connection with this controversy, it shall be unable to exercise such privileges without risk of criminal prosecution and/or civil liability."  Am. Comp. ¶40.  Accordingly, the Tribe seeks "declaratory and prospective relief regarding the constitutionality of Defendant's intention to impede, regulate and/or prohibit the rights granted under said Treaties," *id.* ¶5, and "other and further relief as shall be deemed necessary and proper." *Id.* at 9.  The Tribe asks that it be free to exercise its hunting and fishing privileges subject only to those restrictions that "Defendant shall prove by clear and convincing evidence to be (a) necessary conservation measures, (b) the least restrictive

alternatives available, and (3) non-discriminatory." *Id.* ¶31. Given the nature of the relief sought, the Tribe is implicitly asking that ODNR be enjoined from enforcing regulations against the Tribe, except where ODNR can bear the heavy burden of justifying these regulations under heightened scrutiny.  Under these circumstances, the relief sought is equitable in nature.

The relief sought is equitable because Plaintiff cannot obtain the relief that it wants unless this Court enjoins ODNR from enforcing hunting and fishing regulations against it.  Without an injunction, Plaintiff will not be able "to exercise such privileges without risk of criminal prosecution and/or civil liability." *Id.*  ¶40.  Furthermore, Plaintiff admits that it seeks prospective relief, and not legal damages (which this Court cannot provide pursuant to the Eleventh Amendment). *Id.* ¶5.

Under similar circumstances, i.e. a pre-enforcement challenge to a food and drug rule (this case challenges Ohio's anticipated application of its rules and regulations to tribal hunting and fishing), the Supreme Court found that "the declaratory judgment and injunctive remedies are equitable in nature, and other equitable defenses may be interposed."  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 155 (1967).  Likewise, in a tribal claim regarding development of land containing tribal sacred sites, the Ninth Circuit recognized that "a declaratory judgment, because it is equitable in nature, can be barred by laches." *Apache Survival Coalition v. United States*, 21 F.3d 895, 905 n.12 (9th Cir. 1994) (citing *Abbott*, 387 U.S. at 155).

Where, as here, the relief sought is declaratory judgment and other relief, as appropriate, designed to prevent ODNR from enforcing its regulations against the Tribe, the relief sought in this case is equitable, and equitable defenses apply.

B.  **The Equitable Defenses Of Laches, Acquiescence, And Impossibility Bar The Tribe's Claims.**

20

In *Sherrill*, the Court recognized "[t]he principle that the passage of time can preclude relief has deep roots in our law," and relied on three separate equitable defenses to determine that the Oneida could not obtain the declaratory and injunctive relief that they sought. First, the Court applied laches, "principally a question of the inequity of permitting the claim to be enforced – an inequity founded upon some change in the condition or relations of the property or the parties." *Sherrill*, 544 U.S. at 217. The Court likewise relied upon the doctrine of acquiescence, which occurs when a party "belatedly asserts a right to present and future sovereign control over territory" that is contrary to "longstanding observances and settled expectations" that flow from prior observance of a boundary. *Id.* Finally, the Court noted, impossibility occurs when intervening changes in circumstances render the equitable remedy sought impossible to provide. *Id.* at 218-19. The Court found that these three doctrines prevented the Oneida from reasserting tribal sovereignty over lands that had been governed by New York and her subdivisions since the early 1800s, even though private landowners would not have to be displaced due to the Oneida's purchase of its ancestral lands from willing sellers.

These same doctrines, particularly laches and impossibility, bar the Ottawa's claims here. In this case, as in *Sherrill*:

- generations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation;
- at least since the middle years of the 19th century, most of the Tribe have resided elsewhere;
- the area and its inhabitants are distinctly non-Native American in character;
- the present day is far removed from 1805;
- the Tribe has long delayed in seeking equitable relief against Ohio; and
- the area has been privately owned and developed for several generations.

