**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION – TOLEDO**

| | |
|---|---|
| **OTTAWA TRIBE OF OKLAHOMA** : | |
| : | |
| Plaintiff : | |
| : | |
| vs. : | **CASE NO. 3 05cv7272** |
| : | |
| **SEAN LOGAN, DIRECTOR** : | **JUDGE JACK ZOUHARY** |
| OHIO DEPARTMENT OF : | |
| NATURAL RESOURCES : | |
| : | |
| Defendant : | |

**PLAINTIFF OTTAWA TRIBE OF OKLAHOMA'S RESPONSE
IN OPPOSITION TO DEFENDANT SEAN LOGAN'S
MOTION FOR SUMMARY JUDGMENT**

Richard D. Rogovin (0022002)
Terrence M. Fay (0022935)
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, OH 43215
(614) 559-7234 (Phone)
(614) 464-1737 (Fax)
email:  rrogovin@fbtlaw.com
email:  tfay@fbtlaw.com
*Attorneys for Plaintiff*


William C. Caughey (0005567)
900 South Boundary
Perry Town Square
Suite 8A
Perrysburg, OH 43551
(419) 872-1688 (Phone)
(419) 872-1795 (Fax)
email:  wcaughey@email.toast.net
*Attorney for Plaintiff*

Daniel T. Spitler (0023291)
131 E. Court Street
Bowling Green, OH 43402
(419) 352-2535 (Phone)
(419) 353-8728 (Fax)
email:  dspitler@shynlaw.com
*Attorney for Plaintiff*

## LOCAL RULE 7.1(f) CERTIFICATION

I hereby certify, pursuant to Local Rule 7.1(f), that this action has been placed on the complex track and that this memorandum complies with the 30-page limitation for memoranda relating to dispositive motions that is applicable to that track.


*/s/ Richard D. Rogovin*
Richard D. Rogovin
*Counsel for Plaintiff*

# TABLE OF CONTENTS

LOCAL RULE 7.1(f) CERTIFICATION ................................................................. i

TABLE OF CONTENTS ..............................................................................................ii

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ........................................................................................................ 1

BURDEN OF PROOF AND STANDARD OF REVIEW ........................................ 3

BACKGROUND ........................................................................................................... 4

     I.    History of the Ottawa Tribe ................................................................. 4

           A.   Encroachment on the Ottawas' Lands ...................................... 4

           B.   The Removal of the Ottawas from Ohio .................................. 5

           C.   The Ottawas' Post-Removal Struggles .................................... 6

     II.   Conservation in Lake Erie ................................................................. 8

           A.   Lake Erie – Past and Present ................................................... 8

           B.   Fish Conservation Measures .................................................... 9

ARGUMENT ............................................................................................................... 11

     I.   Preliminaries ...................................................................................... 11

     II.  Laches Does Bar the Tribe's Claim Because the Delay in Asserting Treaty Rights was Neither Unreasonable nor Prejudicial to Mr. Logan. .................................................................... 13

           A.   The Ottawas' Delay is Not Unreasonable Because They Faced Serious Impediments in Asserting Their Treaty Rights. ......................................................................... 15

                  1.   Financial Obstacles ................................................. 16

                  2.   Practical Obstacles .................................................. 16

                  3.   Legal Obstacles ...................................................... 17

    B.   Recognition of the Ottawas' Treaty Rights Will
         Not Prejudice Mr. Logan ...................................................... 18

         1.   Fishing Rights Do not Cause Disruptive
             Prejudice Sufficient to Establish Laches. ................. 19

         2.   As a Factual Matter, the Ottawas' Fishing
             Rights are Consistent with Ohio's
             Conservation Measures ........................................... 20

         3.   Mr. Logan's Assertions of "Prejudice" Miss
             the Mark .................................................................. 23

  III.  The Equitable Defense of Acquiescence is Inapplicable
      Because the Ottawas Have Given No Assurance That They
      Would Not Enforce Their Treaty Rights ............................................. 25

  IV.  The Equitable Defense of Impossibility Does Not Apply
      Because, Quite Simply, The Request Relief is Far
      from Impossible ................................................................ 25

CONCLUSION ..................................................................................... 26

CERTIFICATION OF SERVICE ....................................................... 28

## TABLE OF AUTHORITIES

Cases Cited:

*Bank of Louisiana v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 1826 (2007) .................................................................................. 4

*Cherokee v. Georgia*, 30 U.S. 1 (1831) ................................................................... 17

*City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) ... 14, 19, 20

*Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435 (6th Cir. 2004) ................................................................................................ 1, 14

*Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889 (6th Cir. 1991) ....... 3, 25

*Equal Employment Opportunity Comm'n v. Watkins Motor Lines, Inc.*, 463 F.3d  436 (6th Cir. 2005) ............................................................................ 3

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298 (6th Cir. 2001) ................................................................................. 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................... 4

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) .................................................................... 2, 15, 19, 22, 23

*United States v. Alpine Land and Reservoir Co.*, 431 F.2d 763, 76 (9th Cir. 1970) ...................................................................................................... 18

*United States et al. v. State of Michigan Natural Resources Commission et al.*, 653 F.2d 277 (6th Cir. 1981) ............................. 12, 19, 22, 24

*Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.*, 443 U.S. 658 (1979) ......................................................................................... 22

Statutes and Rules:

25 U.S.C. § 861 ................................................................................................. 7, 18

28 U.S.C. § 1331 ............................................................................................ 17, 18

28 U.S.C. § 1362 ................................................................................................. 18

**INTRODUCTION**

The Ottawa Tribe of Oklahoma seeks recognition of and relief relating to usufructuary rights (*i.e.* hunting and fishing rights) conferred by treaties from the early Nineteenth Century.  Specifically, the Ottawas seek to exercise their treaty right to engage in commercial fishing on Lake Erie.  Defendant Sean Logan, the Director of the Ohio Department of Natural Resources, moves for summary judgment based on several delay-based affirmative defenses – laches, acquiescence, and impossibility.  Mr. Logan's entire argument, and the sum total of his evidence, boils down to this: Ohio has changed a lot in the two centuries since the Ottawas last exercised their treaty rights.

