IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ottawa Tribe of Oklahoma,                    Case No. 3:05 CV 7272

                    Plaintiff,          MEMORANDUM OPINION
                                       AND ORDER

       -vs-

                                         JUDGE JACK ZOUHARY

Ohio Department of Natural Resources,

                    Defendant.

Plaintiff, the Ottawa Tribe of Oklahoma (Ottawa Tribe), filed a Complaint seeking the right to fish and hunt in Ohio and on Lake Erie without restrictions from Defendant, Sean Logan, in his capacity as Director of the Ohio Department of Natural Resources (ODNR). Plaintiff claims its rights were granted by the United States through several treaties. Defendant denies these treaties grant Plaintiff rights to hunt or fish in Ohio or on Lake Erie and, in any event, claims any such rights cannot be enforced because they are barred by laches.

This matter is before the Court on Defendant's Motion for Summary Judgment on Laches (Doc. No. 69). Plaintiff filed an Opposition (Doc. No. 89) and Defendant Replied (Doc. No. 91). The Court requested supplemental briefing from both parties relating to the claimed application of various treaties (Doc. Nos. 95 and 97).

## BACKGROUND

### Ottawa Tribe

In the early nineteenth century, chiefs and representatives of several bands of the Ottawa Tribe signed several treaties with the United States: the Treaty of Greenville, the Treaty of Fort Industry,

the Treaty of Detroit, the Treaty of the Maumee Rapids, and the Treaty of 1831.  In each of these treaties (discussed later in detail), the Ottawas, and other Indian tribes, granted land title to the United States or a private company.  In exchange, the Indian tribes were given various types of consideration, including money, food, supplies, or certain rights to the ceded land, including the right to hunt and fish.

In 1830, Congress passed the Indian Removal Act, removing all Indians to the west of the Mississippi River in order to make way for continued settlement.  Ottawa chiefs signed the Treaty of 1831 relinquishing all land previously held in Ohio and were granted a land reservation in Kansas.  Federal agents enforced the treaty by removing members of the Ottawa Tribe from Ohio.  During the seven hundred mile journey to Kansas, nearly half of the roughly three-hundred Ottawas died from hunger and disease.

Upon arriving in Kansas, the Ottawa Tribe transitioned from hunting and fishing to farming.  This lifestyle provided minimum subsistence, and the problems of disease and alcoholism, that had originated before their removal, increased.  In the 1860s, the Ottawa chiefs signed new treaties, and the Ottawa Tribe was again uprooted and removed to a reservation in Oklahoma where its members continued farming as their primary lifestyle.

In 1938, the Ottawa Tribe was officially recognized by the federal government.  The recognition terminated in 1956 and was once again restored in 1978.  With this restoration, the Ottawa Tribe received various financial grants for social services, and recently purchased a convenience store and built a small casino to raise funds for social welfare.  Despite these new operations, the Ottawa Tribe still has an unemployment rate of nearly twenty-five percent and limited financial resources.

2

With this lawsuit, the Ottawa Tribe is seeking to enforce its alleged treaty rights to initiate commercial fishing operations as a further means to supplement its current income.

*State of Ohio*

Following the Ottawa Tribe removal and relocation, Ohio's geographic, economic, and social framework changed too. In the early nineteenth century, what is now northern Ohio was heavily-forested wilderness and relatively unpopulated. Numerous streams and rivers snaked their way through thick hardwood forests, marshes, and prairie grasslands. As settlers moved westward into Ohio, landowners began the process of converting the wilderness into fields for growing crops and raising animals, but the open range was still free for hunting and trapping. Canals, steamships on the Great Lakes, and railroads stimulated the agriculture market and brought general growth to Ohio's economy. With this economic growth also came a growth in population and land ownership. With less unimproved land available for hunting, Ohio issued laws in 1857 to regulate the trapping and hunting of wild game. By then, more than sixty percent of land within Ohio had been improved into private farmland.

As Ohio settlers drained marshes and swamps, the paths of streams and rivers were also altered. Since the 1820s, Ohio and its local government bodies have built more than six thousand river dams. Lakes and reservoirs were created to provide drinking water to local communities, and inland fishing was established in these manmade lakes. Today, the ODNR operates fish hatcheries and stocks these manmade lakes and reservoirs for sport fishing.

Lake Erie was also affected during Ohio's development from a harsh wilderness to a populous, settled state. During the early 1800s, Lake Erie was primarily used as a means of transportation, both by boat and by foot along its wide sandy beaches. Fishing on the Lake was also a principal means

3

of survival for both settlers and tribes, and by the 1830s, the commercial fishing industry sprang up in lakeside communities.  Like the agriculture industry, commercial fishing on Lake Erie expanded greatly with the arrival of the canals and railroads as a means of efficient transportation to eastern states.  The entrance of refrigeration systems into rail transportation expanded even further the reach of Lake Erie's commercial fishing, and by 1870 nearly twenty percent of the whitefish consumed in the United States was shipped from Lake Erie.