*Id.* at 202-03; *Cayuga*, 413 F.3d at 277 (citations omitted). For these reasons, and the reasons discussed in greater detail below, equity bars the Tribe's attempt to reassert hunting and fishing

rights dating back to treaties signed in 1805-1808, because the Tribe has not exercised these rights since 1839 and waited until 2005 to sue to obtain recognition of these rights.

<div align="center">

**1.  The Tribe seeks far more than a determination that it be permitted to enjoy the same hunting and fishing privileges as all Ohioans.**

</div>

In order to determine whether the rights sought by the Ottawa will disrupt the settled expectations of ODNR and Ohioans, this Court must consider the nature of the rights that the Ottawa seek to exercise.  In this case, the Tribe expressly seeks a declaration that it has an interest that places it beyond ODNR's power to regulate.  Am. Comp. ¶31.

Several consequences may flow from a determination that a tribe possesses a treaty based right to hunt and fish.   A tribe acquires rights superior to non-tribal citizens, whose hunting and fishing rights may be conditioned and extensively regulated by the state. *United States v. Winans*, 198 U.S. 371, 381 (1905).  Moreover, in other circumstances, off-reservation hunting and fishing rights have been held to place an affirmative duty on the State to ensure the availability of a fair share of game and wildlife to tribal participants.  *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 678-679 (1979).  (Of course, the scope of the privilege granted depends on the precise wording of the treaty, so ODNR is not conceding that this language is controlling here.)  What is clear, however, is that the recognition of treaty rights significantly reduces the police power of the State.  *See* Reynolds, *Indian Hunting and Fishing Rights: The Role of Tribal Sovereignty and Preemption*, 62 N.C.L. Rev. 743, 770 (1984).  This is so because the burden shifts to the State to prove that each and every hunting and fishing regulation satisfies strict scrutiny before it may be applied to the tribe.   Thus, to demonstrate that a state regulation "is a reasonably and necessary conservation measure, the state must do more than establish that its hunting and fishing codes are sound programs of resource allocation and management: the state must show that its regulation is necessary to ensure the

<div align="center">22</div>

continued existence of the resource." *Id.*  By definition, then, the availability of fish or game for sportsmen or for those who like to observe wildlife are not necessarily interests that the State may continue to successfully protect.

### 2. The Tribe has not exercised or sought to exercise its alleged right to hunt and fish in over 170 years.

Like the Oneida in *Sherrill*, the Ottawa assert long-dormant claims.  The treaties that allegedly grant them the rights they now seek to enforce were signed in 1805, 1807, and 1808. Then, all of the Ottawa's tribal lands in Ohio were ceded in the treaty signed on August 30, 1831.  As Plaintiff admits, "all of the various bands of Ottawa agreed to cede their remaining lands in Ohio to the United States and to be removed to reservations granted them in areas which later became part of the state of Kansas."  Am. Comp. ¶21.  Plaintiff's experts admit that the last group of Ottawa, with the exception of a handful of individuals who decided to remain behind, left Ohio in 1839.  Opinion and Report of Helen Hornebeck Tanner, p. 11 (Ex. A); Opinion and Report of Patrick Tucker, p. 12 (Ex. B).  As Dr. Tanner concludes, "The main tribal organization transferred to Kansas by 1839."  Tanner, p. 11.

Thus the Ottawa, as a tribe, left the State of Ohio and moved hundreds of miles away (to Kansas) between 1831 and 1839.  Since that time, they have not exercised their alleged treaty based rights.  The fact that a handful of individuals of tribal descent may have remained in Ohio, and possibly hunted and fished in accordance with State law, does not establish that the Tribe (whose organization and leadership has been located many miles away since 1839) was continuing to exercise those rights.  See *Menominee v. Thompson*, 161 F.3d 449, 462 (7th Cir. 1998) (regarding construction of treaties, "it is irrelevant whether members of the tribe" continued to hunt and fish off reservation).  See also *U.S. v. Minnesota*, 466 F. Supp. 1382 (Minn. 1979), *aff'd,* 614 F.2d 1161 (8th Cir. 1980), *cert. denied,* 449 U.S. 905 (1980) (rights

ceded where State consistently enforced its hunting and fishing regulations against tribe who remained in the State).