Mr. Logan has mastered the obvious, but he has not carried his summary judgment burden.  Indeed, he *has not even addressed* – and *has no evidence supporting* -- the critical elements of the affirmative defenses on which he bases his motion.  For example, the laches defense requires Mr. Logan to prove both that the Ottawas *unreasonably* delayed in asserting its claim and that *he* relied on that delay to his detriment.  *Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 466 (6th Cir. 2004).  Mr. Logan makes much of the admittedly long period between the signing relevant treaties and the Ottawas' recent assertion of their usufructuary rights.  But he offers no evidence about the reasons for and reasonableness of that delay.  Neither does he make any effort to establish that he or his Department have relied on that delay to their prejudice.  Having a serious burden to carry, Mr. Logan has shirked it.

This Court well understood that only unreasonable delay – not delay alone – will suffice to establish laches.  In denying the motion to dismiss, the Court held that at least three factual questions would be key to the laches defense:

1.      Why did the Tribe wait until now to seek these hunting and fishing rights?

2.      Did the Tribe voluntarily leave the State?

3.      Was the delay unreasonable?

Ruling on Motion to Dismiss at 14.  But despite this explicit guidance, the Court will search in vain for any answer to these questions in Mr. Logan's brief and supporting evidence.  This is a failure of proof and, by itself, is sufficient to deny the motion.  In any event, the Ottawas' delay was excusable, as their assertion of their rights was long hindered by significant legal, financial, and practical obstacles.

Mr. Logan has also failed to show, as he must, how he or his Department are prejudiced by the Ottawas' present-day assertion of their treaty rights.  He makes much of the need to conserve Ohio's natural resources, specifically its fish and game.  With this no one quarrels.  Mr. Logan hopes the Court will believe that the Ottawas' exercise of its usufructary rights will somehow be a disaster for conservation goals.  As a legal matter, however, the United States Supreme Court has foreclosed this argument: "Indian treaty rights can coexist with state management of natural resources." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999).  Moreover, as a factual matter, the evidence contradicts Mr. Logan's position – Lake Erie fisheries are healthy and under-harvested.  Indeed, the evidence suggests that the Ottawas' commercial fishing can be accommodated within existing conservation limits without squeezing out other fishing interests.  In short, Mr. Logan has not even tried to

show that the Ottawas' delay was unreasonable, and he has not tried to show and cannot show that the delay will cause any prejudice.  "Ohio has changed" is not nearly enough for summary judgment.

Mr. Logan's affirmative defenses of acquiescence and impossibility are similarly flawed.  Acquiescence requires Mr. Logan to prove that the Ottawas *intentionally* failed to protect their rights; he must establish that the Ottawas assured him (or his Department), expressly or impliedly, that they would not assert their rights.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991).  Nothing remotely of the sort occurred here.  And the defense of impossibility means exactly what it suggests – Mr. Logan must prove beyond debate that the lapse of time and delay in the assertion of rights have made relief impossible without serious disruption to settled affairs.  This defense does not apply because reconciling the Ottawas' treaty rights with conservation measures is eminently *possible*.[1]

The motion should be denied.


### BURDEN OF PROOF AND STANDARD OF REVIEW

The burden of proving each element of his affirmative defenses rests squarely on Mr. Logan.  *Equal Employment Opportunity Comm'n v. Watkins Motor Lines, Inc.*, 463 F.3d  436 (6th Cir. 2005) ("As laches is an affirmative defense**,** the burden of establishing both of these elements is on the party raising the defense").  In the summary judgment context, this burden is particularly daunting.  "For a defendant to

---

[1] The bulk of this memorandum focuses on the laches defense, as it is the only one of the three that warrants any extended discussion.  Acquiescence and impossibility are treated separately at the end of this memorandum.  Mr. Logan makes no significant effort to analyze the elements of the separate defenses or apply those elements to the facts.

obtain summary judgment on an affirmative defense, it must establish beyond dispute all of the defense's essential elements."  *Bank of Louisiana v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 1826 (2007).  A genuine dispute on *any* element of an affirmative defense requires denial of the motion as to that defense.  "When the record before the district court on a motion for summary judgment shows factual issues in dispute that could affect the equity of the application of laches to bar the claim, the district court must deny the motion and permit the parties to present their proof."  *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001).  In deciding the motion, the Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences from the record evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## BACKGROUND

I.    **History of the Ottawa Tribe**

A.    **Encroachment on the Ottawas' Lands**

In the early Nineteenth Century, the chiefs of various bands of Ottawa Indians living in present-day northwestern Ohio and southern Michigan signed several treaties with the United States.  Jerome Larry Angelo Affidavit[2] ("Angelo Aff.") ¶ 5.  Through each of the treaties – the Treaty of Fort Industry (1805), the Treaty of Detroit (1807), and the Treaty of 1808 – the United States claimed land from the Ottawas and other

---

[2] Larry Angelo is the Tribal Historian for the Ottawa Tribe of Oklahoma.  He also served for ten years as Second Chief until 2006.  Angelo Aff. ¶ 1; Angelo Depo. at 10.

Indian tribes.  The United States granted the Indians rights to hunt and fish on the ceded lands.