But because of poor regulation and oversight, the ecological condition of the Lake deteriorated greatly over the next hundred years.  Urban development along the Lake and the shoreline eliminated spawning and nursing habitats for a variety of fish.  The natural sands of the lakeshore were replaced by concrete walls, jetties, and breakwaters.  These hardened structures prevented the sands from operating as natural filters for run-off, causing an increase in lake pollution levels. As a result, numerous fish species, including trout, sturgeon, and blue pike no longer exist in Lake Erie, and artificially introduced species, like zebra mussels, carp, and white perch, now dominate.

In reaction to these changing conditions, the states and Canadian province surrounding Lake Erie, including Ohio, formed the Lake Erie Committee of the Great Lakes Commission.  The committee monitors fish populations and sets a Total Allowable Catch ("TAC") on how many walleye and lake perch may be caught.  This limitation is adjusted annually for economic and conservation concerns. Since 1998, the TAC for both walleye and yellow perch have decreased significantly. Ohio's TAC for walleye was 5.28 million fish in 1998 and only 2.733 million in 2007.  Ohio further limits Lake Erie fishing with prohibitions on both gill net fishing and commercial fishing of walleye.

In short, the landscape of northern Ohio has been greatly altered since the Indians were forced

4

westward.  Lake Erie continues to undergo ecological transformations, and threatened species of fish and pollution have triggered strict environmental and conservation objectives.

DISCUSSION

### Subject Matter Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1362.  The Ottawa Tribe is recognized by the United States Secretary of the Interior, and this action arises under several treaties with the United States.

### Summary Judgement

This case involves the interpretation of language in several treaties and therefore turns on questions of law.  *Nat'l Westminister Bank, PLC v. United States*, 58 Fed. Cl. 491, 496 (Fed. Cl. 2003) (treaty interpretation is a question of law and summary judgment is proper).

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  *Id.*  When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## ANALYSIS

Defendant raises two defenses which are the focus of its Motion for Summary Judgment: (1) laches, and (2) relinquished hunting and fishing rights under the treaties.[1]

## I.       Laches

Laches is an equitable doctrine that bars recovery if (1) Plaintiff unreasonably delayed in bringing its claim and (2) Defendant has been prejudiced by the delay.  *See Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 466 (6th Cir. 2004) (recovery is barred for "negligent and unintentional failure to protect one's rights").  Because there is no fixed time period in which laches operates to bar a claim, the Court "must look at circumstances of the case and determine what is equitable."  *Jordan v. Kenton County Bd. of Ed.*, No. CIV. A. 94-202, 1995 WL 916283, at * 2 (E.D. Ky. Oct. 11, 1995).  The Court should consider "the length of the delay, the reasons therefor, how the delay affected the defendant, and the overall fairness of permitting the assertion of the claim" in determining whether laches acts to bar an action.  *Stevens v. Tennessee Valley Auth.*, 712 F.2d 1047, 1056 (6th Cir. 1983).  The trial court has discretion whether laches should be applied.  *See Adcor Indus., Inc. v. Bevcorp, LLC*, 411 F. Supp. 2d 778, 803 (N.D. Ohio 2005) (without a statute of limitations, whether "the equitable defense of laches may apply and is left to the sound discretion of the trial judge.")

## A       Plaintiff's delay in enforcing its treaty rights was unreasonable

Defendant asserts Plaintiff's delay in enforcing its treaty rights and any claims for hunting and fishing was unreasonable.  Plaintiff was removed from Ohio in 1831 and made no attempts to enforce

---

[1] Defendant titled its filing:  Motion for Summary Judgement on Laches and Abandonment.  However, the defense of abandonment was not argued in the brief, the reply, or the supplemental filing.  As such, the Court will not address Defendant's abandonment defense.

any treaty rights to hunt or fish in Ohio or Lake Erie until 2005, some 140 years later.  This excessive delay is presumed unreasonable, as Plaintiff knew of its rights under the various signed treaties.  *See Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1236 (11th Cir. 2002) (a delay of over 23 years is presumed unreasonable when the plaintiff knew of the legal remedies available).  The Ottawa Tribe filed administrative claims with the Indian Claims Commission in the 1950s regarding these same treaties, and did not challenge, legally or practically, its treaty rights.  Plaintiff presents three obstacles to justify the delay: financial, practical, and legal.  Each will be addressed.

First, Plaintiff claims a lack of financial resources inhibited it from pursuing treaty rights.  The Ottawa Tribe's principal means of support was farming on tribal reservations, which resulted in extremely high unemployment.  In 2002, the Ottawa Tribe opened a convenience store and only then began developing financial resources to fund a commercial fishing operation and to assert its treaty rights.  The United States Supreme Court has specifically denied poverty as a "sufficient excuse for postponing the assertion" of legal claims.  *Leggett v. Standard Oil Co.*, 149 U.S. 287, 294 (1893) (upholding laches bar to patent infringement suit where plaintiff's excuse for the delay was his poverty); *see Akhdary v. City of Chattanooga*, No. 1:01-CV-106, 2002 WL 32060140, at *7 (E.D. Tenn. May 22, 2002) (inability to pay counsel cannot excuse a delay).  Delay based on financial impediments cannot excuse an unreasonable delay.