Not only has the Tribe not exercised its rights, it also has not taken any action to assert those rights, until 2005, when they met and corresponded with State officials in the months before filing this action in July 2005.  Amended Complaint, ¶¶ 32-35.  *See also* The Tribe's Response to Request for Admission 3 (attached as Ex. D).  In response to a request to "Admit that the Ottawa Tribe of Oklahoma has not attempted to assert its alleged hunting and fishing rights in Ohio before any tribunal between the time it left Ohio in the 1800s and 2004," the Tribe responded "The Ottawa Tribe of Oklahoma admits this request."

Nor can the Tribe successfully claim recent discovery of its rights under the Treaties. The same Tribe and the same treaties were the subject of claims filed on behalf of the Ottawa Tribe of Oklahoma with the Indian Claims Commission in the 1950s.

Thus, the Ottawa, like the Oneida, have unreasonably delayed in seeking equitable relief. In *Sherrill*, the Oneida filed suits for money damages in the 1970's before asserting its unification theory in the 1990s on claims that date back to 1805.  Here, the Ottawa seek, in 2005, to assert rights granted to them in treaties in 1805, 1807, and 1808, rights that they have not exercised as a tribal entity since the 1830s.

> **3.  Allowing the Tribe to assert its long-dormant alleged rights would disrupt the settled expectations of all Ohioans and the State of Ohio's sovereign authority to regulate hunting and fishing, particularly on Lake Erie.**

Not only have the Ottawa unreasonably delayed in exercising their alleged rights, but to allow them to exercise these rights now would be highly disruptive.  Since the Ottawa were removed from the State in the 1830s, the State has dramatically changed.  These changes have dramatically altered Lake Erie and her fishery, the Lake Erie watershed, the lands in Ohio, and

the inland streams and waterways.  These changes include the dredging of Lake Erie to maintain shipping channels, the hardening of the shoreline, the transfer to private ownership and development of Ohio lands, including the Lake Erie watershed and the coastline, and the pressure that all of this development and population increases have placed on wildlife and its habitat.

But for the careful stewardship of ODNR, certain species would not be currently present in the State.  Due to its efforts, however, Ohioans have many recreational opportunities to enjoy wildlife, whether as a hiker or viewer, or as a hunter or angler. The Ottawa seek the right to hunt and fish commercially in a manner that will operate to the detriment of all Ohioans by inevitably decreasing the populations of any desirable species.  This result is inevitable because the number of fish or game necessary to prevent the extirpation of the species is much lower than the number necessary to support a healthy sport fishery, or to provide a meaningful opportunity to view wildlife or to successfully hunt a species.  Risley Aff. ¶56.  Accordingly, the rights that the Ottawa seek to exercise would be contrary to the rights of all Ohioans who own the fish and game in the State in common.

> a.    **A treaty recognized right to hunt and fish deprives the State of a portion of its sovereign powers.**

In determining whether the asserted rights would disrupt the rights of others, this Court should not limit itself to an inquiry regarding how the Ottawa's right to hunt and fish would impact the rights of other private parties, but must also consider the effect that its declaration, and possible injunctive relief, would have on the sovereign interests of the State of Ohio.  For example, in *Sherrill*, the Oneida owned the land in question and thus would not have displaced any private landowners. The negative impact, instead, was to the State and her subdivisions, through loss of sovereignty and tax revenues, and to neighboring landowners who would be

affected by the resulting changes.  Thus, in this case, the fact that the asserted rights disrupt the State's sovereign powers to regulate hunting and fishing, particularly the State's sovereign authority to control its navigable waterways, supports a determination that the State will be harmed by the relief sought.