The Ottawas exercised these rights until they were removed from Ohio in the 1830s.  Patrick Tucker Deposition ("Tucker Depo.") at 127.  But the Ottawas and other Indians faced serious threats from white settlers and traders in the first few decades of the Nineteenth Century.  As settlers claimed land in these territories, the Indians had fewer places to hunt and fish.  The settlers also brought with them diseases previously unknown to the Indians.   Traders created additional problems.  Although it was illegal to supply alcohol to Indians, traders did so and, in the process, fostered alcoholism at epidemic levels.  Expert Report of Patrick Tucker ("Tucker Report) p. 14.  Traders also deliberately created financial dependency among the Indians by selling goods on credit.  Tribes were often forced to repay these debts with annuity payments they received in exchange for the lands they gave up.  Angelo Aff. ¶ 8.  As a result of all these pressures, Indians in northwest Ohio became almost entirely dependent on the government for subsistence.  Tucker Report p. 14

**B.     The Removal of the Ottawas from Ohio**

In 1830, Congress passed the Indian Removal Act, enacting a federal policy of removing Indians west of the Mississippi River to make way for white settlement.  Federal agents charged with implementing this policy engaged in "persistent and aggressive removal operations" against the Ottawas and other Indians.  Expert Report of Helen Hornbeck Tanner ("Tanner Report") p. 12.  Suffering from disease, alcoholism, poverty, and hunger brought on by the loss of their hunting and fishing grounds, the Ottawas faced extinction as a people if they stayed in northwest Ohio and southern

5

Michigan.  Tucker Depo. p. 98; Tucker Report p. 13.  Nonetheless, they did not leave willingly.  Federal agents pressured or coerced the Ottawas into signing various treaties relinquishing their tribal reservations and requiring their removal to Kansas.  Angelo Aff. ¶ 9; Tucker Report at 1.  The Ottawas did not willingly agree to the removal.  Angelo Aff. ¶ 7.

The Ottawas were subject to forced removals in 1832, 1837, and 1839.  Larry Angelo Deposition ("Angelo Depo.") at 40, 90-91; Tanner Report p. 2.  Many Ottawas resisted the removal operations.  Some fled to Canada.  Others simply refused to leave and stayed behind.  Tanner Report at 11; Tucker Report at 1; Angelo Aff. ¶ 9.

The removal expeditions proved disastrous for the Ottawas.  They marched across Ohio, Indiana, and Illinois to the St. Louis area, where they were devastated by a cholera epidemic.  Tanner Report at 7-8; Angelo Depo. at 86-87.  The federal government failed to deliver necessary and expected supplies along the route.  Tanner Report at 7-8.  Nearly half of the roughly 300 Ottawas who were removed died from disease and hunger within a few years.  Angelo Aff. ¶ 9.

### C.    The Ottawas' Post-Removal Struggles

The Ottawas' involuntary destination was a reservation in Kansas.  Their efforts to farm this land provided them with minimal subsistence, but no more – they were a destitute people.  Angelo Aff. ¶ 10.  About thirty years after their removal to Kansas, they were uprooted again.  In the 1860s, the United States induced the Ottawas to sign new treaties under which the they were removed to a reservation in Oklahoma.  Angelo Aff. ¶ 11.  Once in Oklahoma, the Ottawas continued their impoverished agricultural

6

lifestyle for many decades, unable to break the cycle of poverty they had experienced since the early 1800s.  Angelo Aff. ¶ 12.

The Ottawas became federally recognized as the Ottawa Tribe of Oklahoma in 1938.  Angelo Aff. ¶ 13.  Recognition, however, brought no federal grants or other monies.  Angelo Aff. ¶ 13.  The recognition was short-lived as well; the federal government terminated the Ottawa Tribe's recognized status in 1956.  Angelo Aff. ¶ 15. In May of 1978, Congress restored officially recognized status on the Ottawa Tribe.  25 U.S.C. § 861; Angelo Aff. ¶ 15.

Federal aid finally came in the 1990s.  A 1990 statute authorized aid to tribal governments.  The Ottawa Tribe received various grants for administrative costs and social services.  In 1999 and 2000, the Tribe received grants for building purposes and, in 2002, the Ottawas purchased a convenience store.  Shortly thereafter, the Ottawas built a small casino near Miami, Oklahoma that opened in 2006.  Angelo Aff. ¶ 16.

From the time of their removal from Ohio until this decade, the Ottawas were an impoverished people.  They had no financial ability to assert their treaty rights.  And, even if they could have successfully asserted their treaty rights, they had no financial ability to start a commercial fishing operation on Lake Erie.  Angelo Aff. ¶ 17.  Their recent economic development activities have, for the first time in their history, given them some limited ability to do so.  Even so, the Ottawas remain a poor people.  Of the 600 Ottawas living on or near the historic tribal reservation in Miami, Oklahoma, 25% are retired or disabled.  The unemployment rate among able-bodied, working-age Ottawas is 26%.  Angelo Aff. ¶ 18.

II.     **Conservation in Lake Erie**

      A.     **Lake Erie – Past and Present**

The record is silent on the state of fish populations in Lake Erie at the time the Ottawas were forced from Ohio or at any time in the 19th Century.  Mr. Logan cannot show that the Ottawas' delay caused prejudice if he cannot show how the populations of commercially important species differed between then and now.  He has not and cannot make that showing.

In any event, what the record does establish is that Lake Erie has experienced a remarkable turnaround beginning in the 1970s.  Prior to that time, the lake suffered from increasing exploitation and pollution to the point where various species became extinct or nearly so.  The decline and loss of fish stocks during this period resulted from overexploitation by commercial fisheries, coupled with pollution and poor fishery management practices. Christopher Bunt Affidavit ("Bunt Aff.") ¶ 3.  Additional commercial fishing during the time of decline (including fishing by the Ottawas) may have exacerbated the depletion of certain species and delayed the recovery of those species that survived.  Bunt Aff. ¶ 4.

The lake, however, is very adaptable and resilient.  Bunt Aff. ¶ 6. Christopher Bunt Deposition ("Bunt Depo.") at 76.  Beginning in the 1970s, regulation of the sources of pollution, particularly through enforcement of the Clean Water Act, and the establishment of fish harvest quotas have permitted the recovery and thriving of surviving species.  Bunt Aff. ¶ 3.