Second, Plaintiff claims practical obstacles delayed asserting treaty rights.  In the 1830s, Plaintiff was removed to Kansas, and in the 1860s Plaintiff was removed to an Oklahoma reservation.  Plaintiff further contends that assertion of treaty rights was a "distant concern for many decades after removal."  While this may be true, the fourteen decades that passed far exceeds any reasonable time frame to assert treaty rights, and these practical obstacles do not defeat a defense of laches.

Third, Plaintiff claims legal obstacles prevented a more timely filing of this federal action. Back in 1831, the U.S. Supreme Court held that an Indian tribe could not maintain an action in federal court. *Cherokee Nation v. Georgia*, 30 U.S. 1, 20 (1831) ("[A]n Indian tribe or nation within the United States is not a foreign state in the sense of the constitution, and cannot maintain an action in the courts of the United States."). Later, in 1875, Congress enacted legislation granting federal courts the ability to decide "all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and arising under Constitution or laws of the United States, or treaties made . . . under their authority . . .." Act of March 3, 1875, ch. 137, 18 Stat. 470 (1875) (codified as amended at 28 U.S.C. § 1331 (2007)). Although this statute provided Indian nations new access to federal court to assert treaty rights, Plaintiff claims the amount in controversy requirement ($500), which was maintained as part of the statute until 1980, prohibited its claim of treaty rights. This assertion is unreasonable. Plaintiff's desire to engage in commercial fishing on Lake Erie, although equitable in nature, clearly involves a controversy far exceeding this amount.[2] Federal jurisdiction has been available for over 125 years.

And even if Plaintiff faced difficulty demonstrating the amount in controversy, it definitely had a jurisdictional option when Congress in 1966 created jurisdiction for Indian tribes with the passage of 28 U.S.C. § 1362, which provides for federal jurisdiction for tribes "duly recognized by the Secretary of the Interior." After this statute was enacted, Plaintiff regained recognition as an Indian tribe in 1978 and could successfully assert a claim in federal court. Nevertheless, for more than twenty-five years after regaining federal recognition, Plaintiff made no attempt to assert any

---

[2]

Although the amount in controversy requirement increased up to $10,000 before being abolished in 1980, Plaintiff's claim of commercial fishing rights necessarily involved damages significantly greater than even this increased statutory minimum.

8

treaty rights for hunting and fishing in Ohio.  This delay, when federal jurisdiction was clearly available, was unreasonable, and the earlier times when federal jurisdiction was unavailable does not excuse the unreasonableness of this later delay.

Moreover, irrespective of jurisdiction in federal district courts, jurisdiction has always been available in state courts.  *See Chaffee v. Garrett*, 6 Ohio 421 (1834) (interpreting a lease of land within a reservation held by the Wyandot Indian Tribe).  The United States Supreme Court has also been available as a forum through certiorari.  *See The Kansas Indians*, 72 U.S. 737 (1867) (the Supreme Court interpreted several treaties in challenges brought by certiorari).  Finally, Plaintiff could have petitioned the United States to bring suit on its behalf.  *See United States v. Winans*, 198 U.S. 371 (1905) (United States sued to prohibit interference with the Yakima Tribe's treaty-reserved fishing rights).  Legal obstacles may have limited access to some courts, but they did not prohibit access to all courts and cannot excuse the otherwise unreasonable delay.

In sum, Plaintiff's delay in asserting its treaty rights governing hunting and fishing in Ohio was unreasonable, and Plaintiff's justifications for the delay are not well-taken.

**B.  Defendant will be prejudiced if some of Plaintiff's treaty rights are enforced**

Plaintiff asserts both a right to hunt and fish on lands within Ohio and a right to fish on Lake Erie.  Defendant asserts different prejudices for the two types of activities.  Each will be addressed separately.

**1.  Hunting and Inland Fishing Rights**

Defendant asserts various prejudices the state will face if the Ottawa Tribe is now granted exclusive hunting and fishing rights, mainly the disruption of settled expectations of both private and public land owners.  Plaintiff did not address its rights to hunt and fish on inland waters in its

9

opposition brief, instead focusing on rights to fish on Lake Erie.[3]  Plaintiff also limited its claims to public lands and waters, eliminating any concerns regarding expectations of private land owners (Doc. No. 89, p. 13).

Ninety-five percent of Ohio's land is privately owned, leaving only five percent potentially available for hunting and inland fishing by Plaintiff.  This remaining land is owned and operated by various state agencies and organizations, municipalities, and townships.  Public lands operated by ODNR include state parks and wildlife refuges throughout northern Ohio (the area covered by the applicable treaties).  These state parks receive more than ten million visitors per year and contribute more than $290 million to the state treasury.  Allowing Plaintiff to hunt and fish within these public lands would create a significant disruption for visitors to the state parks and would interfere with the integrity of wildlife management.  Hunting on state land could pose a serious threat of injury to other recreational users.  State parks and wildlife refuges now remain as one of the only sustainable habitats for Ohio's wild animals.  Unregulated hunting and fishing would clearly interfere and perhaps cause irreversible disruption of this habitat, which has been carefully and systematically designed and managed.  Allowing hunting on these lands after years of development would prejudice Defendant.