First, the State of Ohio has a sovereign interest in managing its own natural resources and enacting and enforcing its own legal code.  *See Maine v. Norton*, 257 F.Supp.2d 357, 374-75 (D. Me. 2003); *Alaska Sport Fishing Ass'n v. Exxon Corp.,* 34 F.3d 769, 773 (9th Cir. 1994).   The relief sought by the Tribe will disrupt both of these interests.  Ohio has no recognized tribes, and has managed its natural resources to serve the policy objectives determined by the General Assembly and the Governor since the earliest resource management regulations in the mid 1850s until the present day.

Not only does the Tribe seek to disrupt the State's general authority to regulate its own resources, but it also, by focusing on an alleged right to commercially fish in Lake Erie, seeks relief that impacts an area that has been recognized as uniquely sovereign in nature -- the State's authority to regulate her navigable waterways.  *See Idaho v. Coeur d'Alene*, 521 U.S. 261 (1997) (declaratory and injunctive relief aimed at preventing the enforcement of all Idaho statutes and regulations purporting to regulate or affect the submerged lands so violated sovereignty of the State that relief was barred by the Eleventh Amendment); *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 452 (1892) (State has sovereign interest in regulating the use of the Great Lakes, which are "inland seas.")

Under the doctrine of "equal footing," which provides that all States enter the union with the same incidents of sovereignty enjoyed by the already existing States, Ohio became the owner in trust of the portions of Lake Erie in question when she became a State in 1803, and her

26

ownership arises not from an act of Congress, but from the Constitution itself.  *See Coeur d'Alene*, 521 U.S. at 283; *Illinois Central*, 146 U.S. 387, 434-35 (1892).  As such the State has "a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have the liberty of fishing therein freed from the obstruction or interference of private parties."  *Illinois Central*, 146 U.S. at 452.  *See also* R.C. 1506.10 (The waters of Lake Erie within the boundaries of the State of Ohio belong to the State "as proprietor in trust for the people of the state, for the public uses to which they may be adapted subject to the powers of the United States government, to the public rights of navigation, water commerce, and fishery, and to the property rights of littoral owners . . .").  Accordingly, State ownership of such lands is "considered an essential attribute of sovereignty."  *Coeur d'Alene*, 521 U.S. at 283.

The Tribe seeks rights that interfere with one element of this sovereignty, the State's obligation to manage the fishery resource for the benefit of all Ohioans.  The Tribe cannot prevail on an argument that the relief sought does not lessen the authority of the State to regulate its resources for the benefit of the recreational users.  Thus, a recognition of the Tribe's right, to hunt and fish without complying with all state regulation, would diminish the sovereign powers of the State every bit as surely as the Oneida's request that a court declare land not subject to the taxing authority of the State.  *See id.* at 282 (finding that action for declaratory and injunctive relief prohibiting state regulation of submerged lands was barred by sovereign immunity because "[t]he suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory").  *See also Western Mohegan Tribe and Nation v. Orange County*, 395 F.3d 18, 22-23 (2d Cir. 2004) (the court held that an action in which the Mohegan Tribe sought a declaration of their right to "'camp, to hunt,

27

to fish [and] to use the waters and timbers,'" was "fundamentally inconsistent with the State of New York's exercise of fee title over the contested areas").

> **b.**    **A treaty recognized right to hunt and fish disrupts the settled expectations of Lake Erie sport anglers and commercial license holders.**

The assertion of rights sought here also disrupts the interests of all Ohioans in enjoying the resources of Lake Erie.   Ohio currently regulates the fishery for the benefit of all Ohioans, including the existing commercial license holders and sports anglers.  There is no way to give the Ottawa the rights they seek without disrupting the rights and expectations of both of these groups.