The evidence indicates that today Lake Erie and its fish populations are healthy.  Walleye and yellow perch have, in the recent past, peaked at record levels.  Expert

Report of Christopher Bunt ("Bunt Report") at 3.  The Ohio's Fisheries Program Administrator described the walleye and perch populations as "fairly healthy." Roger Knight Deposition ("Knight Depo.") at 53.  In 2005, for example, the lake was home to an estimated 46 million walleye, well in excess of the 15-40 million "maintenance" level. Bunt Report at 8.  Moreover, sport fishing, the only form of fishing permitted for walleye, has been declining since the 1980s.  Bunt Report at 15; Knight Depo. at 35; *see also* www.dnr.state.oh.us/wildlife/pdf/LicenseSales.pdf (showing Resident Hunting and Fishing License Sales by Year 1925-2000; last accessed June 26, 2007).  Although fish populations naturally grow and shrink from year-to-year, Knight Depo. at 53, the walleye and perch population are expected to remain within the same healthy range as they are now for the foreseeable future.  Bunt Aff. ¶ 8.  Other species within the lake are also underutilized.  Bunt Report at 3.  The Lake Erie fishery "appears to be as good, or better, than it has ever been."  Bunt Report at 15.

### B.    Fish Conservation Measures

Fish conservation measures for Lake Erie begin with the Lake Erie Committee of the Great Lakes Commission.  Knight Depo. at 43; David Risley Deposition ("Risley Depo.") at 35.  The committee consists of representatives of the four American states and Canadian province that own or border the lake.  The committee monitors fish populations in the lake and sets Total Allowable Catch ("TAC") limits for two fish species – walleye and yellow perch.  The TAC is based not only on conservation analyses of the surplus of fish available for harvest, but also on "socioeconomic issues."  Knight Depo. at 47; Bunt Aff. ¶ 7.  It is generally a conservative limit, Knight Depo. at 49, 75, and, barring truly extraordinary circumstances, adherence to the TAC ensure the survival of

9

the species.  Bunt Aff. ¶ 8.  The TAC is adjusted annually.  A declining TAC does not necessarily, or even usually, indicated a decline in the species population; it instead may indicate the Lake Erie Committee has some goal in mind other than mere continuation of the species.  Bunt Aff. ¶ 7.  Indeed, the walleye TAC historically does not track variations in the estimated walleye population.  Bunt Aff. ¶ 7.

Once set by the Lake Erie Committee, the TAC is then allocated to the various jurisdictions pursuant to agreed upon formulas.  *See generally* Knight Depo. at 43; Bunt Depo. at 71.[3]  With its TAC allocations, Ohio imposes further limitations on Lake Erie fishing.  For example, Ohio permits only recreational fishing of walleye in Lake Erie; commercial walleye fishing is prohibited.  Knight Depo. at 78.

These choices are often politically or economically-based, rather than founded on conservation concerns.  Knight Depo. at 118; Bunt Aff. ¶ 10.  For example, Ontario (unlike Ohio) permits full commercial exploitation of its share of walleye TAC.  Knight Depo. at 84.  Ohio's Fisheries Program Administrator admitted that the TAC could be allocated differently but for "socioeconomic factors."  Knight Depo. at 81, 83-84.  Indeed, he conceded that the Department of Natural Resources "[hasn't] done any analysis" to assess the effects of additional commercial fishing.  Knight Depo. at 113.  But he testified that adding an additional commercial license to Ohio's eighteen existing commercial licenses would "probably not" make any difference.  Knight Depo. at 103.

The evidence suggests that Mr. Knight is correct – it would *not* make any difference to conservation efforts to permit the Ottawas to fish commercially on Lake Erie.  The Lake Erie fishery in Ohio is generally underexploited or, at most, moderately

exploited.  Bunt Report at 15.  Thus, the lake is very capable of supporting additional commercial fishing.  Bunt Aff. ¶ 10.  Since 1990, Ohio's walleye harvest has been significantly below Ohio's share of the TAC.  Knight Depo. at 97; Bunt Report at 3, 15. The same is true for perch, which are abundant and available for additional harvest. Bunt Report at 16.  Given the long-term decline in sport fishing and Ohio's long-term under-harvesting of walleye and perch, there is room for additional commercial fishing "without compromising the apparent value of the sport fishery in Lake Erie."  Bunt Report at 18.

In addition, other fish species native to Lake Erie of potential commercial important are not subject to TAC limits and are also under-harvested.  These include White Bass, White Perch, Burbot, Channel Catfish, Carp, Quillback and Freshwater Drum.  Bunt Aff. ¶ 9.

## ARGUMENT

### I.  Preliminaries

For purposes of this motion, the Court should assume that the relevant treaties confer usufructuary rights on the Ottawas in the areas in question, particularly Lake Erie.  Mr. Logan does not challenge in this motion the Ottawas' interpretation of the treaties or the scope of the rights conferred by those treaties.  He concedes as much. *See* Memorandum in Support of Defendant's Motion for Summary Judgment on Laches and Abandonment (*sic*) at 2-3 ("the purpose of this motion is not to argue the merits of the treaty language").  The only question for present purposes is whether Mr. Logan has

---

[3] Dr. Christopher Bunt, one of the Ottawas' experts, is a principal and director of Biotactic, Inc., which "develop[s] solutions and strategies to ensure sustainable fish populations primarily for the future."  Bunt

established beyond dispute that the Ottawas' usufructuary rights have been extinguished by the passage of time, notwithstanding the absence of any explicit revocation or relinquishment of those rights.

The Court may also limit its analysis to commercial fishing on Lake Erie and its adjacent bays and estuaries. The Tribe does not intend to exercise the full extent of its treaty rights elsewhere. Instead, the Tribe intends to engage in recreational fishing on public inland lakes, rivers, and streams, and recreational hunting on public property, under the same conditions and restrictions applicable to any Ohio citizen.[4]  *See* Angelo Depo. at 160, 164. Thus, there is no dispute between the parties except as it relates to commercial fishing on Lake Erie and its bays and estuaries.