Today, Ohio has very few natural lakes that support any fishing, with the majority of inland fishing taking place on manmade lakes.  Over ninety-nine percent of Ohio's lakes that are greater than eighty acres are  manmade as opposed to natural.  These manmade lakes were created, beginning in 1891, as reservoirs to provide drinkable water to local communities by building dams and other water control systems on various rivers and streams.  Since the 1930s, Ohio has stocked these lakes with

---

[3]

Failure to support a claim renders it abandoned.  *See Nat'l Solid Wastes Mgmt. Ass'n v. Voinovich*, 959 F.2d 590, 592 (6th Cir.1992).  Plaintiff explained during a telephone status conference on September 19, 2007 that it was still seeking rights of hunting and inland fishing, in so much as the Ottawas refused to pay state license fees, but the crux of their Complaint is commercial fishing rights on Lake Erie.

over one billion fish for both recreational anglers and to reestablish threatened or endangered species. During this time, commercial fishing has been prohibited in order to sustain the fish population. Inland fishing, as it exists today in Ohio, was not present when any of the treaties granting fishing rights were signed.  The availability of inland fishing is a direct result of conservation and fishery management undertaken by Ohio in the last hundred years.  Allowing the Ottawa Tribe to commercially fish on inland lakes and rivers would have a devastating effect on the lakes' ecosystems and artificial fish populations, prejudicing the ODNR's management efforts.

Ohio also has established hatcheries and created a conservation system to manage and maintain the fish populations in inland lakes.  To now permit Plaintiff to commercially fish on these lakes after a delay of over one hundred years would be extremely prejudicial.  Defendant's Motion for Summary Judgment on Laches is granted with respect to hunting and fishing on inland waters.

### 2.      Lake Erie Fishing Rights

Defendant also argues Plaintiff's delay in attempting to enforce fishing rights on Lake Erie prejudices Ohio's rights of sovereignty and the recreational fishing industry.

Defendant repeatedly directs the Court to the Supreme Court's decision in *City of Sherrill v. Onieda Indian Nation*, 544 U.S. 197 (2005), for the proposition that enforcing a treaty right which inhibits state sovereignty and creates a special sovereign status for Plaintiff is inherently prejudicial. Although the Supreme Court did ultimately deny the Onieda from reclaiming reservation rights and receiving exemption from the State of New York and the City of Sherrill's regulations, this infringement on state sovereignty is distinguishable from the Ottawa's claims.  The Onieda were requesting complete freedom for all laws and regulations, including taxation, police protection, and emergency medical services, on land within the City of Sherrill.  This total deregulation of all activities is clearly an infringement on state sovereignty.  Here, however, Plaintiff requests only the

11

right to fish on Lake Erie without direct regulation by the ODNR. This partial displacement of sovereign authority may not create the same prejudices and distinguishes *Sherrill*.

Defendant correctly identifies that Ohio has a sovereign interest in managing its own natural resources. *See Maine v. Norton*, 257 F. Supp. 2d 357, 374-75 (D. Me. 2003) (Coast Guard regulations caused injury to Maine by interfering with its sovereign interest in managing its own natural resources). However, this interest must be balanced against Plaintiff's alleged treaty rights to fish in Lake Erie. The Supreme Court, in *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999) held "Indian treaty-based usufructuary rights are not inconsistent with state sovereignty over natural resources." If Plaintiff possesses a valid treaty right to fish on Lake Erie, Defendant may only enforce a regulation if it is reasonable, non-discriminatory, and a "necessary conservation measure." *See Puyallup Tribe v. Washington Game Dep't*, 391 U.S. 392, 401 (1978). Limiting ODNR's ability to enforce regulations against Plaintiff is definitely prejudicial to the state's interest in managing its own natural resources, but Defendant's argument that laches is appropriate because of this prejudice lacks the correct reasoning. The prejudice to Defendant must be a result of Plaintiff's delay. Prejudice to Defendant because of an interference with state sovereignty would have been present any time after Ohio entered the Union, and thus the prejudice was not a result of the delay but directly a result of the treaties at issue. Without specific identification of **how** Plaintiff's delay caused prejudice to Ohio's sovereignty interests, laches is unavailable.

Defendant also claims allowing Plaintiff to enforce its treaty rights and fish on Lake Erie would unfairly disrupt the long held expectations of sport anglers and commercial fishing license holders thereby prejudicing the State. Currently, Ohio and its neighboring states and provinces set limits on the number of walleye and perch caught each year in Lake Erie to protect against resource depletion. Both walleye and perch are regulated by ODNR, which limits the TAC. As such, Ohio's

12

eighteen commercial fishing licensees have a limited number of perch available each year and are strictly prohibited from commercial fishing of walleye; thereby leaving a portion of the perch catch and all of the walleye catch for sport anglers.