The Tribe seeks to commercially fish in Lake Erie, subject to only those limitations that ODNR proves are necessary for the conservation of the species.  Thus, the Tribe undoubtedly seeks, at a minimum, to have a portion of Ohio's total allowable catch allocated to it.  Currently, the only fish in Ohio subject to commercial fishing is yellow perch.  As to this species, the Tribe apparently seeks rights that would either force Ohio to allocate more of the species to commercial fishing, to the detriment of sport anglers, or to decrease the quotas currently allocated to the existing license holders, to the detriment of the license holders, and potentially the State.  *See Bigelow v. Mich. Dept. of Nat. Resources,* 970 F.2d 154, 156 (6th Cir. 1992) (discussing Michigan's attempts to resolve claims with its commercial license holders).  More importantly, the Tribe is seeking permission to take, through commercial fishing, a share of walleye, **which is not currently commercially fished in Ohio**.  Furthermore, both of these species are currently experiencing declining populations.  Knight Aff., ¶¶ 48, 51, 52.

Thus, the Tribe is seeking rights that are contrary to the carefully-crafted regulatory scheme that applies to all other anglers in Ohio.  This regulatory scheme is necessary to maintain

the quality of the fishery for all, and commercial fishing of those species not currently subject to those pressures or commercial fishing in excess of current limits will damage or deplete the fishery resource.  Thus, commercial fishing in the manner proposed is to the detriment of the thousands of Ohioans and non-residents who enjoy sport fishing on Lake Erie in Ohio, and who wish to continue to enjoy this right into the future.

<div style="text-align: center;">

**c.      A treaty recognized right to hunt and fish inland disrupts the settled expectations of private landowners and other recreational users of State natural areas.**

</div>

The Tribe appears to have perhaps abandoned its claim to hunt or to fish in inland lakes in Ohio in any manner other than that currently permitted by Ohio law.  Larry Angelo Deposition transcript, pp. 154-169.  To the extent that the Tribe does not seek anything more than the ability to hunt or fish subject to all regulations that apply to residents and non-residents, there is no dispute for the Court to resolve.

If, however, the Tribe insists that the Court adjudicate these alleged rights, the Court should find that laches and impossibility prevents their assertion at this late date.  First, as to inland fishing, the lakes in question did not even exist when the Ottawa were removed from Ohio, commercial fishing has not existed anywhere in the State other than on Lake Erie in over 100 years, and there would be no fish if ODNR did not stock the inland lakes.  Accordingly, to allow one isolated group to come in and fish commercially would be contrary to the expectations of Ohioans, reasonably based upon circumstances in the State over the past 100 years.

Likewise, laches and impossibility prevent the Ottawa from roaming the land in order to hunt game.  Ohio now consists of 95% private property, and private property owners in Ohio have long controlled whether their lands are open for hunting.  And Ohioans have long relied on ODNR to manage wildlife so that every Ohioan who chooses to do so has the opportunity to

<div style="text-align: center;">29</div>

participate in a hunting season.  Again, no other entity is permitted to commercially hunt or trap within the State, and many species would not exist at all in the State but for their careful management.   Laches forbids the re-assertion of a right so foreign to long-standing regulations and to the settled expectations of Ohioans.

## VI.     CONCLUSION

For all of the reasons set forth herein, ODNR is entitled to summary judgment on all claims.

Respectfully submitted,

MARC DANN
Attorney General

/s/  Sharon A. Jennings
SHARON A. JENNINGS (0055501)
DAMIAN W. SIKORA (0075224)
PEGGY  W. CORN (0042197)
RICHARD N. COGLIANESE (0066830)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 17th Floor
Columbus, OH  43215-3428
(614) 466-2872
(614) 728-7592 (facsimile)
sjennings@ag.state.oh.us
dsikora@ag.state.oh.us
pcorn@ag.state.oh.us
rcoglianese@ag.state.oh.us
*Counsel for Sean Logan, Director,*
*Ohio Department of Natural Resources*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2007, a copy of Defendant's Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing has been served by regular U.S. mail upon all parties for whom counsel has not yet entered an appearance and upon all counsel who have not entered their appearance via the electronic system.

/s/  Sharon A. Jennings
SHARON A. JENNINGS