Although herring are not native to Lake Erie, Mr. Logan has focused on a couple of red ones. The Court may quickly dispense with these as well.

First, Mr. Logan contends that the Ottawas seek to hunt and fish "free from all regulation except that strictly necessary to prevent extinction of the species." This is quite the hyperbole. As specified in the amended complaint (at ¶ 31), the Ottawas seek judicial recognition of their treaty rights subject to the limitations specified in the Sixth Circuit's decision in *United States et al. v. State of Michigan Natural Resources Commission et al.,* 653 F.2d 277 (6th Cir. 1981). There the court of appeals held that treaty-based usufructuary rights could be limited to the extent a governmental defendant could prove the limitations were (a) necessary conservation measures, (b) the least

---

Depo. at 22.
[4] These limitations come with two caveats. First, Mr. Logan should not be permitted to discriminate against the Ottawas in any way in their pursuit of recreational hunting and fishing. *See* Angelo Depo. at 161. Second, the Ottawas should not have to pay any license fee or other government-imposed cost in order to exercise their treaty rights, including recreational hunting and fishing.  If the Ottawas had to pay to exercise these treaty rights, they would be no better off than a citizen who had no treaty rights.

restrictive alternatives, and (c) non-discriminatory.  *Id.* at 279.  Neither this case nor any other authority suggests that the only "necessary conservation measures" are those "strictly necessary to prevent extinction of the species."  So Mr. Logan's concern is exaggerated and misplaced.

Second, Mr. Logan argues that private landowners will be prejudiced if the Ottawas are permitted to hunt and fish on private land.  For starters, the Ottawas' limitation of their claim to public lands and waters moots this argument.  (Indeed, the Ottawas never intended to hunt or fish on private lands without permission.)  Moreover, even without that limitation, this argument is specious.  This Court could not order relief that would prejudice private landowners without those landowners being parties to the lawsuit – and of course, they are not.  Mr. Logan's solicitude for private landowners is misplaced.

With these red herrings on ice, the issue is properly framed:  do the doctrines of laches, acquiescence, or impossibility bar the Ottawas from exercising treaty rights to fish commercially on Lake Erie and its bays and estuaries? And given the current summary judgment posture, the inquiry is whether Mr. Logan has established each element of these defenses beyond debate.

## II.    Laches Does Bar the Tribe's Claim Because the Delay in Asserting Treaty Rights was Neither Unreasonable nor Prejudicial to Mr. Logan.

Having argued in his motion to dismiss that the Ottawas brought this case *too soon*, Mr. Logan now argues that they brought it *too late*.  Mr. Logan relies on the affirmative defense of laches, an equitable doctrine left to the sound discretion of the Court.  Laches requires that Mr. Logan prove beyond dispute that the Ottawas

13

unreasonably delayed in bringing their claim <u>and</u> that Mr. Logan has been prejudiced by the delay. *Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 466 (6th Cir. 2004). Mere delay is not enough. Mr. Logan must established beyond debate the unreasonableness of the delay and the resulting prejudice to himself. *Patton v. Bearden*, 8 F.3d 343, 347-48 (6th Cir. 1993).

In *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), the United States Supreme Court held that equitable defenses such as laches, acquiescence, and impossibility were applicable to the Indian *land* claims brought by the Oneida Indian Nation. The issue was in doubt, in part because laches and other delay-based defenses generally do not apply to sovereign entities, and Indian tribes were regarded as quasi-sovereign entities. The Oneidas had purchased on the open market various properties that they claimed had been illegally purchased from them in the 18th and 19th Centuries. They wanted to "revive" their sovereignty over the parcels, which included exemption from taxation of the properties.

The Supreme Court held that laches focuses on one side's inaction and the other side's legitimate reliance on that inaction. *Id.* at 217. The critical factor in the Court's decision was that, after long delay, the Oneidas sought an extremely "disruptive remedy." *Id.* Because of the Oneidas' delay in asserting their rights, the lands in question had been governed by the State of New York, two counties, and various municipalities for two hundred years. *Id.* at 202. The Court held that reviving the Oneida's sovereignty over these lands would create a pattern of alternating state and tribal jurisdiction that would seriously burden the administration of government and

adversely affect neighboring landowners. *Id*. at 220. The Supreme Court therefore held that laches and other delay-based affirmative defenses barred the claim.

Nothing in the Court's opinion suggests that delay-based defenses should bar treaty-based usufructuary rights. The key to the decision was that the Oneidas sought to transfer sovereignty over land – a disruptive remedy sufficient to establish the prejudice required by the laches defense.

In contrast, the exercise of treaty-based hunting and fishing rights do *not* infringe on state sovereignty. So held the Supreme Court in *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999). Recognizing those rights is therefore not a disruptive remedy sufficient to establish laches.; on the contrary, Indian treaty-based usufructuary rights can co-exist with government conservation efforts. *Id*. at 204. Indeed, counsel is not aware of *any* case holding treaty-based usufructuary rights were lost through laches.

## A. The Ottawas' Delay is Not Unreasonable Because They Faced Serious Impediments in Asserting Their Treaty Rights.

Mere delay does not establish laches. Yet mere delay is all Mr. Logan argues. He makes no attempt whatsoever to show that the Ottawas' delay in asserting their treaty rights was unreasonable. He makes no attempt to address the questions the Court already ruled were key to the laches defense. He makes no attempt to establish that the Ottawas could have asserted their rights earlier but chose not to do so. Although it is his burden to establish it beyond debate, Mr. Logan has not even addressed the first prong of the laches defense – *unreasonable* delay. This failure by itself requires denial of summary judgment on the laches defense.

Even if Mr. Logan had presented any evidence of the unreasonableness of the delay, he could not establish the point beyond dispute.   Indeed, the Ottawas faced significant financial, practical, and legal obstacles to the assertion of their treaty rights – obstacles that they could overcome only recently.   Different obstacles existed at different times, but collectively these obstacles confronted the Ottawas from the time they were removed from Ohio until the very recent past.