Defendant claims that accommodating Plaintiff's treaty rights to fish on Lake Erie will necessarily prejudice either sport or commercial fisherman.  However, Defendant has not presented any concrete evidence to support this theory.  Roger Knight, ODNR Fisheries Program Administrator, testified several times in his deposition (Doc. No. 85) that because of the changing Lake conditions and the unknowns regarding Plaintiff's possible fishing practices, he could not determine (other than general statements of negative implications) what the damage to commercial fishing operations would be (Doc. No. 85, p. 113-115).  Plaintiff presented expert testimony that the current TAC is being under-harvested and increased fishing poses no negative effects to either commercial or recreational fishing (Doc. No. 90, p. 3-4).  This disagreement raises a genuine dispute of material fact with regard to the prejudicial impact on commercial and sport fishing on Lake Erie if Plaintiff is permitted to fish unregulated.

Ohio's sovereign interest in managing its natural resources is significant, but allowing Plaintiff to fish on Lake Erie may not destroy all means of regulation, and the prejudice to Defendant does not reach the level of disruption in *Sherrill*.  Defendant's interest in protecting and maintaining its commercial and sport fishing industries is also a legitimate concern, but the prejudice of enforcing Plaintiff's alleged treaty rights is unclear.  Plaintiff and Defendant disagree over the material issue of whether the current TAC is a conservation measure or a limit imposed in an attempt to protect political and economic goals.  Furthermore, Defendant provides no specific evidence to show how Plaintiff's fishing on Lake Erie will damage or deplete the fishery resources to the detriment of both sport and commercial anglers, and instead only presents data on the current economic benefits with

13

general claims that increased fishing on the Lake will necessarily have a negative impact on the recreational fishing industry.  As such, based on the current record, summary judgment on laches is inappropriate with regard to Plaintiff's right to fish on Lake Erie.

## II.     Treaty Rights

Defendant claims Plaintiff retained no hunting and fishing rights under various treaties.  To fully understand the rights granted to Plaintiff, the Court shall address each of the treaties and their respective provisions concerning land and water rights.

### A.     Treaty of Greenville (1795)

The Treaty of Greenville, signed August 3, 1795, between the United States and various Indian nations, including the Ottawa Tribe, ended the war between the United States and the Indian nations by setting general boundary lines.  The boundary in Ohio begins "at the mouth of the Cuyahoga River" and then runs generally south following various rivers to Fort Lawrence and then westerly into what is now Indiana.[4]  Treaty of Greenville, Art. 3, May 6, 1796, 1 Stat. 460. The northern border of the treaty is disputed by the parties, Plaintiff arguing Lake Erie is within the treaty and Defendant maintaining the boundary ends at the shore and does not include the lake bed.

---

[4]

The general boundary line between the lands of the United States and the lands of the said Indian tribes, shall begin at the mouth of the Cayahoga [sic] river, and run thence up the same to the portage, between that and the Tascarawas branch of the Muskingum, then down that branch to the crossing above fort Lawrence, then westerly to a fork of that branch of the Great Miami river, running into the Ohio, at or near which fork stood Loromie's store, and where commences the portage between Miami of the Ohio, and St. Mary's river, which is the branch of the Miami which runs into lake Erie; thence westerly course to fort Recovery, which stands on a branch of the Wabash; thence southwesterly in a direct line to the Ohio, so as to intersect that river opposite the mouth of Kentucke [sic] or Cuttawa river. . . . And the said Indian tribes will allow the people of the United States, the free use of the harbors and mouths of rivers along the lakes adjoining the Indian lands, for sheltering vessels and boats, and liberty to land their cargoes where necessary for their safety.

Treaty of Greenville, Art. 3, May 6, 1796, 1 Stat. 460.

14

Plaintiff admits fishing rights on Lake Erie were not expressly mentioned, but rather were implied in Article Five's grant of "quiet enjoyment" to those lands relinquished by the United States. This argument, however, takes Article 5 out of context and fails to recognize the boundary definitions of Article 3.  Article 5 simply grants Plaintiff the use of the land free from disruption by settlers while granting the United States exclusive rights to buy the land if Plaintiff should sell.  Nothing in this Article establishes any boundary that would include Lake Erie or grants any rights on the Lake.  In order to determine which land was granted to Plaintiff and which was retained by the United States, Article 3 must be examined.

Article 3 sets the boundary lines generally from the Cuyahoga River south to Fort Lawrence and then west.  All land to the north of the boundary line, except specifically delineated outposts, remained Indian land, and the United States obtained land south of the boundary line.  However, in granting land to Plaintiff and other tribes, the United States did **not** convey Lake Erie, stopping the grant at the shoreline.

The language of Article 3 implies a separation between Lake Erie and the surrounding shore. The treaty grants the United States "the free use of the harbors and mouths of rivers along the lakes and adjoining Indian lands, for sheltering vessels and boats, and liberty to land their cargoes where necessary for their safety."  This language specifically mentions "adjoining Indian lands" which implies that the Indian land adjoins Lake Erie and, necessarily, that the Lake is not Indian land.  In addition, the treaty specifically recognizes government control over harbors and rivers, but is silent on the use of the Lake.  This silence differentiates Indian land and rivers from the Lake which is still under the control of the United States.  Both the specific language of "adjoining Indian lands" and the absence of a need for free passage on the Lake necessarily means the United States retained control and ownership over Lake Erie.