### 1.    Financial Obstacles

For the entirety of their history since removal from Ohio, the Ottawas as a people have been poor.  Angelo Depo. at 173.  Until recently, their principal means of support has been subsistence farming at the tribal reservations first in Kansas and then in Oklahoma.  The Ottawas' historic unemployment and disability rates have been very high and remain so today.  Thus, the Ottawas have had no ability to finance a federal lawsuit to assert their treaty rights.[5]  Angelo Aff. ¶ 17.  And even if they had obtained judicial recognition of their treaty rights, they had no ability to finance a commercial fishing or hunting operation.  Angelo Aff. ¶ 17.

Only within the past few years have the Ottawas had any funding to pursue a commercial fishing operation.  Although the federal government provided some grants to the Tribe after the restoration of federal recognition in 1978, the use of these funds was strictly limited.  Angelo Depo. at 174.  It was not until 2002, when the Tribe opened its convenience store, that the Ottawas began to develop financial resources to pursue their treaty rights.  Angelo Aff. ¶ 16.

---

[5] The Ottawas did assert certain other claims before the Indian Claims Commission during the 1960s and 1970s.  They were able to do so only because, under the Indian Claims Commission Act, federal awards paid their attorneys' fees.  Angelo Depo. at 175.

16

### 2.    Practical Obstacles

At times the Ottawas have faced serious, perhaps insurmountable, practical impediments to assertion of their treaty rights.  In the aftermath of their removal from Ohio, the Ottawas were quite literally trying to survive.  Beset by disease and hunger, many Ottawas died as a result of the removal operations to Kansas.  Those that survived found themselves in a foreign region, trying to subsist on basic farming operations.  About thirty years after being uprooted from Ohio, the Ottawas were again uprooted and removed to Oklahoma – nearly 800 miles away from the familiar territory of northwest Ohio and southern Michigan – where they were again forced to create a sustainable community from scratch.  In the faced of far more basic and pressing needs, the assertion of usufructuary rights was a literally and figuratively distant concern for many decades after removal.

### 3.    Legal Obstacles

For part of the period since they were forced out of Ohio, the Ottawa Tribe could not even bring an action in federal court.  The Ottawas were removed from Ohio in the 1830s.  In 1831, the Supreme Court held that an Indian tribe could not maintain an action in federal court.  *Cherokee v. Georgia*, 30 U.S. 1, 20 (1831).  At the time, there was no general federal-question jurisdiction statute that might have allowed the Ottawas to assert a claim "arising under" their treaties.  In 1875, Congress enacted the precursor to the present day federal-question jurisdiction statute, 28 U.S.C. § 1331, which might have – for the first time – allowed an Indian tribe to sue to enforce treaty-based rights.  Even so, the statute contained an amount-in-controversy requirement until 1980.

17

Furthermore, it is not clear that the Tribe was entitled to sue all throughout the period from 1875 to the present.  At some point after the 1875 passage of the first federal-question jurisdiction statute, it became reasonably clear that an Indian tribe could file suit in federal court to assert its treaty rights.  But the Ottawas were not federally recognized as a tribe until 1938.  The Tribe lost its federal recognition in 1956.  Angelo Depo. at 174.  Congress restored recognition of the Ottawas in 1978.  25 U.S.C. § 861; Angelo Depo. at 129.  And at least one source of federal jurisdiction for Indian tribes asserting treaty-based claims, 28 U.S.C. § 1362, explicitly requires that the tribe be "duly recognized by the Secretary of the Interior."  The purpose of this statute was to provide a federal forum for Indian-rights cases that did not meet the amount-in-controversy requirements of 28 U.S.C. § 1331.  *United States v. Alpine Land and Reservoir Co.*, 431 F.2d 763, 767 (9th Cir. 1970).

Thus, the Tribe could not pursue its treaty rights during at least some portion – and perhaps a significant portion – of the period in question.  Mr. Logan has the burden of proving beyond dispute that the Tribe *could have* asserted its rights earlier, and he has not even tried to do so.

**B.     Recognition of the Ottawas' Treaty Rights Will Not Prejudice Mr. Logan**

The second element of laches requires that Mr. Logan prove prejudice to himself as a result of his reliance on the Ottawas' inaction.  Again, Mr. Logan has not even attempted to establish this element of the defense, even though it is his burden to do so.  He has not shown how he changed his position in reliance on the Ottawas' delay.  That failure is fatal to his motion.  In any event, there is plenty of evidence that the Ottawas'

requested relief will not prejudice Mr. Logan (or his Department), even if he had established that he relied on the Ottawas' delay.

### 1. Fishing Rights Do not Cause Disruptive Prejudice Sufficient to Establish Laches.

Preliminarily, though, Mr. Logan's motion has a fatal legal problem on the prejudice prong of the defense.  The Supreme Court's decision in *City of Sherrill* focused on the disruptive prejudice that the Oneidas' *land* claim would create.  The Oneidas' attempt to reassert sovereignty over various properties would, the Supreme Court believed, create chaos.

The Ottawas' usufructuary rights claim in this case is quite different.  *Land* claims are disruptive in a way that *fishing rights* claims are not.  A claim for treaty-based fishing rights involves none of the concerns identified in *City of Sherrill* as dispositive – there is no transfer of sovereignty and no potential loss of zoning power.