15

In addition, the Supreme Court held that navigable water, such as Lake Erie and the lake bed below, are such important resources that there is a strong presumption that a sovereign government, like the United States, would not grant away title to such property.  *See Massachusetts v. New York*, 271 U.S. 65, 88 (1926) (common law establishes land under navigable water belongs to the sovereign and there is a presumption against separation of this sovereignty by sales or grants over the water). This presumption, however, can be rebutted by "an unavoidable construction" of the granting language.  The Treaty of Greenville has no such "unavoidable construction."  None of the language in the treaty indicates, or even implies, the United States intended to relinquish Lake Erie to the Ottawa Tribe.  To the contrary, in Article 4, the United States only relinquished its claim to Indian lands "westward and southward of the Great Lakes and the waters, uniting them . . . ."  When the treaty is viewed as whole, the clear conclusion is that the United States did not grant Lake Erie to Plaintiff.

### B.       Treaty of Fort Industry (1805)

The Treaty of Fort Industry actually consists of two treaties negotiated and signed concurrently on July 4, 1805.  These treaties represent two separate parcels of land with different rights and restrictions.

### 1.       Connecticut Land Company Treaty

The first treaty (Connecticut Land Company Treaty) ceded a parcel of land identified as Royce Area 53 to the Connecticut Land Company.  The parcel includes "all the lands of said companies, lying west of the River Cuyahoga, and the portage between that and the Tuscarawa branch of Muskingum, north of the northmost part of the 41st degree of north latitude, east of a line agreed and designated in a treaty between the United States and said Indian nations, being a line north and south one hundred and twenty miles due west of the west line of the State of Pennsylvania, and south of the

16

northernmost part of the forty-second degree and two minutes north latitude . . ."  1 *American State Papers: Indian Affairs* 696 (Washington, DC, Gales and Seaton 1832).  This land, originally reserved for the Indians in the Treaty of Greenville, was conveyed to the Connecticut Land Company free and clear of any claims by the signatories, including Plaintiff.  As compensation for the land, Plaintiff received $8,917.67.  In exchange, its claims "and the posterity of said [Indian] nations shall be forever barred."  *Id.*

Defendant asserts the treaty specifically bars Plaintiff from any rights on land ceded while Plaintiff argues the treaty only concerns the land up to the shore of Lake Erie, not the Lake itself, and, irregardless, because the treaty did not expressly abrogate Plaintiff's fishing rights, the right to fish on Lake Erie was not affected.

The Connecticut Land Company Treaty specifically bars Plaintiff from any land claims in any fashion.  Plaintiff cannot reasonably maintain it has a right to hunt and fish on the lands when the treaty bars "occupation" of the land.  Even "giving effect to the terms as the Indians would have understood them," barring Plaintiff from the land could never be interpreted as allowing return for certain activities.  *See Mille Lacs*, 526 U.S. at 196.  While Indian treaty rights can only be abrogated with the clearest of language, here the treaty language is sufficiently clear, and the phrase "forever barred" unmistakably abrogates any rights Plaintiff may have possessed before signing the treaty.

Plaintiff then argues the Connecticut Land Company Treaty only extends to the shore of Lake Erie and the Treaty of Greenville governs its rights on Lake Erie.  Defendant maintains the actual language of the treaty extends the northern border to forty-two degrees and two minutes north latitude, a line extending through Lake Erie and what is now Canada.  As the Court has previously found the Treaty of Greenville did not grant Plaintiff fishing rights on Lake Erie, the issue of how far north the Connecticut Land Company Treaty extends, and if it bars Plaintiff from fishing on Lake Erie, is moot.

17

Finally, Plaintiff argues that because two treaties were signed on the same day (the Connecticut Land Company Treaty and the later discussed United States Treaty), one permitted fishing while the other silent, Plaintiff would not have understood that fishing was not permitted in Royce Area 53, the land conveyed in the Connecticut Land Company Treaty. Although Plaintiff signed two treaties on the same day, the Connecticut Land Company Treaty was not silent to Plaintiff's right to hunt and fish.  The treaty "forever barred" the signatories from occupying any of the ceded land and unequivocally prohibited any fishing.  The land conveyed by each treaty was unique, and the restrictions and grants to both the United States and Indian nations were clearly drafted. Even giving Plaintiff every benefit of both construction and understanding, it is unreasonable that the Indian nations could confuse  a land secession which allowed for continued residence with hunting and fishing rights for one which required removal from the area and a prohibition on ever returning.