At most, a fishing rights claim involves an accommodation of the Tribe's rights within existing conservation policies.  *See United States et al. v. State of Michigan Natural Resources Commission et al.,* 653 F.2d 277, 279 (6th Cir. 1981) (holding that treaty-based usufructuary rights may be limited by the application of non-discriminatory, least restrictive, necessary conservation measures).  And the United States Supreme Court has already held that this accommodation is not at odds with either state sovereignty or the conservation of natural resources.  In *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999), the Court held that "Indian treaty-based usufructuary rights are not inconsistent with state sovereignty over natural resources." The Court emphasized that "Indian treaty rights can coexist with state management of natural resources."  *Id.*

19

Thus, as a matter of law, recognition of the Ottawas' treaty-based fishing rights would not create the kind of disruptive prejudice needed to establish laches under *City of Sherrill*.   Not surprisingly, Mr. Logan has cited no case in which a court found that laches barred a fishing rights claim – because (as far as counsel can determine) there are no such cases.

>    **2.    As a Factual Matter, the Ottawas' Fishing Rights are Consistent with Ohio's Conservation Measures.**

Even ignoring this legal defect, Mr. Logan has failed to establish beyond dispute that permitting the Ottawas to fish commercially in Lake Erie will harm his Department's conservation efforts.[6]   There is plenty of evidence that commercial fishing by the Ottawas will not harm Lake Erie or its fish populations.

The evidence indicates that Lake Erie fish populations are healthy.  The lake as a whole is very adaptable and resilient.  Bunt Depo. at 76.  Walleye and yellow perch have, in the recent past, peaked at record levels.  Bunt Report at 3.  The Ohio Department of Natural Resources' Fisheries Program Administrator described the walleye and perch populations as "fairly healthy." Knight Depo. at 53.  In 2005, for example, the lake was home to an estimated 46 million walleye, well in excess of the 15-40 million "maintenance" level.  Bunt Report at 8.  Moreover, sport fishing, the only form of fishing currently permitted for walleye, has been declining since the 1980s, perhaps marginally contributing to the abundance of walleye.  Bunt Report at 15; Knight Depo. at 35; *see also www.dnr.state.oh.us/wildlife/pdf/LicenseSales.pdf* (showing

---

[6] Even if he had shown this, it would not be a sufficient showing to grant his motion.  Mr. Logan must establish that he was prejudiced *by the Ottawas' delay*.   Nowhere does he explain how he would have acted differently if the Ottawas had asserted their rights earlier, or how he detrimentally relied on the Ottawas' inaction.  Moreover, it would not be enough for Mr. Logan to provide evidence that commercial

Resident Hunting and Fishing License Sales by Year 1925-2000; last accessed June 26, 2007).  Although fish populations naturally grow and shrink from year-to-year, Knight Depo. at 53, the walleye and perch population are expected to remain within the same healthy range as they are now for the foreseeable future.  Bunt Aff. ¶ 8.  Other species within the lake are also underutilized.  Bunt Report at 3.   In the words of the Ottawas' expert, the Lake Erie fishery "appears to be as good, or better, than it has ever been." Bunt Report at 15.

The TAC limits for walleye and perch are conservative ones driven in part by socioeconomic factors, not just conservation concerns.  Knight Depo. at 47, 49, 75.  The further limits Ohio places on commercial and recreational fishing are also often based on political or economic goals.  *E.g.*, Knight Depo. at 118.  Ohio's Fisheries Program Administrator admitted that the TAC could be allocated differently but for these "socioeconomic factors."  Knight Depo. at 81, 83-84.

Even though these fishing restrictions are conservative as a matter of conservation and often influenced by factors other than conservation, the Ottawas can be easily accommodated within the current regime.  The Lake Erie fishery in Ohio is generally underexploited or, at most, moderately exploited.  Bunt Report at 15.  Since 1990, Ohio's walleye harvest has been significantly below Ohio's share of the TAC. Knight Depo. at 97; Bunt Report at 3, 15. The same is true for perch, which are abundant and available for additional harvest.  Bunt Report at 16.  Thus, despite Mr. Logan's protestations, the reality is that Ohio fisherman have not even harvested the very conservative levels represented by the TAC.  Indeed, Ohio's Fisheries Program

---

fishing by the Ottawas would be harmful to conservation efforts; he would have to establish that there is *no* genuine evidence to the contrary.  He has not come close to satisfying his burden on this motion.

Administrator testified that adding an additional commercial license to Ohio's eighteen existing commercial licenses would "probably not" make any difference.  Knight Depo. at 103.  Far from being "prejudicial," the Ottawas' proposed commercial fishing fits well within Ohio's existing conservation scheme.

To be sure, the Ottawa seek to engage in commercial fishing of walleye, something that Ohio has elected to prohibit.  But Ohio elects to permit only sport fishing of walleye not for valid conservation reasons, but because it believes recreational fishing is a greater boon to the economy than commercial fishing.  And, not coincidentally, recreational fishing licenses generated nearly three-quarters of the funds available to the Department's fisheries management program.  Bunt Report at 13.

But the Ottawas' treaty rights do not give way to the Department's economic or political interests; they give way only to conservation interests.  "Although non-treaty fisherman might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fisherman are immune from all regulation save that required for conservation."  *Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.*, 443 U.S. 658, 682 (1979); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204-05 (1999) (establishing a *conservation* standard for limitation of treaty rights); *United States et al. v. State of Michigan Natural Resources Commission et al.,* 653 F.2d 277, 279 (6th Cir. 1981) (same).  Moreover, there is no evidence that the Ottawas' interest in commercial fishing of walleye will stymie the Department's interest in promoting sport fishing.  Given the long-term decline in sport fishing and Ohio's long-term under-harvesting of walleye, there is room for additional

commercial fishing "without compromising the apparent value of the sport fishery in Lake Erie."  Bunt Report at 18.

Ironically, perhaps, the Ottawas' delay in asserting their treaty rights likely *benefited* Mr. Logan's mission rather than prejudicing it.  As northern Ohio experienced urbanization and industrialization, Lake Erie and its fisheries suffered from the effects of pollution and over-exploitation of fish populations.  Throughout the late 19th Century and first three-quarters of the 20th Century, various fish species were depleted, and some became extinct.  Bunt Aff. ¶ 2.  Any additional commercial fishing, including by the Ottawas, during the years of overexploitation and uncontrolled pollution could have exacerbated the depletion of certain species and delayed the recovery of those species that survived.  Bunt Aff. ¶ 4.  With the advent of pollution-control regulation and effective fisheries management in the 1970s and 1980s, however, the lake made a remarkable turnaround.  As described above, Lake Erie fisheries are – and should continue to be – plentiful enough that commercial fishing by the Ottawas will create no conservation concerns.