**2.      United States Treaty (1805)**

The second treaty (United States Treaty) was also signed at Fort Industry on July 4, 1805, and it ceded Royce Area 54 to the United States.  The land ceded in the treaty included all lands east of a line 120 miles from Pennsylvania "bounded southerly and easterly by the line established by said Treaty of Grenville, and northerly by the northernmost part of the forty first degree of north latitude." United States Treaty, Art. 3, July 4. 1805, 7 Stat. 87. Although title to the land was transferred to the United States, Plaintiff retained its right to fish and hunt within Royce Area 54.[5]  However, Royce

---

[5]
> The said Indian nations, parties to this treaty, shall be at liberty to fish and hunt within the territory and lands which they have now ceded to the United States, so long as they shall demean themselves peaceably.

United States Treaty, Art. 6, July 4, 1805, 7 Stat. 87.

18

Area 54 does not share any border with Lake Erie, and without a border on or access to Lake Erie, the United States Treaty is inapplicable to Plaintiff's alleged fishing rights on the Lake.

### C.    Treaty of Detroit (1807)

The Treaty of Detroit was signed November 17, 1807 by members of the Ottawa Tribe and representatives of the United States.  The treaty granted land encompassing both Michigan and Ohio from several Indian tribes, including Plaintiff, to the United States.[6]  Several portions of Lake Huron and Lake St. Clair, as well as Lake Erie, were included within the boundaries of the treaty.  In consideration for the land, the United States paid money and goods to the Indian tribes and established several Indian reservations.  Article 5 of the treaty provided:  "[i]t is further agreed and stipulated, that the said Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded as aforesaid, as long as they remain the property of the United States."

Defendant argues the privilege to hunt and fish was temporary in nature and expired when the United States surveyed and sold the land.  Plaintiff understands the language "remain property of the United States" not as a requirement of title but relating to the issue of sovereignty.  In 1807, the United States and Great Britain were engaged in an ongoing territorial dispute over the lands surrounding what is now Detroit and Toledo.  This dispute, one of the primary causes of the War of 1812, was finally resolved by the Treaty of Ghent in 1814.  The Supreme Court's decision in

---

[6]

Beginning at the mouth of the Miami river of the lakes, and running thence up the middle thereof, to the mouth of the great Au Glaize river, thence running due north, until it intersects a parallel of latitude, to be drawn from the outlet of lake Huron, which forms the river Sinclair; thence running north east the course, that may be found, will lead in a direct line, to White Rock, in lake Huron, thence due east, until it intersects the boundary line between the United States and Upper Canada, in said lake thence southwardly, following the said boundary line, down said lake, through river Sinclair, lake St. Clair, and the river Detroit, into lake Erie, to a point due east of the aforesaid Miami river, thence west to the place of beginning.

Treaty of Detroit, Art. 1, Nov. 17, 1807, 7 Stat. 105.

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999), requires the Court "to give effect to the terms [of the treaty] as the Indians themselves would have understood them."  The territorial dispute between the United States and Great Britain created a great deal of confusion and uncertainty of the eventual sovereignty of the land ceded in the Treaty of Detroit.  Plaintiff argues the Indians would have reasonably understood the language to grant hunting and fishing rights so long as the land ceded remained under the sovereignty of the United States.  The Court agrees.  Reasonable construction of the treaty language shows ambiguity in whether "remain property of the United States" explains title or sovereignty. This ambiguity requires construction of the treaty in favor of Plaintiff, granting hunting and fishing rights, including the right to fish on Lake Erie.  Therefore, despite later transfer of title by the United States, the hunting and fishing rights granted under the Treaty of Detroit continued to remain in effect until the Treaty of 1831, discussed later.

### D.  Treaty of the Maumee Rapids (1817)

The Treaty of the Maumee Rapids was signed by the Wyandot and Ottawa Tribes on September 29, 1817 and ceded to the United States certain portions of land previously granted to the tribes in the Treaty of Greenville.[7]  Plaintiff argues that a section of land in Royce Area 87 protrudes

---

[7]

    Beginning at a point on the southern shore of lake Erie, where the present Indian boundary line intersects the same, between the mouth of Sandusky bay and the mouth of Portage river; thence, running south with said line, to the line established in the year one thousand seven hundred and ninety-five, by the treaty of Greenville, which runs from the crossing place above fort Lawrence to Loramie's store; thence, westerly, with the last mentioned line, to the eastern line of the reserve at Loramie's store; thence, with the lines of said reserve, north and west, to the northwestern corner thereof; thence to the northwestern corner of the reserve on the river St. Mary's, at the head of the navigable waters thereof; thence, east, to the western bank of the St. Mary's river aforesaid; thence, down on the western bank of the said river, to the reserve at fort Wayne; thence, with the lines of the last mentioned reserve, easterly and northerly, to the north bank of the river Miami of lake Erie; thence, down on the north bank of the said river, to the western line of the land ceded to the United States by the treaty of Detroit, in the year one thousand eight hundred and seven; thence, with the said line, south, to the middle of said Miami river, opposite the mouth of the Great Auglaize river; thence, down the middle of said Miami river, and easterly with the lines of the tract ceded to the

into Lake Erie and was not ceded in the treaty, thereby allowing fishing rights granted in the Treaty of Greenville to continue to apply.[8]  The Court ruled previously the Treaty of Greenville did not grant fishing rights on Lake Erie to the Indian tribes, and thus any attempt to reestablish these rights because of certain land not included within the Treaty of the Maumee Rapids is futile.  Nothing in the Treaty of the Maumee Rapids abolished Plaintiff's rights previously granted, nor did it create any fishing rights either.