### 3.    Mr. Logan's Assertions of "Prejudice" Miss the Mark.

Mr. Logan offers several misguided arguments in an effort to show that commercial fishing by the Ottawas will create the kind of disruptive prejudice needed to establish laches.  First, he argues that the Department of Natural Resources must be able to act to protect species.  Despite suggestions to the contrary in Mr. Logan's motion papers, the Ottawas do not seek to fish free of any restrictions.  They seek to exercise their treaty rights consistent with necessary conservation measures, as outlined in Supreme Court and Sixth Circuit jurisprudence.  *See Minnesota v. Mille Lacs*

*Band of Chippewa Indians*, 526 U.S. 172, 204-05 (1999); *United States et al. v. State of Michigan Natural Resources Commission et al.,* 653 F.2d 277, 279 (6th Cir. 1981). Furthermore, this argument has nothing to do with laches or prejudice due to delay; Mr. Logan could make the same argument if there were no delay at all in the assertion of treaty rights.  The argument is, at most, an argument as to how relief ought to be shaped.

Second, Mr. Logan complains that his Department will have to prove that its conservation measures are reasonably necessary.  While Mr. Logan might prefer to regulate without any scrutiny, treaty rights can be limited only by necessary conservation measures, regardless of whether the tribe delayed in asserted those rights or not.  So this argument, like the previous one, really has nothing to do with the present motion.  That Mr. Logan's Department will have to justify its decisions is not the kind of prejudice contemplated by the laches defense.

Third, Mr. Logan argues that accommodating the Ottawas will necessarily prejudice either sport or commercial fishermen or others who rely on the current conservation regime.  The problem with this argument is that it is contrary to the facts. Ohio's long-term under-harvesting of its TAC allocations means that the Ottawas could commercially fish without squeezing out other fishermen or harming the fish populations.  Bunt Report at 3.  The Court will search in vain for any *evidence* that the Ottawas will destroy Lake Erie – because it is all assertion.  Indeed, Ohio's Fisheries Program Administrator testified that he did not know what, if any, damage would be caused by adding the Ottawas to the roster of commercial fishing operations because "[w]e haven't done any analysis."  Knight Depo. at 113.  That testimony dooms Mr.

24

Logan's motion – he cannot prove prejudice because his Department "[hasn't] done any analysis" of the relevant issue.

### III.  The Equitable Defense of Acquiescence is Inapplicable Because the Ottawas Have Given No Assurance That They Would Not Enforce Their Treaty Rights.

To win summary judgment on his equitable defense of acquiescence, Mr. Logan must establish beyond dispute that the Ottawas gave him (or his Department) express or implied assurance that they would not assert their rights.  Acquiescence involves an intentional failure to protect one's rights.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991).  Little discussion is needed to dispose of this defense – Mr. Logan has zero evidence that the Ottawas ever gave anyone any assurance that they would not assert their treaty rights.  The acquiescence defense is seemingly thrown in just for good measure, as Mr. Logan makes no attempt to support it.  And he could not if he had tried.

### IV.  The Equitable Defense of Impossibility Does Not Apply Because, Quite Simply, The Requested Relief is Far from Impossible.

The defense of impossibility requires Mr. Logan to prove that the lapse of time and delay in the assertion of rights have made relief impracticable without serious disruption to settled affairs.  As shown above, the Ottawas' treaty rights are not inconsistent with Ohio's efforts to conserve its natural resources.  Indeed, the record suggests that the Ottawas may engage in commercial fishing without any harmful effect on fish populations or other fishing interests.   The requested relief is far from impossible.

25

## CONCLUSION

By definition, equitable defenses are supposed to serve the cause of equity.  The historic treatment of Indians in this country, including the Ottawas, is a case study in inequity.  Forced from their homeland and consigned to poverty, the Ottawas eked out a hardscrabble existence for many decades.  Now, when they finally have the ability and resources to exercise the meager rights they received in exchange for their native lands, Mr. Logan would have this Court deny them those rights.

Equitable defenses appeal to the Court's discretionary exercise of its sense of justice and fairness.  The result Mr. Logan seeks would only perpetuate the pervasive injustice and unfairness to which the Ottawas have been subjected.

The motion for summary judgment should be denied.

Respectfully submitted,


*/s/ Richard D. Rogovin*
Richard D. Rogovin (0022002)
Terrence M. Fay (0022935)
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, OH 43215
(614) 559-7234 (Phone)
(614) 464-1737 (Fax)
email:  rrogovin@fbtlaw.com
email:  tfay@fbtlaw.com
*Attorneys for Plaintiff*

/s/ William C. Caughey
William C. Caughey (0005567)
900 South Boundary
Perry Town Square
Suite 8A
Perrysburg, OH 43551
(419) 872-1688 (Phone)
(419) 872-1795 (Fax)
email:  wcaughey@email.toast.net
*Attorney for Plaintiff*

/s/ Daniel T. Spitler
Daniel T. Spitler (0023291)
131 E. Court Street
Bowling Green, OH 43402
(419) 352-2535 (Phone)
(419) 353-8728 (Fax)
email:  dspitler@shynlaw.com
*Attorney for Plaintiff*

**CERTIFICATION OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was filed electronically this 28th day of June, 2007.  Notice of this filing will be sent to all parties by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.  Parties who do not receive this filing via the Court's electronic filing system will receive a copy by regular U.S. mail.

/s/ Richard D. Rogovin
Richard D. Rogovin
*Counsel for Plaintiff*

CINLibrary 0110846.0543715 1750381v4

28