Furthermore, the language of the treaty in Article 11 grants Indians the limited right to "hunt upon the land hereby ceded" in accordance with the Treaty of Greenville.  This language does not address fishing rights on Lake Erie and instead specifically refers to "the privilege of making sugar" on the land.  Although not definitive on the grants of the Treaty of Greenville, the Treaty of the Maumee Rapids does not imply that fishing on Lake Erie was ever permitted by the prior treaty, and provides no support for creating Lake Erie fishing rights.

### E.      Treaty of 1831

The Treaty of 1831 removed Plaintiff from all lands held by reservation in Ohio and established a new reservation in Kansas.  On August 30, 1831, Plaintiff and other Indian tribes signed the treaty with the United States relinquishing several tracts of land, including those reservations

---

United States by the treaty of Detroit aforesaid, so far that a south line will strike the place of beginning.

Treaty of the Maumee Rapids Art. 1, Sept. 29, 1817, 7 Stat. 160.

[8]  Plaintiff also argues the Treaty of the Maumee Rapids reenforces hunting rights previously granted in the Treaty of Greenville.  As the Court has previously found any right to hunt is barred by laches, this argument is moot.

made under the Treaty of Detroit.[9]  Plaintiff was compensated with both land in Kansas and money. In Article XVII, "the privileges of every description, granted to the Ottoway nation within the State of Ohio, by the treaties under which they hold the reservations of land herein ceded, shall forever cease and determine."  Therefore, any fishing or hunting rights previously held under the Treaty of Detroit, including any rights to fish on Lake Erie, terminated upon ratification of the Treaty of 1831.

Plaintiff argues the treaty could not apply to the water of Lake Erie because the language of Article XVII specifically includes only "the reservations of land herein ceded."  This interpretation is inconsistent with Plaintiff's argument that the Treaty of Detroit, although only granting "privileges of hunting and fishing on the lands ceded," also granted Plaintiff fishing rights on Lake Erie.  To now argue that the nearly identical language of "lands ceded" doesn't apply to Lake Erie is counter intuitive.  Plaintiff attempts to draw opposing inferences from essentially similar language in the two treaties.

Plaintiff then points to the Supreme Court's decision in *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999), which held treaty language conveying "any and all right,

---

[9]

> The band of Ottoawy Indians, residing on Blanchard's fork of the Great Auglaize river, and at Oquanoxa's village on the Little Auglaize river, in consideration of the stipulations herein made on the part of the United States, do forever cede, release and quit claim to the United States, the lands reserved to them by the last clause of the sixth article of the treaty made at the foot of the Rapids of the Miami of the Lake on the 29th of September 1817 . . ..

Treaty of 1831, Art. I.

> The chiefs, head men and warriors of the band of Ottoway Indians, residing at and near the places called *Roche de Boeuf* and Wolf rapids, on the Miami river of Lake Erie, and within the State of Ohio, wishing to become parties to this convention, and not being willing, at this time, to stipulate for their removal west of the Mississippi; do hereby agree, in consideration of the stipulations herein made for them on the part of the United States, to cede, release and forever quit claim to the United States the following tracts of land, reserved to them by the treaty made at Detroit on the 17th day of November, 1807 . . ..

Treaty of 1831, Art. II.

22

title, and interest, or whatsoever nature the same may be" to the United States was insufficient to extinguish hunting and fishing rights held by the Indians in subsequent treaties.  But the language in the Treaty of 1831 is distinct from and more specific than that addressed in *Mille Lacs*.  Here, Article XVII states "the privileges of **every** description . . . shall **forever** cease and determine."  The omission and ambiguity of "whatsoever the nature the same may be" that was present in *Mille Lacs* is not present in this treaty.  Plaintiff's rights granted under the Treaty of Detroit and the Treaty of the Maumee Rapids, including the privilege to fish on Lake Erie, were terminated by the explicit language in the Treaty of 1831.

### CONCLUSION

The hardship brought upon the Ottawa Tribe following their removal from Ohio was severe.  Despite the Tribe's identified hardships, the delay in asserting treaty rights to hunt and fish in Ohio is unreasonable.  This delay in asserting hunting and inland fishing rights is also prejudicial to Defendant, and as such laches bars recovery of these claims.  Plaintiff has, however, established a dispute of material facts surrounding the prejudice to Defendant of asserting treaty rights to fish in Lake Erie, specifically the impact of commercial fishing on current conservation levels.  Nevertheless, after examining all treaties identified by the parties, the Treaty of 1831 extinguished any treaty-based right for the Ottawa Tribe to fish in Lake Erie.  Therefore, Defendant's Motion for Summary Judgement is granted and this case is dismissed.

IT IS SO ORDERED.

            *s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 31, 2008

23